IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CORTNEY KAISER, individually, and as mother
and next friend of C.B., a minor,

Plaintiff,

v.                                                  OPINION and ORDER

THE MONROE CLINIC, INC., JAMES J. EHLE, and        19-cv-315-jdp
WISCONSIN INJURED PATIENTS AND FAMILIES
COMPENSATION FUND,

Defendants.

---

This case for medical malpractice is scheduled for a final pretrial conference on August 4, 2020. This opinion will address the parties' motions in limine, ruling on most of them and noting issues that require further discussion at the conference.

ANALYSIS

A. Kaiser's motions in limine

Kaiser filed her motions in two sets. On June 26, she filed one omnibus motion raising 30 different issues. *See* Dkt. 167. On July 17, she filed five additional motions related to recently deposed experts, as permitted by the court. *See* Dkts. 228, 232, 233, 234, 235, and 237.

1. Motion to apply Illinois law on damages issues

A threshold dispute is which state's law should apply to this case. A review of the parties' proposed instructions on this case suggests that Kaiser is assuming that Illinois will apply to all issues and defendants are assuming that Wisconsin law will apply. But neither side asks for a

general ruling on choice-of-law issues. Instead, Kaiser focuses on a few issues, beginning with damages.

Wisconsin places a $750,000 cap on "noneconomic damages" for "each occurrence" in medical malpractice cases. Wis. Stat. § 893.55(4)(d)1.[1] Kaiser contends, and defendants don't dispute, that Illinois doesn't impose a damages cap. So it isn't surprising that Kaiser wants to apply Illinois law on damages issues and defendants want to apply Wisconsin law.

The parties agree that the court must apply the forum state's choice-of-law rules. *See Auto–Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). Unfortunately, as even the Wisconsin Supreme Court has acknowledged, Wisconsin's choice-of-law jurisprudence "has had something of a checkered past." *Drinkwater v. Am. Family Mut. Ins. Co.*, 2006 WI 56, ¶ 32, 290 Wis. 2d 642, 654, 714 N.W.2d 568, 574. In *Drinkwater*, the court identified three choice-of-law tests.

Under the first test, there is a presumption that the law of the forum state applies "unless it becomes clear that nonforum contacts are of the greater significance." *Id.* at ¶ 40 (internal quotation marks omitted). If it is "not clear that the nonforum contacts are of greater significance," then the court applies five "choice-influencing factors:"

(1) Predictability of results;

(2) Maintenance of interstate and international order;

---

[1] "Noneconomic damages" are defined as "moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection." Wis. Stat. § 893.55(4)(a). There is no limitation on economic damages. *Mayo v. Wisconsin Injured Patients & Families Comp. Fund*, 2018 WI 78, ¶ 11, 383 Wis. 2d 1, 914 N.W.2d 678.

(3) Simplification of the judicial task;

(4) Advancement of the forum's governmental interests; and

(5) Application of the better rule of law.

*Id.*

Under the second test, the question is "whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Id.* at ¶ 41. The supreme court observed that this test is "related" to the presumption under the first test because "[i]t could not become clear that nonforum contacts are of the greater significance . . . if the nonforum state's contacts are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Id.* at ¶ 42.

Under the third test, the court simply applies the five "choice-influencing factors" listed above. *Id.*, at ¶ 41.

The supreme court concluded in *Drinkwater* that it would apply the first test, but it also said that it would look to the "principles" of the other tests for guidance. *Id.*, at ¶ 39. The underlying question in *Drinkwater* was whether a health plan could enforce its contractual subrogation rights to recover from the proceeds of the plaintiff's tort action. *Id.*, at ¶¶ 36–37. The court didn't say whether different tests should apply in different circumstances or different types of claims.

*Drinkwater* is the supreme court's most recent in-depth discussion of choice-of-law principles. But the Wisconsin Court of Appeals has attempted to "reconcile[e]" the different tests discussed in *Drinkwater* by synthesizing them into two steps. *See NCR Corp. v. Transp. Ins. Co.*, 2012 WI App 108, ¶ 11, 344 Wis. 2d 494, 501, 823 N.W.2d 532, 535. First, the court

3

looks at each state's contacts with the claim, such as "the locations of the injurious conduct and injury" if the claim is a tort. *Id.*, at ¶¶ 12–13. "If one state's contacts are clearly more significant, we may terminate our analysis and apply that state's law." *Id.*, at ¶ 13. If the answer at step one is not clear, then the court proceeds to step two and considers the five choice-influencing factors. *Id.*, at ¶ 14.

Federal courts "give great weight" to opinions of intermediate state courts "absent some indication that the highest court of the state is likely to deviate from those rulings." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007). *NCR*'s synthesis of Wisconsin's choice-of-law tests is a reasonable interpretation of *Drinkwater*, so this court will follow *NCR*.

The decision transferring this case from the Northern District of Illinois to the Western District of Wisconsin already considered some of the factors relevant to the first step of *NCR*'s analysis. When considering whether venue was proper in Illinois, the court asked "whether a substantial portion of the activities giving rise to the claim occurred in a particular district." Dkt. 79, at 2 (quoting *Allstate Life Ins. Co. v. Stanley W. Burns, Inc.*, 80 F. Supp. 3d 870, 877 (N.D. Ill. 2015)). In concluding that the case should be transferred to this district, the court observed that Kaiser didn't dispute defendants' contention that "the only events or omissions giving rise to the claim occurred in Wisconsin." *Id.* at 3. The court also observed that Kaiser chose to sue the Fund, which has no presence in Illinois.

This court similarly concludes that Wisconsin's contacts with the case are much more significant than Illinois's contacts. By Kaiser's own assertion, all of the alleged negligence in this case occurred in Wisconsin at a Wisconsin hospital; the injuries were incurred in Wisconsin; and Ehle and the nursing staff reside in Wisconsin. It is also undisputed that Kaiser

knew that her delivery would occur in Wisconsin. And Kaiser has sued an entity, the Fund, that is a creature of Wisconsin law.

Kaiser resists a conclusion that Wisconsin contacts are more significant, pointing out that her prenatal care occurred in Illinois. If Kaiser were alleging that defendants had provided inadequate prenatal care, the court would agree with the significance of that contact.  But throughout her filings, Kaiser insists that there were no problems with her pregnancy before she went into labor, so the location of her prenatal care has little significance. Kaiser also points out that she and C.B. lived in Illinois in 2016 and still live there today. That is one factor pointing in the direction of Illinois, but it is less significant when Kaiser knew that her delivery would be performed in Wisconsin. Finally, Kaiser says that the clinic "advertises heavily" in Illinois. Dkt. 168, at 9. That would be a factor relevant to an exercise of personal jurisdiction over defendants in Illinois, *see uBID, Inc. v. GoDaddy Group, Inc.*,  623 F.3d 421, 427 (7th Cir. 2010), but Kaiser cites no authority for the view that advertising in a state is a relevant contact under a choice-of-law analysis in a case that has nothing to do with advertising. And Kaiser doesn't contend that she chose defendants as her medical provider because of advertisements in Illinois. At most, advertising would be a minor factor to consider. It doesn't overcome the more significant contacts that the case has with Wisconsin.

Courts following *Drinkwater* have consistently applied the law of the state that has the most significant contacts with the plaintiff's claims. *See In re Jafari*, 569 F.3d 644, 650 (7th Cir. 2009); *Fox v. Iowa Health Sys.*, 399 F. Supp. 3d 780, 793–94 (W.D. Wis. 2019); *Extrusion Dies Indus., LLC v. Cloeren Inc.*, No. 08-CV-323-SLC, 2008 WL 4401219, at *3 (W.D. Wis. Sept. 24, 2008); *NCR*, 2012 WI App 108, at ¶¶ 21–22; *Kender v. Auto-Owners Ins. Co.*, 2010 WI App 121, ¶ 22, 329 Wis. 2d 378, 391–92, 793 N.W.2d 88, 94–95. But even if it is necessary to

consider the factors in step two of the *NCR* analysis, Kaiser points to no factors that would clearly favor applying Illinois law. Subjecting Wisconsin medical providers to different damages laws based on the residence of the patients would not lead to more predictable results than a consistent rule based on the location of the services provided; applying Illinois law wouldn't be simpler than applying Wisconsin law; and applying Illinois law wouldn't advance the forum's governmental interests.

Kaiser's most developed argument is on the factor for "maintenance of interstate order," which "requires that a jurisdiction which is minimally concerned defer to a jurisdiction that is substantially concerned." *Drinkwater*, 2006 WI 56, at ¶ 50. Kaiser contends that Illinois's interest in her damages is greater than Wisconsin's interest because Illinois has an interest in insuring that its residents receive adequate compensation for their injuries. She cites cases from other jurisdictions in which courts have concluded that the state where the plaintiff is domiciled has the strongest interest in making sure that the plaintiff is fully compensated. *E.g.*, *Schoeberle v. United States*, No. 99 C 0352, 2000 WL 1868130, at *5 (N.D. Ill. Dec. 18, 2000); *Martinez v. Smithway Motor Xpress, Inc.*, No. 99 C 6561, 2000 WL 1741910, at *4 (N.D. Ill. Nov. 24, 2000).

Kaiser cites no cases that have adopted this view under Wisconsin law. And the cases she cites don't fit comfortably within Wisconsin's framework. One cannot plausibly contend that Wisconsin is only "minimally concerned" with the damages awarded against a Wisconsin hospital and a Wisconsin entity that was created by the state legislature.

Even if the court were to accept a general rule that the state where the plaintiff is domiciled has the greatest interest in damages, Kaiser's decision to name the Fund as a defendant changes the calculus. The purposes of the Fund are to "pay[] that portion of a

medical malpractice claim which is in excess of the limits expressed in s. 655.23(4) or the maximum liability limit for which the health care provider is insured, whichever limit is greater, pay[] future medical expense payments under s. 655.015, and pay[] [certain] claims." Wis. Stat. § 655.27(1). In other words, "the Fund pays medical malpractice claims in excess of the health care provider's insurance coverage amount." *Mayo*, 2018 WI 78, at ¶ 6. Thus, suing the Fund gives Kaiser a level of protection that she otherwise wouldn't have. And, as the Fund points out, it can be sued only under Wisconsin law. *See* Wis. Stat. § 655.27(5). By naming the Fund as a defendant, Kaiser is taking advantage of the benefits of *Wisconsin* damages law that aren't provided under Illinois law. These benefits were important enough to Kaiser that she chose to keep the Fund in the case even when doing so threatened her choice of forum in Illinois.

Kaiser fails to explain how she can seek relief against the Fund while also relying on Illinois damages law. In fact, her motion completely fails to account for the Fund's presence in this case.

Kaiser also makes an argument under the fifth factor: which state has the "better rule of law?" Kaiser contends that Illinois has the better rule because the Wisconsin's damages cap is "arbitrary." Dkt. 168, at 16. For their part, defendants contend that Wisconsin's law is "better" because it represents an accommodation of multiple interests: ensuring that victims of medical malpractice receive compensation while keeping health care affordable in Wisconsin. *Mayo,* 2018 WI 78, ay ¶ 47.

As this court has noted before, there is limited guidance on what "better" means: "Better for whom? Better in what way?" *Extrusion Dies*, 2008 WL 4401219, at *4. Both sides make fair points, but the court doesn't view this factor as giving courts carte blanche to pick and choose

7

the law they prefer. Perhaps in a case in which the states' contacts were more or less equal, the court's view of which state's law was more equitable could be viewed as a tiebreaker. But in this case, Wisconsin's contacts are clearly more significant. And because Kaiser herself chose to invoke the benefits that Wisconsin law provides, the court cannot say that applying Wisconsin law in this case is inequitable.

So this motion is DENIED. The court will apply Wisconsin law on damages, but the court will not instruct the jury on the damages cap or allow the parties to refer to the cap during trial. As is this court's usual practice, any reduction to the verdict will be made after trial.

### 2. Motion to apply Illinois law on causation issues

The parties agree that there is a conflict between Wisconsin and Illinois law on causation. But Kaiser simply repeats the argument she made in motion in limine no. 1. She identifies no new issues related to causation that would counsel in favor of applying Illinois rather than Wisconsin law. So this motion is DENIED.

### 3. Motion regarding collateral source payments

Kaiser contends that Wisconsin and Illinois law conflict on the use of collateral source payments as evidence at trial. But she doesn't explain what the conflict is or even explain Illinois's rule. In any event, the court is applying Wisconsin law to all other legal issues, so it will apply Wisconsin law to this issue as well. The court will give an instruction based on Wis. JI–Civil 1757 that informs the jury that it can consider collateral source payments for the purpose of determining the value of medical services provided, but that it may not use those payments to reduce any award. The court declines to grant Kaiser's request to order defendants to submit to the court *in camera* all evidence related to collateral source payments so that the court can screen the evidence before admitting it. But if defendants haven't done so already,

they are directed to identify for Kaiser what evidence related to collateral source payments they intend to offer so that Kaiser can object to any specific evidence.

### 4. Motion to "deem Cortney Kaiser an appropriate next friend for C.B., or in the alternative, for court instruction"

Kaiser asks the court to "deem" her to be "an appropriate next friend for C.B." under Federal Rule of Civil Procedure 17(c)(2). But no party is challenging Kaiser's status as C.B.'s next friend, and questions about capacity to sue can be waived, *see RK Co. v. See,* 622 F.3d 846, 850–51 (7th Cir. 2010), so this motion is DENIED as moot.

### 5. Motion to "bar the opinions of Jerome Barakos or in the alternative to bar opinions disclosed at his deposition"

Barakos gave an opinion about the timing of C.B.'s injuries. Kaiser asks the court to bar Barakos's testimony on the ground that he filed a supplemental report that changes his opinion. But the court has already addressed this issue by granting defendants' motion to allow Barakos to file a supplemental report. Dkt. 191. As explained in that order, the supplemental report doesn't contain any new opinions, so this part of Kaiser's motion is DENIED. In both reports, Barakos's opinion is that C.B.'s brain injury occurred before birth.

Alternatively, Kaiser asks for permission to cross examine Barakos with his original report to note the discrepancies. The court's previous order already gave Kaiser permission to do that, so this part of the motion is GRANTED.

Kaiser also asks the court to bar the opinion that "C.B. suffered a stroke before labor and delivery" because Barakos "conceded that this opinion was not in his expert report." Dkt. 172, at 3. Kaiser includes no citations to the record to support this allegation, but defendants cite a section from Barakos's deposition in which he gives an opinion that C.B. suffered a "PCA stroke" and then answers, "I don't believe so" to the question, "[w]as the right

9

PCA stroke written anywhere in your disclosures?" Dkt. 215-3 (Barakos Dep. 68:23–69:1, 71:16–18).

Defendants say that a stroke is the same thing as an "embolic injury," which is mentioned in Barakos's report. Specifically, the report says that an MRI of C.B. "also demonstrates asymmetrical cortical abnormalities that are somewhat focal and could be the result of a superimposed embolic injury." Dkt. 215-2, ¶ 5. The court sees no problem with Barakos explaining that a stroke is a type of "embolic injury," but defendants' argument raises a different question, which is whether a single sentence in a report that abnormalities in an MRI "could be" the result of a stroke is a sufficient basis to support the opinion that Barakos gave in his deposition. Kaiser didn't anticipate that question in her motion, so the parties should be prepared to discuss it at the final pretrial conference.

### 6. Motion for leave to conduct attorney voir dire

This motion is DENIED. The court itself conducts voir dire in this district, relying on input from the parties. The court isn't persuaded that attorney-conducted voir dire is needed in this case.

### 7. Motion to grant Kaiser "leave to file her expert reports"

Kaiser says that she timely disclosed her expert reports, but she "inadvertently did not e-file these expert reports, pursuant to this Court's procedures for electronic filing," Dkt. 174, so she asks the court for permission to file them now. This motion is GRANTED as unopposed.

### 8. Motion "regarding additional genetic testing"

Steiner is one of defendants' causation experts; he refers to himself as a pediatric genetics clinician. Kaiser makes a broad attack on Steiner's opinions in a later motion, *see infra*, § A.31, but this motion is focused on Steiner's opinion that, "[h]ad [more genetic] testing been

done, it could have very likely revealed a genetic or metabolic disorder." Dkt. 109, at 2. Kaiser contends that the testimony should be excluded because it is speculative.

The court agrees that it is inherently speculative to testify about what a test that was never administered would have showed. Defendants do not contend that Kaiser thwarted their attempts to conduct their own examination under Federal Rule of Civil Procedure 35, and they do not contend that they are entitled to an adverse inference in light of any failure by Kaiser herself to conduct additional testing.

It is one thing to offer testimony that the available evidence suggests that C.B.'s injuries were caused by a genetic defect. But defendants cite no authority for the view that it is permissible under the federal rules of evidence to speculate about what evidence that is not available to the jury would or would not show. Even if defendants could meet the requirements for presenting expert testimony under Rule 702, the court would find that any probative value of such testimony is substantially outweighed by unfair prejudice and the risk of confusing the jury. This motion is GRANTED.

### 9.  Motion to exclude the testimony of expert Mark Simms

Simms offers opinions about C.B.'s life expectancy. Defendants say that he is an expert in developmental pediatric medicine.

Kaiser raises two objections to Simms's opinions: (1) Simms admitted that he couldn't interpret the table he was relying on for his life expectancy opinion; (2) Simms stated that C.B. would have a reduced life expectancy as a result of both his cerebral palsy and his Lennox-Gastaut Syndrome (a type of epilepsy), but Simms didn't explain how those two conditions interact with each other, and he admitted that he couldn't quantify the reduction.

Simms gives three opinions about life expectancy in his report. First, he says:

11

> Given [C.B.'s] profile of severe disabilities, the need for a
> gastrostomy tube to achieve adequate growth, the presence of
> medically intractable seizures (Lennox-Gastaut syndrome), and
> his clinical presentation at the time of my examination, it is my
> opinion, to a reasonable degree of medical certainty, that there is
> less than a 50% probability that Colton will live to age 27 years.

Dkt. 158, at 12. Simms then gives two more opinions based C.B.'s ability to roll over:

> [I]f he is capable of complete independent rolling, it is my
> opinion, to a reasonable degree of medical certainty, that there is
> a less than 50% probability the Colton will live to age 33 years. If
> he cannot even partially roll independently, there is less than a
> 50% probability that he will live to age 20 years.

*Id.* During his deposition, Simms acknowledged that C.B. could roll over, Dkt. 134 (Simms

Dep. 96:2–21), so Simms's opinion during the deposition was that there was a less than 50

percent probability that C.B. will live to age 33.

Simms doesn't say in his report where any of his numbers comes from, but he discusses

the "Brooks article" in his deposition. Dkt. 134 (Simms Dep. 48:5–8). This article doesn't

appear to be in the record, but Kaiser says that it is called "Recent trends in cerebral palsy

survival. Part II: individual survival prognosis." Dkt. 176, at 5. Simms refers to "Table II,"

which he says is called "Probability That A Four-Year-Old Child With Cerebral Palsy Will

Survive to Ages 10, 15, 20, 25 and 30 years." Dkt. 134 (Simms Dep. 51:4–6). During his

deposition, Simms was also asked about "Table III," which Kaiser says is called "Life

expectancy: additional years (standard error) for adolescents and adults with cerebral palsy."

Dkt. 176, at 6.  Table III includes a list of different ages, including 15 years, and predicts how

many additional years the person will live, depending on different factors. When Kaiser's

counsel asked Simms about Table III, he said:

> I'm not a statistician. I didn't write this paper. I don't know what
> went into deriving these numbers, and I'm not relying upon this
> because he's not 15. I'm relying upon Table II because he's almost

12

> four. . . . I'm not in a position to be able to account for these discrepancies [between the two tables]. You'd have to ask the people who wrote these papers and what calculations they used to derive this.

Dkt. 134 (Simms Dep. 74:3–17). From this testimony, Kaiser says that Simms admitted that he "is not qualified to interpret the tables in the article he relies upon." Dkt. 176, at 7.

As defendants point out, most of the confusion during the deposition was about Table III, which Simms didn't rely on in his report. Nevertheless, Simms's testimony suggests more generally that he has very limited knowledge about the basis for the numbers in Table II and whether those numbers are reliable. It appears that Simms is simply reading numbers off a table in the Brooks article, raising the question whether he has sufficient expertise in this area and whether his opinion would be helpful to the jury. The court is inclined to exclude his life-expectancy opinions, but it will reserve a ruling on this motion until the final pretrial conference.

In addition to her general objection, Kaiser asks the court to exclude any opinion that Lennox-Gastaut Syndrome reduces C.B.'s life expectancy. In his report, Simms lists Lennox-Gastaut Syndrome as one reason that C.B. will have a reduced life expectancy. In his deposition, Simms says that the opinion in his report doesn't take Lennox-Gastaut into account, so C.B.'s life expectancy is actually less than 33 years. Dkt. 134 (Simms Dep. 43:6–10). He doesn't identify a specific reduction, but he again relies on the Brooks article for the proposition that "children with Lennox-Gastaut syndrome have a 14 times greater mortality." *Id.* at 47:12–14.

Defendants oppose this part of Kaiser's motion, but they acknowledge in their response that Simms's discussion of the effect of Lennox-Gastaut Syndrome on C.B.'s mortality does not change his overall opinion on C.B.'s expectancy. Dkt. 232, at 32. If it doesn't change

Simms's opinion, then its not clear what purpose the testimony would serve except to confuse the jury. So this part of Kaiser's motion is GRANTED.

10. **Motion to preclude question about why Kaiser didn't request a caesarian section**

This motion is GRANTED as unopposed for the most part. There is no dispute that whether Kaiser requested a C-section is irrelevant. But Kaiser also asks the court to give "the defendant, the witnesses called by the defense and defense counsel" the following instruction:

> (a) Not to mention, refer to, interrogate concerning, voluntarily answer or attempt to convey before the jury, at any time during these proceedings in any manner, either directly or indirectly, the matters as stated above without first informing the Court and obtaining permission of the Court at sidebar or in chambers, outside the presence and hearing of the jury;
>
> (b) Not to make any reference or inference to the fact that this Motion has been filed, argued or ruled upon by the Court; and
>
> (c) To warn and caution each witness appearing in this litigation strictly comply with the ruling of the Court.

Kaiser repeats this request for some of her other motions in limine as well. The court is not persuaded that giving such an instruction is necessary, so this aspect of Kaiser's motion is DENIED. The court expects counsel to communicate with their witnesses about rulings that may implicate a witness's testimony.

Defendants raise a new issue in their response to this motion. Specifically, they contend that Kaiser should be precluded from testifying that she would have agreed to a C-section if defendants had recommended it. But that's a different issue. One of Kaiser's main theories is that defendants were negligent because they didn't perform a C-section. So to prove causation, Kaiser will have to testify that she would have agreed to a C-section if Ehle had informed her that it was medically appropriate. So this request is DENIED.

**11.  Motion to allow evidence of Ehle's statement, "We need to get this baby out"**

This motion is GRANTED as unopposed.

**12.  Motion to exclude evidence of Kaiser's "unrelated surgeries"**

Kaiser wants to exclude evidence that she had an appendectomy and an abdominoplasty ("a tummy tuck") years before her pregnancy because defendants haven't pointed to any evidence that these other surgeries played any role in harming C.B. Defendants say that they do not "generally" oppose the motion, but they want to leave the door open to impeach Kaiser if she testifies that "she has never had surgery or that she was unfamiliar with medical procedures." Dkt. 213, at 12. Defendants don't explain why that testimony would be relevant, so this motion is GRANTED. If defendants believe that Kaiser has opened the door to evidence about her past surgeries during trial, they should request a sidebar and seek permission from the court before offering such evidence.

**13. Motion to exclude "hearsay from medical providers"**

Kaiser seeks to exclude testimony that none of the medical providers involved in her delivery told her that they acted negligently. This motion is GRANTED as unopposed.

**14.  Motion to exclude references "to verdicts from other cases and tort reform"**

Kaiser asks the court to exclude references to other tort cases and to verdicts in those cases. This motion is GRANTED as unopposed. Neither side may refer to other cases, but defendants are not precluded from contending that Kaiser's damages request is excessive.

**15. Motion to "exclude reference to the Wisconsin Injured Patients and Families Compensation Fund and to limit arguments and examinations of counsel for the defense"**

This motion has two parts. First, Kaiser asks that the Fund not be mentioned to the jury. Second, Kaiser asks that counsel for the Fund and the other defendants be treated as one

unit, so that only one lawyer for the defense questions each witness and that Kaiser "be allowed the same amount of time as both defense presentations." Dkt. 182, at 1.

The Fund has a strong interest in the outcome of this case, and it could be required to pay a significant portion of any judgement entered. So the Fund should be allowed to participate at trial.

But it's also true that the Fund's existence isn't relevant to any issue that the jury needs to consider. And identifying the Fund in front of the jury could lead to confusion. At the least, it would require carefully worded jury instructions that explain the reasons the Fund is participating in the case. None of the parties explain how other courts have dealt with the Fund during trials in the past.

The court will reserve a ruling on the question whether lawyers for the Fund need to be identified as lawyers for the Fund or whether they may be treated as simply part of the team representing defendants. But regardless whether the Fund is identified, the court isn't inclined to allow an already lengthy trial to be extended further by allowing witnesses to be questioned by multiple lawyers from the same side. The court expects defendants and the Fund to choose one lawyer to conduct direct or cross examination of each witness. They should collaborate before trial to decide which lawyer that will be and what questions they will ask. If they cannot agree, they can bring their disputes to the court.

The court will not grant Kaiser's request to "put forth evidence of insurance premiums paid by Dr. Ehle and the Monroe Clinic, as well as the amount of funds available." Dkt. 182, at 2. Even if the Fund is identified as a separate party, those issues are not relevant to any issue that the jury will decide.

**16. Motion to preclude argument that "a judgment against defendant would burden taxpayers or the public"**

This motion is GRANTED as unopposed. Neither side may argue about the potential effect of the judgment on taxpayers.

**17. Motion to preclude argument that Kaiser "did not call all the physicians, nurses, or other health care providers as witnesses because their testimony would in some manner be unfavorable to" Kaiser**

This motion is GRANTED. In this circuit, a part may ask the jury to draw an adverse interest about the testimony of a missing witness only if: (1) the missing witness was physically available only to the party against whom the inference would be drawn; or (2) the missing witness has a relationship with that party that practically renders the testimony unavailable to that party's adversary. *See* Seventh Circuit Civil Pattern Instruction 1.19, Committee Comment. Neither side contends that it can meet that standard, so neither side may ask the jury to speculate about the potential testimony of a witness who didn't testify.

**18. Motion to preclude argument that "defendants' personal reputation is at stake or is otherwise held in the balance"**

This motion is GRANTED as unopposed. Neither side may argue about the potential effect of a verdict on the defendants' reputation.

**19. Motion to preclude evidence about settlement negotiations**

This motion is GRANTED as unopposed.

**20. Motion to exclude evidence "regarding the circumstances under which attorneys for the Plaintiff were employed, retained, and fee agreement in the event of recovery"**

Defendants say that they "generally do not oppose" this motion, but they wish to keep the door open in case "the timing of when the plaintiff hired counsel becomes an issue in this case." Dkt. 213, at 40. Defendants don't explain why that timing would be relevant, so this

17

motion is GRANTED. If defendants believe that evidence about Kaiser's relationship with her lawyers becomes relevant at trial, they may move for reconsideration.

### 21. Motion to exclude evidence of defendants' "good character or reputation"

Defendants object to this motion, contending that they should be permitted to offer evidence of their "professional reputation" because that isn't barred under Federal Rule of Evidence 404, which prohibits propensity evidence. But there is a more fundamental issue, which is that it simply isn't relevant what defendants' reputation is. And if defendants mean to contend that they generally do a good job with deliveries, then that is propensity evidence. So this motion is GRANTED.

Defendants also contend that they should be permitted to testify about their "medical knowledge, training, experience, and professional acumen . . . as background information." Dkt. 213, at 41. The court doesn't understand Kaiser's motion to be targeted at that type of evidence. The court will allow witnesses to provide succinct background information. But the court will not allow testimony about what others think of them or their own views about their character traits.

### 22. Motion to sequester witnesses

Kaiser wants the court to sequester "all non-party witnesses." Dkt. 167, at 7. This motion is GRANTED in part and DENIED in part. The court's general practice is to allow each party to pick *one* witness who will represent the party under Rule 615(b), and to exclude experts from the sequestration order. Defendants list four party representatives for the clinic in their response to this motion, so they must pick one of those four to serve as a representative. The parties don't discuss how Rule 615 should be applied to the Fund, so we will discuss that issue at the final pretrial conference.

### 23. Motion to bar leading questions "of any adverse witness called by" Kaiser

This motion is simply too broad to allow the court to give a definitive answer. Leading questions of a "friendly" witness are generally prohibited under Rule 611(c), but, as defendants point out, "[t]here is no blanket prohibition of such questions. They are permissible when used against adverse witnesses, usually in cross-examination, or when used with friendly witnesses to move direct examination along rather than to elicit testimony damaging to the opposing party that the witness might not have given in response to a neutral question." *United States v. Cephus*, 684 F.3d 703, 707–08 (7th Cir. 2012). The court cannot provide more guidance than that, so this motion is DENIED as too broad. If either side believes that counsel is using leading questions improperly, they will have to raise that objection at the time.

### 24. Motion to preclude a "golden rule argument"

Kaiser asks the court to preclude defendants from asking the jury to "stand in the shoes" of defendants. This motion is GRANTED as unopposed. Neither side may ask the jury to view the evidence from that side's perspective.

### 25. Motion "regarding lawsuits against plaintiff's experts"

Kaiser asks the court to preclude questioning about whether an expert has been sued for malpractice or has been negligent in the past. Defendants do not oppose this motion as it applies to prior lawsuits against experts. But they say that they "are permitted to ask expert witnesses about their care and treatment of patients and are permitted to ask if they have been negligent in their professional careers or otherwise." Dkt. 213, at 47. But defendants don't explain why such questioning would be relevant to the issues the expert is testifying about. So this motion is GRANTED. If defendants can identify a relevant purpose for asking an expert about past negligence, they may raise that issue at the final pretrial conference.

**26. Motion to preclude evidence or argument that Timothy Babler doesn't pay child support**

During her deposition, Kaiser said that C.B.'s father, Timothy Babler, doesn't pay child support, and she asks the court to exclude as irrelevant any evidence of that during trial. Defendants' only response is to ask that the motion be "taken under submission until such time as Mr. Babler and Courtney Kaiser testify." Dkt. 213, at 47. Defendants haven't offered a relevant purpose for this evidence, so this motion is GRANTED. If defendants believe that evidence about payment of child support is relevant for impeachment or any other purpose at trial, they may seek permission from the court to offer it then.

**27. Motion to bar evidence or argument "regarding (1) the intentions of attorneys representing plaintiffs, (2) the trial strategy of attorneys representing plaintiffs, and (3) common practices of attorneys representing plaintiffs"**

Kaiser says that she filed a separate brief to support this motion, but no brief is on the docket. That being said, it is difficult to see the relevance of the "intentions" or "common practices" of either side's attorneys. But it isn't clear what Kaiser means by "trial strategy," which could be an appropriate issue for a closing argument, depending on context. Kaiser will have to clarify what she means at the final pretrial conference.

**28. Motion to preclude references to Kaiser's motive in filing the lawsuit**

Again, defendants only response to this is that the motion "should be taken under submission." Dkt. 213, at 48. The court sees no relevance to Kaiser's motive in bringing the lawsuit, so this motion is GRANTED.

**29. Motion to allow use of exhibits during opening statements**

The court's general practice is to allow parties to use exhibits during opening statements, so this motion is GRANTED. This doesn't mean that the parties may use any exhibits they

wish. The court requires the parties to provide the other side no later than 5:00 p.m. on the Friday before trial any exhibits they intend to use during opening statements. If the parties have any specific concerns about particular exhibits, they may raise those concerns at the final pretrial conference.

### 30. Motion to preclude argument that Kaiser has "acted improperly in any way by interviewing any witness for the purpose of learning what the witness will testify to at trial"

Again, defendants do not "generally" oppose this motion. But they say that they "are not aware of everyone the plaintiff interviewed," so they "cannot know if all such interviews were proper or improper. For example, if a plaintiff interviews a witness that is represented by counsel, without contacting the witness' attorney, that would be improper." Dkt. 213, at 49–50. But if defendants believe that Kaiser improperly interviewed a witness, that is a matter to raise with the court. Defendants don't explain why this would be an issue for the jury, so this motion is GRANTED.

### 31. Motion to exclude testimony of Robert Steiner

The court has already concluded in the context of motion in limine no. 8 that Steiner may not give opinions about what tests never administered might show. (As a reminder, Steiner is one of defendants' causation experts, and he refers to himself as a pediatric genetics clinician.) This motion is a broader attack on Steiner's report generally.

Kaiser summarizes Steiner's opinion to be that "C.B.'s injuries are genetic in nature, metabolic in nature, or developmental in nature," and Kaiser says that he purports to employ a differential etiology method. Dkt. 232, at 1. "[I]n a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment."

*Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Kaiser seeks to exclude Steiner's testimony on the ground that Steiner failed to "rule in" a genetic, metabolic, or developmental diagnosis and failed to properly "rule out" the possibility that intrapartum hypoxic ischemic encephalopathy ("HIE") caused C.B.'s injuries.

Steiner's report is only three pages long, but it lists six opinions:

1.   CB's "injuries" are consistent with a developmental/genetic/metabolic etiology.

2. Any developmental/genetic and/or metabolic causes were not the result of anything that was done or not done during the labor and delivery process.

3.  CB's providers tested for some genetic and metabolic conditions demonstrating that they had concerns and were questioning the possibility of metabolic and/or genetic causes to CB's condition. The limited genetic testing performed does not exclude, rule out or refute the presence of a developmental/genetic and or metabolic cause. Parents declined further genetic evaluation and follow up.

4. CB does not fulfill international consensus criteria to determine a severe acute hypoxic event as a potential cause of brain injury/cerebral palsy as specified by the medical literature (e.g. MacLennan AH et al, 2015). For example, CB had good Apgar scores (4,9) and Dr. Steiner does not believe that CB suffered from multi-organ system failure nor were his blood gas pH levels indicative of birth trauma causing permanent neurologic impairment. He required on[ly] minimal non-invasive resuscitation at birth and was allowed to room with mother.

5.  CB has microcephaly; spastic quadriplegia; global developmental delays; cortical visual impairment; dystonia; myoclonic-tonic, atonic and possibly atypical absence seizures,; Lennox Gastaut syndrome; and an aberrant subclavian artery which are all clinical signs of genetic/metabolic conditions.

6. Recent research and cohort studies have shown that many children diagnosed with neonatal encephalopathy and/or cerebral palsy initially thought to have been due to birth events are actually misdiagnosed. Upon sophisticated genetic and metabolic

> testing, these children are frequently found to have genetic or
> metabolic causes.

Dkt. 109, 1–2.

Steiner provides one paragraph of additional explanation for these opinions:

> The child's infarcts, seizures, Lennox Gastaut syndrome,
> dystonia, cortical visual impairment, and developmental delays
> can all be explained by a developmental disorder or genetic or
> metabolic disease as opposed to hypoxic ischemic encephalopathy
> (HIE). Additionally, there was no sentinel event, no placental
> abruption, no uterine rupture, no bleeding, etc. that would
> indicate a cause for HIE. There was minimal genetic work-up and
> testing done and the treating geneticist actually requested the
> family submit to additional genetic testing and follow up which
> they denied. Had such testing been done, it could have very likely
> revealed a genetic or metabolic disorder.

Steiner's report can be summarized into three key opinions: (1) the available evidence doesn't support a finding that C.B.'s injuries were caused by HIE; (2) the available evidence supports a finding that C.B.'s injuries were caused by genetic, metabolic, or developmental factors; and (3) additional genetic testing could provide additional evidence that C.B.'s injuries are genetic in nature. The court has already determined that (3) should be excluded.

As for Steiner's other two opinions, he doesn't go so far as to say that "C.B.'s injuries are genetic in nature, metabolic in nature, or developmental in nature," as Kaiser contends. Rather, his opinion is more cautious. He simply says that the evidence "is consistent with" those causes. Defendants rely on *Felde v. Kohnke*, 50 Wis. 2d 168, 183, 184 N.W.2d 433, 441 (1971), which says that the party without the burden of proof "may attempt to weaken the claim for injuries with medical proof couched in terms of possibilities" rather than probabilities. Kaiser doesn't challenge the application of *Felde* to this case.

But *Felde* doesn't excuse Steiner from the requirements of Rule 702 or Rule 26. Steiner's support for his opinion about a genetic or metabolic cause is limited to a list of C.B.'s

problems that Steiner says are "clinical signs of genetic/metabolic conditions." He doesn't explain *why* he believes those problems are signs or a genetic or metabolic condition. Steiner's explanation of his opinion about HIE is only a bit more specific. He identifies "international consensus criteria" for HIE, and he identifies the criteria that C.B. doesn't satisfy.

At this point, the court would be inclined to allow Steiner to offer his opinion about HIE at trial, but it would exclude his opinion about "genetic/metabolic/developmental" factors. But the court will reserve a ruling until the final pretrial conference.

**32. Motion to preclude Timothy Reilly from testifying about "irrelevant facts"**

Timothy Riley is defendants' retained vocational assessment expert. Kaiser seeks to exclude testimony on certain subjects raised during Riley's deposition: (1) from whom Kaiser bought her home; (2) the size of her home; and (3) the amount of care that C.B.'s father (Tim Babler) provides for C.B. This motion is GRANTED as unopposed.

**33. Motion to preclude Nurse Zimmerman from "interpreting Monroe's policies and procedures"**

Crystal Zimmerman is one of the nurses who cared for Kaiser during her labor. Kaiser contends that Zimmerman should be precluded from giving testimony about her understanding of the Clinic's policies or an opinion on whether nursing staff complied with those policies because she hasn't disclosed those opinions. Defendants oppose this motion, but it isn't clear why. They don't contend that Zimmerman has disclosed opinions about compliance with policies, and they don't ask the court to give Zimmerman permission to testify about the clinic's policies. Rather, their position is that the policies aren't relevant. So this motion is GRANTED.

### 34. Motion to exclude Michael Msall's undisclosed opinions and opinions in the supplemental report

Msall is a neurodevelopmental, developmental, and behavioral pediatrician. He is offered as an expert on both causation and damages.

Kaiser seeks to exclude Msall's testimony on the ground that defendants didn't provide requested information before his deposition. Specifically, Kaiser points to four things: (1) Msall's fee schedule; (2) Masall's billing records; (3) the list identifying the cases Msall testified as an expert witness in the past four years; and (4) Msall's notes. But Kaiser doesn't provide any context for what happened, she doesn't contend that she was prejudiced by the failure, and she doesn't explain why exclusion would be an appropriate sanction. So Kaiser's motion to exclude all of Msall's testimony is DENIED.

Alternatively, Kaiser says that the court should exclude any testimony that comes from Msall's two-page supplemental report, Dkt. 186-21, because it violates the following passage from the preliminary pretrial conference order:

> Supplementation of an expert's report pursuant to Rule 26(e) must be in writing and must be served not later than five calendar days before the expert's deposition, or before the general discovery cutoff if no one deposes the expert. Supplementation under Rule 26(e) is appropriate only to correct mistakes and oversights, not to include new examples, illustrations, or analyses that could have been included in an original expert report. Any further expert report is allowed only by stipulation of all parties, or by leave of court.

Dkt. 90, at 3.

Kaiser acknowledges that she received the supplemental report 10 days before Msall's deposition, but she says that it was untimely because the opinions in the new report "could have been included in his original report." Dkt. 235, at 3. In response, defendants say that the supplemental report is based on "updated UW health records" that defendants didn't receive

until after Msall issued his original report. Dkt. 245, at 18. Defendants also say that Msall's supplemental report relies on the reports of other experts that Msall received after the original report.

Defendants don't clearly explain what purpose the supplemental report serves. Msall's original report was focused on the opinion that "C.B.'s injuries were not the result of an event that occurred during the labor and delivery or caused by any action or inaction on the part of the labor and delivery providers." Dkt. 117, at 2. The supplemental report is primarily a description of C.B.'s care, challenges, and abilities. Dkt. 186-21. He concludes with the following sentence: "The course of CB from neonate to preschooler, the conditions he has displayed and the treatments he has received are wholly consistent opinions stated above as to the etiology, and absence of causation of the intrapartum period." Dkt. 186-21, at 2. But he doesn't explain what he means by that or connect his observations to his conclusion.

The bottom line is that defendants didn't seek court permission to file the supplemental report, so Kaiser's motion to exclude testimony based on the supplemental report is GRANTED. In any event, the court doesn't see how the information in the supplemental report would be helpful to the jury because Msall doesn't explain any of his conclusions in the report.

### 35. Motion to exclude Dr. Gilles's opinions about "unknown potential causes"

Elizabeth Gilles is a pediatric neurologist. She is offered as an expert on causation. Kaiser doesn't challenge Gilles's testimony generally, but she asks the court to exclude Gilles's opinion that "the specific cause of [C.B.'s] injuries may not be able to be known." Dkt. 108, at 8.

In response, defendants "reassert" their response to Kaiser's motion to exclude Steiner's testimony. Defendants don't explain what they mean by this, but the court understands

defendants to be contending that their experts aren't required to give opinions with certainty. If that is what defendants are contending, it's not persuasive in this context. Kaiser is challenging this opinion on the ground that it simply isn't helpful, and the court agrees. Gilles may explain the reasons why she believes that C.B.'s injuries weren't caused by HIE. And she may explain why she believes it is difficult to determine the cause of the injuries that C.B. has sustained. But a conclusory opinion that the cause of an injury "may not be able to be known" doesn't help the jury decide anything. So this motion is GRANTED.

## B. Defendants' motions in limine

The Clinic and Ehle filed one omnibus motion in limine that raises 24 different issues. Dkt. 146. They also filed a separate motion to limit the testimony of Kaiser's experts. Dkt. 216.

### 1. Motion to preclude evidence or argument about "medical safety rules," "patient safety rules," or other similar terminology that seek to redefine the standard of care as it applies in this case

Defendants say that the purpose of this motion is to prevent Kaiser from relying on the "Reptile Theory" to persuade the jury. They cite *Hodgson v. Wisconsin Cent. Ltd.*, No. 19-cv-15-jdp, 2020 WL 3251187, at *8 (W.D. Wis. June 16, 2020), for the proposition that this court has granted similar motions in limine in the past. But *Hodgson* actually declined to grant such a motion because its scope was "simply too broad and ill-defined." *Id.* at *8. The same is true in this case. If defendants can identify specific testimony that they believe misleads the jury about the standard of care, they may do so at the final pretrial conference. Otherwise, they may object during trial if Kaiser attempts to elicit improper testimony.

### 2. Motion to preclude evidence or argument about the defendants not taking "responsibility"

This motion is GRANTED as unopposed.

### 3. Motion to preclude evidence or argument about the defendants not being willing to "settle" or agree to a "settlement"

This motion is GRANTED as unopposed.

### 4. Motion to require Kaiser's experts to testify to a "probability" and to allow defendants to elicit "possibility" testimony by direct or cross examination

This is a broad motion that is little more than a request to follow the law. It is based on a passage in *Felde v. Kohnke*, 50 Wis. 2d 168, 183, 184 N.W.2d 433, 441 (1971):

> Although the party with the burden of proof must produce testimony based upon reasonable medical probabilities, the opposing party is not restricted to this requirement and may attempt to weaken the claim for injuries with medical proof couched in terms of possibilities. Thus, it is proper to cross-examine a plaintiff's medical witness on matters which do not rise to the dignity of 'reasonable medical probability.'

Kaiser doesn't challenge the basic rule in *Felde* that experts testifying for the party with the burden of proof must meet a higher standard. But defendants don't identify any specific evidence that they want to admit or exclude under this standard, so this motion is DENIED as too vague.

### 5. Motion to preclude any evidence or argument "that is a personal preference and/or not stated to a proper standard"

This motion is similar to defendants' motion in limine no. 1. Defendants ask the court to require expert witnesses to base their testimony on the standard of care rather than on their own opinion of what care should be provided. Kaiser doesn't oppose the motion, but, again, defendants don't identify any specific testimony they wish to exclude, so the court cannot provide any additional guidance. This motion is DENIED as too vague.

6.  **Motion to preclude argument that "this case is analogous to any case in which the defendant's negligence is compared to the duty of the average person"**

This motion essentially asks the court to preclude Kaiser from using analogies to argue her case. Again, this motion it too broad and divorced from a specific argument that Kaiser has indicated she will make. The basic point is undisputed and unremarkable: whether defendants are negligent depends on what a reasonable medical professional would do under similar circumstances, not what an average person would do. But lawyers often use analogies to attempt to explain complicated concepts, and that can be both proper and useful, depending on context. The court declines to issue a broad ruling in advance, so this motion is DENIED. The parties will have to raise specific objections at trial if they believe the other side is using an analogy improperly.

7.  **Motion to preclude argument that the jurors "can determine medical negligence using their own experience, common sense, or without expert testimony"**

This motion is GRANTED as unopposed. The parties agree that the jury cannot determine negligence without the assistance of expert testimony in this case.

8.  **Motion to preclude Kaiser from presenting evidence regarding the alleged negligence of Ehle or the nursing staff "unless supported by expert testimony that establishes a causal link"**

The title of this motion is vague, but defendants ask the court in the body of the motion to "preclude Dr. [James] Green [one of Kaiser's experts, who is an obstetrician] from testifying regarding any alleged violation of the standard of care, on the part of Dr. Ehle or the nursing staff, prior to 12:30 a.m. on September 24, 2016. This testimony must be precluded because Dr. Green testified that had Dr. Ehle ordered a C-section at this time, C.B. would not have suffered any injuries." Dkt. 147, at 13.

Defendants' theory appears to be that there is no causal connection between negligence and an injury if some later intervening act by the defendant could have prevented the injury. But they cite no authority for that view, and the court isn't persuaded that it is correct. If Kaiser has evidence that defendants acted negligently before 12:30 a.m. on September 24 and that C.B.'s injuries could have been prevented or lessened in the absence of that negligence, Kaiser is free to offer that evidence. As will be explained in the context of some of defendants' other motions in limine, the court is persuaded that Kaiser has such evidence. So this motion is DENIED.

### 9. Motion to prohibit witnesses from "testifying about the credibility of other witnesses"

This motion is GRANTED as unopposed.

### 10. Motion to allow "testimony, reference, and evidence relating to collateral sources"

This motion is the mirror image of Kaiser's motion in limine no. 3. As the court concluded in the context of that motion, the court will be following Wisconsin law on this issue and giving an instruction based on Wis. JI–Civil 1757.

### 11. Motion to preclude evidence or argument about "the fact that the defendant health care entity and/or its health care providers are insured for liability"

This motion is tied to Kaiser's motion in limine no. 15 about the extent of the Fund's involvement at trial. If the Fund isn't identified at trial, then Kaiser doesn't oppose this motion. But if it is, Kaiser says that the Fund's role as an excess insurer would have to be disclosed. This motion is GRANTED as to any insurance other than that provided by the Fund. The court will reserve a ruling on whether and how the Fund's role as an excess insurer should be discussed.

**12. Motion to preclude Kaiser from arguing that a finding of negligence will "have no effect on [defendants'] right to practice in the state of Wisconsin"**

This motion is GRANTED as unopposed. Neither side may discuss the effect that a potential verdict may have on Ehle's or anyone else's ability to practice medicine.

**13. Motion to preclude Kaiser from "eliciting medical opinion testimony from unqualified witnesses"**

This motion is DENIED because it is simply too vague. Defendants don't identify any specific opinions they wish to exclude.

**14. Motion to preclude the parties "from utilizing any of parties' motions or arguments contained therein as evidence"**

This motion is GRANTED as unopposed.

**15. Motion to exclude evidence about hospital policies and procedures**

Defendants contend that their internal policies and procedures are irrelevant because "those materials do not establish the standard of care." Dkt. 147, at 21. Defendants cite a list of their own policies that appear to be primarily about care by nurses, and they ask the court to exclude them from the case.[2]

Kaiser contends that federal rather than state law controls this question, but Kaiser ignores that the Court of Appeals for the Seventh Circuit has treated this as a state-law question, and it has applied Wisconsin law. The court summarized Wisconsin law as follows:

---

[2] Defendants cites the following policies: "Assessment and Triage of Labor Patient in Family Birth and Women's Center," "Admission of Inpatient to Labor and Delivery," "Nursing Care of Inpatient Labor," "Electronic Fetal Monitoring," "Intermittent Auscultation Using Doppler Ultrasound Stethoscope," "Cervical Ripening, Induction, and Augmentation of Labor," "Pain Management – Labor Patient," "Immediate Postpartum Maternal Care after Vaginal Delivery," "Nursing Care of Patients Receiving IV Oxytocin (Pitocin) To Induce or Augment Labor," "Delivery Room Care of Newborns," protocols regarding "Tachysystole Management," and "Coping with Labor Algorithm."

> As a general rule in Wisconsin, the internal procedures of a private organization do not set the standard of care applicable in negligence cases. *See Johnson v. Misericordia Community Hospital*, 97 Wis.2d 521, 294 N.W.2d 501, 510 (1980), citing *Marolla v. American Family Mut. Ins. Co.*, 38 Wis. 2d 539, 157 N.W.2d 674, 678 (1968). However, the *Marolla* court also recognized an exception to this general rule, "if it could be shown that an entire industry or substantially an entire industry had essentially the same safety regulations," or if Wisconsin law required the regulations. *Id.* at 678; *Johnson*, 294 N.W.2d at 510.

*Cooper v. Eagle River Mem'l Hosp., Inc.*, 270 F.3d 456, 462 (7th Cir. 2001).

For their part, defendants ignore the exceptions to the rule identified in *Cooper,* and Kaiser contends that both exceptions apply. First, she says that her nursing expert will testify that all of the clinic's nursing policies and procedures are consistent with national standards. Second, Kaiser says that some of the policies track the language of requirements in the Wisconsin Administrative Code. Defendants didn't anticipate these issues in their motion, so we will have to discuss them at the final pretrial conference.

### 16. Motion to preclude evidence or argument about "any type of site survey, peer review, audit, or quality review organization or evaluation related to" defendants

This motion is GRANTED as unopposed.

### 17. Motion requiring C.B. to appear at voir dire

Defendants want C.B., who is now nearly four years old, to appear during voir dire "so the potential jurors are able to see and observe his conditions." Dkt. 147, at 24. This is important, defendants say, so that the jury can determine whether they can be fair and impartial in a case involving a child with C.B.'s disabilities.

Kaiser objects. Although she says that she intends on bringing C.B. to court to appear once during the trial, she says that it is too dangerous in light of COVID-19 to bring him to the courthouse for voir dire.

This motion is DENIED. For purposes of voir dire, C.B.'s injuries can be described to the jury. It isn't necessary to bring him to the court more than once.

18. **Motion to preclude evidence or argument that C.B. was "at an increased risk for injury because her labor was induced or because she was administered Pitocin, Oxytocin, or Cytotec during labor and delivery"**

This motion is directed to the testimony of James Green, an obstetrician who is a standard-of-care expert for Kaiser. Green opines that several factors in Kaiser's labor increased the risk of fetal injury, specifically the induction of labor and the use of Pitocin, Oxytocin, and Cytotec.

Defendants seek to exclude Green's testimony that these things posed an "increased risk." Defendants cite four reasons: 1) there is no evidence that the conduct was negligent; 2) Green couldn't quantify what he meant by "increased" risk; 3) there is no evidence that the "increased risks" caused any injury; and 4) allowing the testimony would violate Rule 403.

Green does not contend that the decisions to induce labor or to administer Pitocin, Oxytocin, and Cytotec were negligent in themselves. But, according to Green, each of these interventions posed risks that defendants were obligated to manage. Pitocin and Cytotec, for example, increase uterine contractions. If those contractions are too long or too close together, the fetus might be deprived of oxygen. Defendants are correct that the increased risks alone did not cause C.B. any injury. But that provides no basis to exclude Green's testimony about the risk of adverse effects.

According to Green, the potential adverse effects of these interventions actually occurred during Kaiser's labor. Part of Green's theory of negligence is that defendants failed to take appropriate steps in the face of those well-known risks. And, as a result of predictable adverse effects, "the fetal heart rate deteriorated to a life-threatening Category III pattern."

33

Dkt. 222-1, at 39. Green's opinion sets out alternative theories of causation, both rooted in the failure of the defendant nurses and Dr. Ehle to follow the standard of case, which required proper monitoring the fetus and intervention in the conditions that caused fetal distress. Under the first alternative, if the called-for interventions were successful, Kaiser could have proceeded to a safe vaginal delivery. Under the second alternative, if the interventions were not successful, Dr. Ehle should have promptly delivered C.B. by C-section, which would have avoided catastrophic injury. Dkt. 222-1, at 40–41. Green doesn't estimate the likelihood that that the interventions would have been successful, but he explains how, had the standard of care been followed, C.B. would have avoided injury.

To be sure, Green's theory of the case is sharply disputed. But an expert's opinions do not have to be correct to be admissible. Defendants' motion to exclude Green's testimony that the induction of labor and the use of Pitocin, Oxytocin, and Cytotec posed increased risks to Kaiser and C.B. is DENIED.

### 19. Motion to preclude evidence or argument that Pitocin is a "high-alert drug"

This motion is again focused on Green, who referred to Pitocin as a "high-alert drug" in his deposition. Green is free to testify why he believes that Pitocin is a "high-alert" drug. Defendants are free to cross examine Green about the basis for that belief and to ask their own experts whether they agree with Green's assessment. So this motion is DENIED.

### 20. Motion to preclude evidence or argument that "defendants were negligent in causing shoulder dystocia or resolving it"

This motion is GRANTED as unopposed.

**21. Motion to preclude evidence or argument that "defendants were negligent in failing to save the cord blood, the placenta, and cord"**

This motion is GRANTED as unopposed. This ruling is limited to the issue of negligence. It does not address other potential relevance of the decision not to save the cord, cord blood, and placenta.

**22. Motion to preclude nurse Laura Mahlmeister from providing causation opinion testimony "that is outside her expertise and qualifications or [is] non-causal"**

Mahlmeister is a nurse who will testify about the standard of care for nursing staff. This motion could be clearer about its proposed scope, but I understand defendants to be asking the court to exclude Mahlmeiser from testifying on the following issues: (1) whether the fetus had "enough time to reoxygenate between uterine contractions," Dkt. 147, at 38; (2) whether Nurse Henning was qualified or "competent" to monitor Kaiser without supervision; (3) whether nursing staff should have "ordered or installed" the use of an intrauterine pressure catheter (IUPC); (4) what nursing staff may have told Ehle over the phone; and (5) any "causation" opinions.

Kaiser says that Mahlmeister will not be offering any causation opinions, so that aspect of the motion is GRANTED as unopposed.

As for the opinion about whether the fetus had enough time to reoxygenate between uterine contractions, defendants say that Mahlmeister isn't qualified to give such an opinion because she isn't a doctor, but they don't explain why only a doctor can offer such an opinion. The court is persuaded that Mahlmeister's extensive training and experience in fetal monitoring qualifies her to give an opinion on this issue. So this aspect of the motion is DENIED.

As for whether Henning had the necessary training and experience to monitor Kaiser without supervision, defendants say that such an opinion isn't admissible for two reasons: (1) Mahlmeister hasn't identified a "published standard of care" that would prohibit someone with Hennings's experience and qualifications from independently caring for someone in Kaiser's situation; and (2) Kaiser hasn't identified a causal connection between Henning's lack of experience and any harm to C.B. Defendants cite no authority for the view that an expert must point to a "published" standard of care, so the court isn't inclined to exclude this opinion on that ground. Defendants' second reason is related to defendants' motion to exclude Green's testimony. The main problem that Kaiser identifies with Hennings's lack of experience is that Hennings failed to recognize that she should have discontinued Pitocin. Defendants contend that Kaiser doesn't have evidence connecting Pitocin to an injury, so Mahlmeister's opinion about Hennings isn't relevant. But the court concluded in the context of defendants' motion in limine no. 18 that Green provided the causal connection on that issue. So this aspect of the motion is DENIED.

As for whether nursing staff should have "ordered or installed" an IUPC, defendants say: (1) only a doctor can make the determination whether to use an IUPC; and (2) Kaiser hasn't established a causal connection between the failure to install an IUPC and any injury to C.B.  Kaiser says that an IUPC is placed in the uterine cavity to measure the frequency, duration, intensity, resting time, and resting tone of contractions. And she acknowledges that nurses don't have the authority to order that an IUPC be ordered, but she says that Mahlmeister should be permitted to testify that nursing staff should have *recommended* that Ehle order an IUPC.

36

The court sees no problem with testimony that the nursing standard of care would have required a nurse to recommend a particular procedure. And Kaiser relies on Green to show that the failure to order an IUPC contributed to C.B.'s injuries, so this part of the motion is DENIED.

As for the conversations between nursing staff and Ehle, Kaiser is not offering expert testimony about what nursing staff or Ehle said. Rather, Mahlmeister is offering opinions based on two different versions of the facts. Specifically, neither the nursing staff nor Ehle recall the content of their telephone conversations while Ehle was away from the hospital on the evening of September 23. Mahlmeister's opinion is that the nursing standard of care would have required nursing staff to inform Ehle about C.B.'s condition, including what the fetal monitoring strips showed. The court sees no problem with that testimony, so this part of the motion is DENIED.

### 23. Motion to preclude testimony from Kaiser's life care planner Gary Yarkony about "C.B. having a normal life expectancy"

Yarkony is a physician specializing in rehabilitation and physical medicine. During his deposition, when defense counsel asked Yarkony to explain his method for determining C.B.'s life expectancy, Yarkony gave this answer: "I examine the person, I review the records, I see their history, and then I see if there's anything that would decrease their life expectancy if they receive proper care and all the necessary equipment, supplies, medical care, et cetera." Dkt. 148-5 (Yarkony Dep. 13:13–17).

Defendants contend that Yarkony's opinion isn't sufficiently reliable to be admissible under Rule 702 because: (1) he is unaware of any literature that has adopted his method; (2) he doesn't identify any basis for his opinion other than his own experience; and (3) his own

experience is untested because he hasn't tracked his predictions to determine whether they are correct.

Kaiser doesn't respond directly to any of these criticisms. Instead, she primarily relies on the fact that Yarkony's life expectancy testimony hasn't been excluded in other cases. Dkt. 225, at 4. But Kaiser acknowledges that only one of these cases involved a determination whether Yarkony's testimony met the requirements of Rule 702. *See Arroyo v. United States*, No. 07 C 4912, 2010 WL 1437925 (N.D. Ill. Apr. 2, 2010). But even in that case, the defendant didn't challenge Yarkony's testimony until *after* trial. *Id.* at *10. At that point, the court concluded that the testimony met the requirements of Rule 702 because "[i]t was based on [Yarkony's] extensive medical experience with cerebral palsy patients and others with severe brain injuries, a review of [the plaintiff's] medical records, visits with [the plaintiff] and his family, and examinations of [the plaintiff]." *Id.* at *12. But missing from the court's discussion is an explanation of how Yarkony relied on all those things to reach his conclusions. That explanation is a key part of any expert's opinion, and it is missing from Yarkony's report in this case as well.

So the court is inclined to exclude Yarkony's testimony on C.B.'s life expectancy. But the court will give Kaiser an opportunity at the final pretrial conference to explain why she believes Yarkony's report is adequate.

### 24. Motion to preclude references to "defense counsel's medical chronology memorandum"

Defense counsel prepared a lengthy chronology of events that it provided to some of defendants' experts, though defendants don't say which ones. Defendants ask the court to preclude Kaiser from relying on the chronology for any purpose, but not because the

chronology is work product. Rather, defendants say that the chronology is irrelevant because none of their experts relied on the chronology in forming their opinions, even if some of them reviewed it.

Kaiser opposes this motion, contending that the chronology is fair game for cross examination of the defendants' experts, regardless whether they relied on the chronology. She identifies two potential purposes for the chronology. For those experts who reviewed the chronology, Kaiser says that it is relevant to "the credibility" of the experts' opinions "to the extent those chronologies omit important facts." Dkt. 227, at 3.[3] For those experts who didn't review the chronology, Kaiser says that it's relevant "that they specifically chose to not review them. . . . The fact that they chose not to review those chronologies simply means they chose to ignore data given to them." *Id.*

Kaiser is free to use the chronology to prepare cross examination questions for defense experts, but the court isn't persuaded that it is appropriate for Kaiser to identify the chronology to the jury. Kaiser doesn't suggest that the chronology should be admitted into evidence, so the only purpose for referring to the chronology would be to create questions about what the document is and why the jury isn't allowed to see it. Kaiser can ask experts what the factual foundations of their opinions are and point out inaccuracies or omissions without discussing the chronology specifically.  So this motion is GRANTED.

---

[3] Kaiser uses the word "chronologies" throughout her brief, but she identifies only one document that defense counsel created.

### 25. Motion to preclude Kaiser's experts from testifying from using the words "risk factors" or "consistent with" or "associated with"

This motion is related to defendants' other motions to require Kaiser's experts to testify to a "probability" and to prohibit expert testimony that doesn't show a causal connection between alleged negligence and an injury to C.B. Defendants seek to exclude numerous opinions of five of Kaiser's experts—Green, Mahlmeister, Mulkey, Rotenberg, and Linscott—on the ground that the opinions are not tied to C.B.'s injuries.

In response, Kaiser says that her experts should be permitted to testify that defendants violated the standard of care by failing to take particular actions in light of her risk factors. As for the nurses, Kaiser says that they should have discontinued Pitocin and informed Ehle of her excessive uterine activity and deteriorating fetal heart rate pattern. As for Ehle, Kaiser says that he should have returned to the hospital upon learning of Kaiser's excessive uterine activity and deteriorating fetal heart rate pattern.

The court agrees with Kaiser that the standard of care may be dependent on the presence of risk factors. And Green's testimony provides the causal connection between defendants' alleged failure to account for the risk factors and C.B.'s injuries. So this motion is DENIED.

## C. The Fund's motions in limine

### 1. Motion to preclude questioning of Dr. Ehle on whether he discussed differences between Wisconsin and Illinois law with his patients

Kaiser didn't file a response to this motion, so this motion is GRANTED as unopposed.

### 2. Motion to exclude evidence of past medical expenses

The Fund asks the court to exclude evidence of past medical expenses, not because such evidence is admissible, but because Kaiser failed to disclose the amount of past medical

expenses she is seeking, despite a discovery request asking Kaiser for a "computation of each category of damages claimed by you." Dkt. 239, at 1. In response, Kaiser acknowledges that she failed to provide the Fund with a total, but she says that the failure is harmless because she provided the Fund with all of the underlying medical bills that she will be relying on at trial.

For reasons it doesn't explain, the Fund didn't file this motion until July 17, with a supporting brief that followed two days later. The July 17 deadline was limited to motions related to experts who had been recently deposed, so this motion is untimely.

In any event, the court isn't persuaded that Kaiser has forfeited her right to seek damages for past medical expenses. The Fund doesn't contend that Kaiser failed to provide any of the underlying documents, so the Fund has the information it needs if it wishes to object to any damages for past medical expenses. So this motion is DENIED. But Kaiser is directed to provide the Fund with a computation of past medical expenses before the final pretrial conference.

### 3.  Motion to preclude Kaiser "from eliciting evidence from" Frederick Edelman, Doroto Walkiewicz, and Kimberly Hornback

The Fund seeks to bar these three witnesses from testifying because Kaiser didn't disclose them until June 26, 2020. Kaiser says that she won't be calling Walkiewicz or Hornback, so that part of the motion is GRANTED.

As for Edelman, he is one of C.B.'s treating neurologists. Kaiser doesn't deny that she failed to disclose him before June 26, and she offers no excuse for her failure. But she says that there is no prejudice to defendants because they have been aware since September 2019 that Kaiser viewed Edelman as a potential witness. She points to numerous attempts to take Edelman's deposition between September 2019 and July 2020, but she says that each attempt

was thwarted because of the limited availability of defense counsel, Edelman's counsel, or Edelman himself.

The court is persuaded that the Fund had actual notice that Kaiser was likely to call Edelman, so this motion is DENIED.

## ORDER

IT IS ORDERED that:

1. The motion in limine filed by Wisconsin Injured Patients and Families Compensation Fund to preclude questioning of Dr. Ehle on whether he discussed differences between Wisconsin and Illinois law with his patients, Dkt. 131, is GRANTED as unopposed.

2. The motions in limine filed by defendants the Monroe Clinic and James J. Ehle, Dkt. 146, are GRANTED in part and DENIED in part as discussed in this opinion. The court has also reserved ruling on all or part of defendants' motions nos. 11, 15, 23.

3. Plaintiff Cortney Kaiser's motions in limine, Dkt. 167, are GRANTED in part and DENIED in part as discussed in this opinion. The court has also reserved ruling on all or part of Kaiser's motions nos. 5, 9, 15, 22, and 27.

4. The Fund's motion to exclude evidence of past medical expenses, Dkt. 212, is DENIED.

5. The Fund's motion to preclude Kaiser from eliciting evidence from Frederick Edelman, Doroto Walkiewicz, and Kimberly Hornback, Dkt. 216, is GRANTED as to Walkiewiewcz and Hornback and DENIED as to Edelman.

6. Defendants' motion to join the motions in limine filed by the Fund, Dkt. 220, is GRANTED.

7. Defendants' motion to preclude Kaiser's experts from testifying from using the words "risk factors" or "consistent with" or "associated with," Dkt. 228, is DENIED.

8. The court reserves a ruling on the motion to exclude the testimony of Robert Steiner, Dkt. 232.

9. Kaiser's motion to preclude Timothy Reilly from testifying about "irrelevant facts," Dkt. 233, is GRANTED as unopposed.

10. Kaiser's motion to preclude Nurse Zimmerman from "interpreting Monroe's policies and procedures," Dkt. 234, is GRANTED.

11. Kaiser's motion to exclude Michael Msall's undisclosed opinions and opinions in the supplemental report, Dkt. 235, is GRANTED as to opinions from the supplemental report but otherwise DENIED.

12. Kaiser's motion to exclude Dr. Gille's's opinions about "unknown potential causes," Dkt. 237, is GRANTED.

13. The Fund's motion to join defendants' motions in limine, Dkt. 247, is GRANTED.

Entered July 30, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge