Kaiser (C.B) vs Monroe Clinic, et al.

3:19-cv-00315

Transcript of the Testimony of:

# DAVID GIBSON

March 05, 2020



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 WESTERN DISTRICT OF WISCONSIN
 3
 4   CORTNEY KAISER, Individually, )
 5   and as mother and next friend )
 6   of C.B., a minor,             )
 7             Plaintiff,          )
 8        vs.                      ) No. 3:19-cv-00315
 9   THE MONROE CLINIC, INC., and  )
10   WISCONSIN INJURED PATIENTS    )
11   AND FAMILIES COMPENSATION     )
12   FUND,                         )
13             Defendants.         )
14
15            The deposition of DAVID GIBSON, called
16   for examination, taken pursuant to the Federal
17   Rules of Civil Procedure of the United States
18   District Courts pertaining to the taking of
19   depositions, taken before KRISTIN C. BRAJKOVICH, a
20   Certified Shorthand Reporter, CSR. No. 84-3810, of
21   said state, at Suite 101, 1111 Westgate Street, Oak
22   Park, Illinois, on the 5th day of March, A.D. 2020,
23   at 9:12 a.m.
24
25
```

## Page 2

```
 1   PRESENT:
 2
 3        COPLAN & CRANE,
 4        (1111 Westgate Street, Suite 101,
 5        Oak Park, Illinois 60301,
 6        1-708-590-4896), by:
 7        MR. STEPHEN M. BLECHA,
 8        sblecha@coplancrane.com,
 9             appeared on behalf of Plaintiff;
10
11        LEIB KNOTT GAYNOR LLC,
12        (219 North Milwaukee Street, Suite 710,
13        Milwaukee, Wisconsin 53202,
14        1-414-276-2102), by:
15        MR. BRENDEN LEIB,
16        bleib@lkglaw.net,
17             appeared on behalf of Defendant
18             The Monroe Clinic, Inc.;
```

## Page 3

```
 1   PRESENT (Continued):
 2
 3        OTJEN LAW FIRM, S.C.,
 4        (20935 Swenson Drive, Suite 310,
 5        Waukesha, Wisconsin 53186,
 6        1-262-777-2200), by:
 7        MR. TODD M. WEIR,
 8        tweir@otjen.com,
 9             appeared on behalf of Defendant
10             Wisconsin Injured Patients and Families
11             Compensation Fund.

24   REPORTED BY:  KRISTIN C. BRAJKOVICH,
25             CSR No. 84-3810.
```

## Page 4

```
 1                    I N D E X
 2   WITNESS                              EXAMINATION
 3   DAVID GIBSON
 4        By Mr. Weir                          5
 
 8                    E X H I B I T S
 9   NUMBER                                     PAGE
10   Gibson Deposition Exhibit
11        No. 1 - Notice of Deposition         5
12        No. 2 - Testimony Report             5
13        No. 3 - Gibson File Review Notes     5
14        No. 4 - Life Care Plan               5
15        No. 5 - Evaluee Interview Form       5
16        No. 6 - Economic Indices             5
```

## Page 5

```
 1              (WHEREUPON, certain documents
 2              were marked Gibson Deposition
 3              Exhibit Nos. 1 through 6, for
 4              identification and the witness was
 5              duly sworn.)
 6              DAVID GIBSON,
 7   called as a witness herein, having been first duly
 8   sworn, was examined and testified as follows:
 9              EXAMINATION
10   BY MR. WEIR:
11        Q.   You are David Gibson, correct?
12        A.   I am.
13        Q.   And you understand we are here for a
14   deposition in a case called [C.B.] versus
15   The Monroe Clinic?
16        A.   I do.
17        Q.   You have given many depositions before,
18   right?
19        A.   I have.
20        Q.   So you understand the basic rules,
21   right?
22        A.   Yes.
23        Q.   I'm going to ask you to wait until I'm
24   done with my question.  I, in turn, will wait until
25   you are done with your answer.  People tell me I
```

Page 6

1 have a little bit of a habit of seeming like I'm
2 done with the question, but I am not, so let me
3 kind of spit it out.  Okay?
4     A.   Okay.
5     Q.   And the important thing is if you answer
6 a question, we are going to assume, A, that you
7 understood the question and, B, that your answer
8 was truthful and responsive.  Does that sound fair?
9     A.   Yes.
10    Q.   You have got a CV in front of you,
11 correct?
12    A.   I do.
13    Q.   And you work for Vocational Economics,
14 Inc., out of Louisville, Kentucky, right?
15    A.   Yes.
16    Q.   And last I saw, they had 15 to 17
17 employees.  Still the case?
18    A.   Best estimate, yes.  I can't give you an
19 exact number, but that is fair.
20    Q.   And you are a forensic economist?
21    A.   Yes.
22    Q.   And have done exclusively forensic
23 economist work since 2011?
24    A.   Yes.
25    Q.   How many --

Page 7

1     A.   Exclusively, yes.  Really all of the
2 work of Vocational Economics is forensic economics,
3 so I have been doing that since '93.
4     Q.   Okay.  And how many forensic economists
5 does Vocational Economics, Inc., have?
6     A.   Again, I can't give you an exact number,
7 but probably people that provide either the
8 vocational side or the economic side, about 11 or
9 12.
10    Q.   Do they do services nationwide?
11    A.   Yes.
12    Q.   You are paid by Vocational Economics,
13 Inc., right?
14    A.   Yes.
15    Q.   And your income is directly dependent on
16 the volume of work that you do?
17    A.   Yes.
18    Q.   Exhibit 3, is this a list of all of the
19 documents which you have reviewed in this case?
20    A.   Yes.
21    Q.   And you have issued two reports.  One
22 dated November 21, 2019, correct?
23    A.   Yes.
24    Q.   And that deals with the losses
25 associated with the life care plan, correct?

Page 8

1     A.   It does.
2     Q.   And a second report of November 25,
3 2019, deals with the vocational losses, correct?
4     A.   Yes.
5     Q.   We have a case list, which we have
6 marked as Exhibit 2, correct?
7     A.   We do.
8     Q.   And that was updated actually just
9 through a month ago, right?
10    A.   Yes.
11    Q.   You have provided some testimony in
12 Wisconsin, correct?
13    A.   I have.
14    Q.   Of the cases where you have provided
15 testimony in the last five years, am I correct that
16 95 percent have been for the plaintiff?
17    A.   Yes.
18    Q.   And that has actually been consistent if
19 we take it back even 10 or 15 years?
20    A.   I believe so.
21    Q.   Somewhere I saw your charges.  I think
22 you are up to $720 an hour for review?
23    A.   No.  For the report itself, it's a flat
24 fee, so a flat fee of $5,200 for the loss of
25 earnings report and $2,400 for the present value of

Page 9

1 the life care plan.  Then after that any
2 non-testimony time is $520 per hour, and the $720
3 per hour that you were referring to is for
4 testimony time.
5     Q.   All right.  Before we got started, I
6 gave you Exhibit 1, which is a notice of
7 deposition?
8     A.   Yes.
9     Q.   And you indicated that, without casting
10 aspersions on the gentleman seated to your right,
11 you had not seen this before?
12    A.   I don't believe that I have.
13    Q.   Let's just go through this.  One is the
14 complete file?
15    A.   Yes.
16    Q.   We have that, correct?
17    A.   You do.
18    Q.   Did you consult any outside sources in
19 conjunction with your work?
20    A.   The only sources that I cite in my
21 reports are various statistics from the Bureau of
22 Labor Statistics, the Census Bureau, and others.
23    Q.   You took the numbers from Dr. Gary
24 Yarkony and used them in your life care plan
25 calculations, true?

Page 10

1   A.   Yes.
2   Q.   You have worked with Dr. Yarkony before,
3 I assume?
4   A.   I have never really worked with him, but
5 I have evaluated his life care plans before, yes.
6   Q.   So "work with" is probably too broad or
7 maybe too specific a term.  You have been involved
8 in other cases where you have been asked by
9 plaintiffs to do a life care plan and you have
10 based your calculations on Mr. Yarkony's life care
11 plan, fair?
12   A.   Yes.
13   Q.   Do you know how many times?
14   A.   I don't.  I would probably say that I
15 see life care plans by Dr. Yarkony anywhere from
16 five to eight times per year.
17   Q.   And if we total up your depositions in
18 Exhibit 2, we don't need to do the arithmetic, but
19 there's well over 100 for 2019?
20   A.   Yes, yes.
21   Q.   While we are on the topic, how often
22 have you worked with this law firm, Coplan & Crane?
23 Right?
24   A.   Over the last five years, I would say
25 two to five times per year.

Page 11

1   Q.   When did you first start working with
2 this firm?
3   A.   Probably around 2007, when I relocated
4 to the Chicago market from Louisville.
5   Q.   How often have you worked with Kevin
6 Burke, do you know?
7   A.   Only two times, I believe.
8   Q.   From your testimony list, some of your
9 cases involve business litigation, some involve
10 injuries.  Do you have a breakdown for the last
11 five years what percentage have been business
12 litigation or non-injury or death, we are including
13 in injury litigation?
14   A.   I would say that approximately
15 15 percent of the work that I do is either
16 commercial in nature or employment in nature.  Then
17 the other 85 would be the personal injury arena.
18   Q.   Getting back to Dr. Yarkony.  You do not
19 vouch for his life care plan, review it, put your
20 stamp of approval on it or stamp of disapproval on
21 it in any way, shape, or form, fair?
22   A.   That's fair.  I would state explicitly
23 that I rely upon Dr. Yarkony to identify what is
24 needed, how much it currently costs, and how
25 frequently it's needed.  My role is merely doing

Page 12

1 the mathematics with it.
2   Q.   Right.  You just take those numbers and
3 do the economic calculations, fair?
4   A.   That's right.
5   Q.   And so if there was a different life
6 care plan with different numbers, you could plug
7 that in and do the calculations for that as well?
8   A.   I could.
9   Q.   The point is, at a trial in this matter,
10 you are not going to be saying, Based on my years
11 of doing this work and reviewing life care plans,
12 Dr. Yarkony's life care plan is a reasonable life
13 care plan?
14   A.   True.
15   Q.   Okay.  Any reports.  I'm on No. 2.
16   A.   Yes.
17   Q.   We have those, right?
18   A.   We do.
19   Q.   CV, we have got that?
20   A.   We do.
21   Q.   Four, the recent list, we have that?
22   A.   Yes.
23   Q.   Publications, we can find that on your
24 CV, right?
25   A.   Exactly.

Page 13

1   Q.   Here is what I don't see, and maybe you
2 have it, itemization of hours spent and how much
3 you have billed or received in this case.  Do we
4 have that?
5   A.   It does not exist in terms of hours.
6 The reports I bill as a flat fee.  I don't track
7 hours until after the date of the report, so the
8 only hours that I have had so far, where I would
9 track them, would be the preparation for the
10 deposition.
11   Q.   How many hours have we got there at the
12 $520 an hour?
13   A.   Probably about an hour and a half.
14   Q.   And today hopefully will be less than an
15 hour and a half, I can tell you that.  Okay?
16       Any records, charts, notes, we have
17 covered that, correct?
18   A.   Yes.
19   Q.   Did you make any notes separate and
20 apart from your report regarding the life care
21 plan, which are retrievable?
22   A.   Any notes I have will be -- did they
23 turn over my file to you beforehand?
24   Q.   Yes.
25   A.   So any notes I had will be part of that

Page 14

1  file.  With regard to the life care plan, the only
2  thing that would exist would be a document -- and I
3  printed multiple pages per side -- that looks
4  something like that, which is input verification to
5  make sure that we got Dr. Yarkony's numbers input
6  correctly.
7       Q.   Let me see that.
8       A.   Sure.  It looks very similar to the
9  detail on the report itself, but it's slightly
10 different.
11      Q.   Looks similar to the charts attached to
12 your report, right?
13      A.   It does, but it doesn't -- it has a
14 little bit more detail to it than what is attached
15 to the report.
16      Q.   Who makes this document that I'm going
17 to mark Exhibit 4?  Who inputs this data?
18      A.   What you marked includes Dr. Yarkony's
19 plan itself, but who inputs the data into our
20 spreadsheet would be one of my two assistants, most
21 likely a lady named Anne Rinke, A-n-n-e, R-i-n-k-e.
22      Q.   Okay.  And Exhibit 4, again for our
23 record, is what?
24      A.   Exhibit 4 is a combination of -- the
25 first set is Dr. Yarkony's plan itself.  The next

Page 15

1  set is the input verification pages that I
2  mentioned, which is nine pages if they were printed
3  out full size.  Then the final page is the -- a
4  copy of the U.S. life tables for males that I used
5  for the life expectancy.
6       Q.   Okay.  Let's lay that aside now and go
7  back to your CV, if we can.
8       A.   Sure.
9       Q.   We have Vocational Economics, Inc., out
10 of Louisville, 1993 to present, correct?
11      A.   Yes.
12      Q.   And three bullet points down it says,
13 Assess present cash value of future medical care
14 costs.  That is part of what you are doing here?
15      A.   It is.
16      Q.   The next bullet point is, Consult with
17 and train experts in vocational and economic
18 analysis.  What is that work?
19      A.   That is working with other experts
20 within Vocational Economics and is -- needed either
21 training them on the statistics that we employ, the
22 type of work that we do, or consulting with them as
23 they come up with nuances in the cases that they
24 are analyzing.
25      Q.   Do you train these individuals on how to

Page 16

1  provide depositions and how to be effective expert
2  witnesses?
3       A.   No, I don't.
4       Q.   Is there any discussion about that?
5       A.   Not with me.  I am sure that somebody
6  must talk to them about it when they are brought
7  in, but nobody has asked me to do that.
8       Q.   You have, over the years, given many
9  lectures to groups of trial attorneys, fair?
10      A.   I have.
11      Q.   How many times in the last five years
12 have you given lectures to groups of trial
13 attorneys?
14      A.   In the last five years, not that many.
15 It has been quite a while since I have.
16           I guess in the last five years
17 specifically, none.  The first one I see would be a
18 little more than five years ago -- I'm sorry --
19 just barely within five years, a webinar, I believe
20 it was, on No. 71 on my CV, which would be May 8th
21 of 2015.
22      Q.   And what was that webinar about?
23      A.   Complications and assessments of lost
24 earnings.
25      Q.   Do you know if you have any materials

Page 17

1  that were submitted for that webinar?
2       A.   I believe I would probably have a
3  PowerPoint presentation.
4       Q.   All right.  So if you still have that
5  PowerPoint, I'm just going to ask you to preserve
6  it.  Okay?
7       A.   Sure.
8       Q.   Then we can iron out the details as to
9  whether it will be turned over to me.  Okay?
10      A.   Okay.
11      Q.   No. 80 is, Use of ACS to improve
12 occupational earnings estimate.  ACS, again remind
13 me what that is?
14      A.   That is the American Community Survey.
15      Q.   And 69, I thought that is what it was,
16 but 69 says, Use of disability data from American
17 Community Survey, so that follows on that, correct?
18      A.   It does.
19      Q.   65 is, Loss of lifetime earnings from
20 brain injury presentation to Illinois and Indiana
21 continuing legal education.  Do you still have a
22 PowerPoint from that?
23      A.   I should, yes.
24      Q.   Okay.  I'm going to ask you to preserve
25 that too.  Okay?

Page 18

1    A.    Okay.
2    Q.    64 is, Economic damages in cases of
3  catastrophic or total disability, Illinois and
4  Indiana continuing legal education. Same issue,
5  you probably still have a PowerPoint?
6    A.    Yes.
7    Q.    And you are willing to preserve it so we
8  can work out the data of me obtaining it or not
9  obtaining it. Okay?
10   A.    Okay.
11   Q.    53 is, Proving economic loss, winning
12 civil cases with expert testimony, Plymouth,
13 Michigan, State Bar of Michigan. I assume you
14 still have a PowerPoint for that one?
15   A.    Yes.
16   Q.    And I'm going to ask you to keep that as
17 well. Fair?
18   A.    Yes.
19   Q.    You'll do that. All of the way back to
20 2000, No. 15, Defining economic damages in medical
21 malpractice cases, presentation and meeting for
22 Wilson Elser, a New York law firm?
23   A.    Yes.
24   Q.    Do you know if you have materials from
25 that?

Page 19

1    A.    That one I'm not sure about.
2    Q.    We may be stretching it.
3    A.    Yeah. It's quite possible that I do,
4  but I can't say for sure.
5    Q.    Let's go in terms of any notes. Are the
6  only notes that you have not associated with your
7  report that you have generated retrievable?
8    A.    I would say that the notes that I have
9  would be the combination of what is in Exhibit 4,
10 what is in Exhibit 3, then my interview notes.
11   Q.    And we have marked your interview notes
12 as 5, right?
13   A.    Yes.
14   Q.    And what have you got now?
15   A.    This would be a document that you should
16 have received, but it's essentially the tabs from
17 my Microsoft Excel workbook that contain statistics
18 that I employed and background computations.
19   Q.    All right. I have marked this document,
20 the background computations, as 6, correct?
21   A.    Yes.
22   Q.    All right. So if we work off of your
23 November 21, 2019, report.
24   A.    Okay.
25   Q.    And we have various categories, correct?

Page 20

1    A.    Yes.
2    Q.    And assistance at home, we have
3  23,303,000 to 28,105,000. And can you point to me
4  in the report itself or the tables where we have
5  the breakdown as to how you got that range based
6  upon what Dr. Yarkony indicated were the potential
7  assistance needs at home?
8    A.    Yes. That would be on page 10 of 14.
9    Q.    Okay.
10   A.    And there are the line items that are
11 consistent with Dr. Yarkony's report. I'm looking.
12 Dr. Yarkony habitually never has page numbers on
13 his, but he has a category called Assistance At
14 Home, so this would correspond with that.
15   Q.    Let me see what you have for
16 Dr. Yarkony's report.
17   A.    Sure.
18   Q.    You are looking at Exhibit 4?
19   A.    Yes. I'm sorry. And this would be the
20 sixth page, where the very first page was a fax
21 cover page. It was really the fifth page of what
22 he produced.
23   Q.    Do you have a copy of Dr. Yarkony's
24 report handy?
25   A.    Exhibit 4.

Page 21

1    Q.    That is how you reduce it down and input
2  it?
3    A.    No. Actually, on my computer, I have it
4  full size, but to save my back when I print it out
5  to bring to the deposition, I print multiple sides
6  per page.
7    Q.    I'm relying on you to put 4 back
8  together. Okay?
9    A.    I will.
10   Q.    So here is the page of Yarkony's report
11 from which you got the information on Exhibit 4,
12 fair?
13   A.    It is.
14   Q.    Okay. So we have, RN/LPN, right?
15   A.    Yes.
16   Q.    And his rates vary. Where on your
17 page 10 do we see the spread and the picking of
18 which rate higher, lower?
19   A.    So note that on -- for that first group,
20 he is covered until age 12. Then within age 12, he
21 has two different providers that cover school days,
22 and note that the first provider of the repeat
23 medical has a range of 36,630 to 44,030 per year.
24 The second provider has exactly 38,480, which is
25 within that range in the first group.

Page 22

1        So what you see on page 10 of my report
2   is the quantification of that first group of 36,000
3   to 44,000 under the annual cost column, if I could
4   just point it out.
5        Q.   Sure.
6        A.   So that will correspond with that. And
7   then I'm saying that extending that out for the
8   number of years, nine years until he's age 12,
9   would give you what the current cost is and the
10  present value because this would qualify as a
11  professional service, would be a pure offset in
12  terms of the net present value that would be the
13  same present value as current cost.
14       Q.   Okay.  So if we take the first item to
15  age 12, 36,630, is the present value that
16  corresponds with that 36,630 the 329,670?
17       A.   Yes.
18       Q.   And then is the $44,030, does the
19  present value number that corresponds if you take
20  that and make the calculation from 44,030, 396,270?
21       A.   It is.
22       Q.   And that is true throughout your report?
23       A.   It is.
24       Q.   So that is the methodology you employ,
25  and we could go through each and every item and the

Page 23

1   answers would be the same?
2        A.   The only variance is that the net
3   discount rate that I apply will be different, but
4   the lion's share of the costs under Dr. Yarkony's
5   plan falls under professional services where the
6   net discount rate is zero.
7        Q.   And why is the net discount rate for
8   what we have got in your report as assistance at
9   home zero?
10       A.   There I would note back on page 3 of my
11  report -- I'll let you get there.
12       Q.   Yep.
13       A.   On page 3, I show the long-term
14  inflation rates for various medical -- categories
15  of the Consumer Price Index.  The one that covers
16  the services that we just looked at would be the
17  one that has 1E over in the left-hand column,
18  Professional Services.
19            And their note, following that over to
20  the first number column, shows that long-term, the
21  last 60 years, that has averaged 4.8 percent in
22  nominal terms, backing out of the general rate of
23  inflation.  The next row down shows that that would
24  be essentially 1.1 percent above the rate of
25  inflation.

Page 24

1        Q.   And this comes from CPI?
2        A.   It does.
3        Q.   Your investment vehicle, is it still
4   90-day T-bills?
5        A.   Right.  That is the very last row there,
6   where I'm showing that the long-term would be
7   4.7 percent nominal or 1 percent real.  So
8   comparing the 1.1 percent growth for professional
9   services to the 1 percent interest is what gives me
10  that pure offset, saying that is 0 percent.
11       Q.   You lost me here.  Which column on 1E do
12  I have?
13       A.   I'm sorry.  So comparing this number --
14       Q.   Gotcha.  It's the bottom?
15       A.   Yes, it is.
16       Q.   All right.  With the stock market being
17  the way it is, it's probably the wrong time for me
18  to bring this point to your attention?
19       A.   Actually so, but go ahead.
20       Q.   You know what this is, Stocks, Bonds,
21  Bills, and Inflation by Ibbotson, I-b-b-o-t-s-o-n?
22       A.   You are doing very well.  Most attorneys
23  call it Ibbotson.  You pronounced it correctly.
24       Q.   And you agree that this book is market
25  quotations and tabulations generally used and

Page 25

1   relied upon by forensic economists like you, if you
2   want to track at least what the data is?
3        A.   Yes, if you want to track investment
4   data.
5        Q.   Right.  And inflation data?
6        A.   Yes.
7        Q.   And it's reliable and used by forensic
8   economists like you?
9        A.   Well, no, I won't say that.  To do the
10  work that I'm doing here, it really does not apply
11  that much.
12       Q.   Because you don't use large corporate
13  stocks or large corporate bonds or small corporate
14  stocks as an investment vehicle?
15       A.   That's right.
16       Q.   But if someone was to use those
17  investment vehicles, Ibbotson's is a reliable
18  source to find out and track how those investment
19  vehicles have performed?
20       A.   Yes.
21       Q.   And for any 20-year period, all of the
22  way back to The Depression, when you take a whole
23  20-year period, stocks have outperformed the 90-day
24  T-bill by a substantial amount?
25       A.   Yes.

Page 26

1  Q.   But you have lectured and testified
2  before that you don't want to use that as an
3  investment vehicle because you want a, quote, No
4  risk investment vehicle under circumstances like
5  this, when you have life care plans for medical
6  needs?
7  A.   Yes.
8  Q.   And that has consistently been your
9  opinion?
10 A.   It is.
11 Q.   Some forensic economists disagree?
12 A.   Some.
13 Q.   And reasonable forensic economists can
14 disagree on what investment vehicles should be
15 used, fair?
16 A.   Fair.
17 Q.   So you did the November 21, 2019,
18 report, right?
19 A.   Yes.
20 Q.   With the assistance of people who their
21 involvement was limited to inputting the data?
22 A.   Yes.
23 Q.   And then I assume you have got a
24 computer program that allows you to use your
25 present value number and outcome the present value

Page 27

1  of future losses?
2  A.   Correct.
3  Q.   Let's go to the November 25, 2019,
4  report.
5  A.   Okay.
6  Q.   This is signed by you, correct?
7  A.   It is.
8  Q.   Who did the vocational evaluation?
9  A.   I did the evaluation as far as
10 determining what my opinions were and how I was
11 going to analyze the case.  In the back of
12 Exhibit 5, I would have laid out how I'm doing.
13 There's pages there called evaluee -- I'm sorry.
14 I'm on the wrong page.
15      They start a couple pages from the end
16 that are called analysis parameters.  That is where
17 I lay out how I'm going to do my analysis in the
18 case.  Then my case manager, who is also my wife,
19 Margaret Gibson, would set up a spreadsheet to
20 match these parameters.
21 Q.   Is she an employee of Vocational
22 Economics, Inc.?
23 A.   She is.
24 Q.   At least you don't have to pay her out
25 of your cut?

Page 28

1  A.   That's correct.  Actually, I do.
2  Q.   In different ways?
3  A.   My overall compensation depends on the
4  expenses of our office, and she's an expense.
5  Q.   How many people are in your Chicago
6  office?
7  A.   Just myself and the two people I have
8  mentioned, Maggie, who is a full-time employee, and
9  Anne, who is part-time.
10 Q.   All right.  So all of these pages, all
11 of the way through page 49 of this vocational
12 report, are those generated essentially for any
13 vocational loss case that you do?
14 A.   I'm not sure the way that you are asking
15 that.  I would say, first of all, that pages 6
16 through 43 are boilerplate pages that would include
17 any disability analysis of lost earnings.  Then the
18 other pages are similar to what I prepare for any
19 similar case, but they are specific to C.B.
20 Q.   Okay.  That is right.  That is actually
21 what I meant to say.
22 A.   Okay.
23 Q.   Only the first five pages of your
24 November 25, 2019, are specific to young C.B.
25 A.   The first five and then the last six,

Page 29

1  those are the detailed computations.
2  Q.   The last six are the tables specific to
3  C.B.
4  A.   That's right.
5  Q.   But pages 6 through 43 are boilerplate
6  used in any vocational economic report?
7  A.   Concerning disability, that's right.
8  Q.   And when were the pages 6 through 43 put
9  together?
10 A.   The original version probably put
11 together mid-'90s, but you'll note that there's a
12 date on the bottom of these that indicates the most
13 recent revision was May of 2019.
14 Q.   Who puts together pages 6 through 43?
15 A.   I have had a major role in every
16 revision.  The updates that are done to it nowadays
17 are done by me and another expert at Vocational
18 Economics that will review what new research has
19 come out and include that in the citations as well
20 as updating the economic statistics that show on
21 one of the pages here.
22 Q.   So pages 6 through 43 are a Vocational
23 Economics generated product?
24 A.   Yes.
25 Q.   With you having some input?

Page 30
1   A.   Yes.
2   Q.   How many others have input?
3   A.   Over the years, considering it as a
4   cumulative document, there's probably about 12 or
5   13 people that have had some input. I have had a
6   major input into every version.
7   Q.   And if we go to page 5 of 49, it appears
8   what you have done is for the losses, you have
9   taken three potential circumstances in totality,
10  recognizing we can't roll the clock back and
11  predict the future with young C.B.
12  A.   True.
13  Q.   So you have taken high school diploma as
14  one, right?
15  A.   Yes.
16  Q.   And the loss there, you have indicated
17  at $2,039,723 in present value?
18  A.   Yes.
19  Q.   And then we have some college education
20  but no degree, correct?
21  A.   Yes.
22  Q.   How do you define "some college
23  education with no degree"?
24  A.   Technically, one semester of college
25  would qualify, and that goes up to 12 years of

Page 31
1   school but no diploma. They are all fairly
2   consistent in what their earnings are.
3   Q.   All right. We have the earnings. We
4   don't need to put them in the record. They are on
5   page 5 of 49?
6   A.   True.
7   Q.   What source material did you use to get
8   the income for, for example, high school diploma?
9   A.   The income depends upon how much and how
10  long. The "how much" means how much he's making
11  per year. That I'm relying upon the American
12  Community Survey that shows me on an age-by-age
13  basis, how much I would expect somebody of that
14  level of education to earn.
15       Secondly, the "how long" on computing,
16  by combining the likelihood that C.B. would be
17  alive at each age and the likelihood that he would
18  be employed if he is alive. The likelihood of life
19  I'm getting from the U.S. life tables. The
20  likelihood of employment also comes from the
21  American Community Survey.
22  Q.   Is the American Community Survey
23  nationwide data?
24  A.   It is, and there's also community-wide.
25  However, that said, for a child, I always use

Page 32
1   nationwide data because I don't know where they are
2   going to reside as an adult. There's a footnote on
3   a prior page that talks about the differences.
4   Q.   All right. You did not have any
5   specific Wisconsin data for young C.B. to make
6   these projections, fair?
7   A.   I did have the data. I did not use it.
8   Footnote No. 3 on page 3 notes that had I used data
9   specific to the Freeport, Illinois, area, that the
10  earnings would have been slightly higher for the
11  first two scenarios and slightly lower for the
12  third.
13  Q.   Okay. I misspoke. I forgot. He lives
14  just south of the border in Illinois?
15  A.   Right.
16  Q.   Let's go back to the November 21st
17  report.
18  A.   Okay.
19  Q.   And I think the answer is on Table 1.
20  For example, when we take medications, where does
21  that fit in?
22  A.   That is under the medical commodities
23  row, which is 1D.
24  Q.   Okay. Disposable supplies?
25  A.   Also the same row.

Page 33
1   Q.   Future feeding supplies, same?
2   A.   Yes.
3   Q.   Durable medical equipment?
4   A.   Same.
5   Q.   Additional medical care, back to 1E?
6   A.   I believe so. Let me go to that. It
7   could vary, depending on what he has got in there,
8   but I believe you are right. Yes, you are right.
9   Q.   Therapy until 21, back to 1E?
10  A.   Yes. I'm sorry. If I could back up to
11  the additional medical care that I actually put
12  under 1B for medical services because there's some
13  testing and other labs in there that would be a
14  little bit different than the professional
15  services.
16  Q.   Okay. So the answer as to the discount
17  rate for each of the services outlined by
18  Dr. Yarkony is found in Table 1?
19  A.   Yes.
20  Q.   What is page 4 of 14?
21  A.   That takes the opinions I had from
22  Table 1 that we just looked at, looks at that
23  long-term average inflation rate, which shows up
24  under the growth column, and compares it to the
25  long-term interest rate on the 91-day Treasury

Page 34
1  bill, then shows you what either the net discount
2  or the net growth rate would be for each of those
3  categories.
4      Q.   When you do your calculations and input
5  an inflation rate, what period of time are you
6  using as your average for inflation?  How many
7  years back do you capture?
8      A.   60.
9      Q.   60.  Okay.  Our current rate of
10 inflation is what?
11     A.   Very low, about 2 to 3 percent.
12     Q.   And for your investment vehicle, how
13 many years back do you go to capture the average
14 rate for the 90-day T-bills?
15     A.   I do 60 years for everything.
16     Q.   60?
17     A.   Yes, sir.
18     Q.   What is 5 of 14?
19     A.   This is the first category in
20 Dr. Yarkony's plan for medications, all of which
21 are covered under the medical commodity rate,
22 breaking them out by the medication specified.
23     Q.   You have not taken into account the
24 possibility or probability that third-party payers
25 would pay any of these amounts, fair?

Page 35
1      A.   That's fair.
2      Q.   Page 6.  I mean, it's obvious, I think,
3  disposable supplies, right?
4      A.   Yes.
5      Q.   So let me just go through this and see
6  if I have any questions.  You have broken out each
7  category, and each category gets its own page,
8  fair?
9      A.   Yes.
10     Q.   And the overwhelmingly significant
11 number is the assistance at home, page 10 of 14?
12     A.   Definitely.
13     Q.   How often are you repurchasing a
14 wheelchair accessible van?  Five years is it?
15     A.   I believe so.  That is back --
16     Q.   From Yarkony?
17     A.   Yeah.
18     Q.   You did not do any independent analysis
19 to see if a vehicle -- wheelchair accessible
20 vehicle purchased January 1st of 2021 will last ten
21 years, 20 years, two years or anything?  You just
22 took Yarkony's five years and plugged it in?
23     A.   That's right.
24     Q.   What is page 30 of 49?  It's back to the
25 Volk report?

Page 36
1      A.   Let's see here.  This is part of my
2  discussion of present value and more specifically
3  discount rates that I think you are probably
4  referring to the Figure 4 there?
5      Q.   Yes.
6      A.   Which shows the various inflation and
7  discount rates from multiple different time frames
8  that you might look at.  Once again, I'm using a
9  60-year period.
10     Q.   So, for example, if we used an inflation
11 rate of ten years, it would be half of your
12 60 years?
13     A.   Yes, but the net discount rate would be
14 considerably lower, and I would increase the losses
15 significantly.
16     Q.   Okay.  Because where do we see net
17 discount rate on Figure 4, or is that elsewhere?
18     A.   It does not show you the net, but it
19 shows the discount rate, which is a 91-day Treasury
20 bill, which you would then compare to the
21 compensation growth rate.  So the net discount
22 would actually be a growth of 1.8 percent.
23     Q.   Do you use the Rule of 72s as a forensic
24 economist?
25     A.   I don't use it.  I compute exact present

Page 37
1  value, but I recognize what it is.
2      Q.   Why don't you articulate for us what the
3  Rule of 72s is.
4      A.   That if you combine an interest rate
5  stated as a whole number with the number of years
6  that a value is spread or that it grows, that it
7  will double when the -- when you multiply the years
8  by the rate.  So to say it more clearly, let's say
9  that you have a 6 percent interest rate.  It would
10 essentially say that you need 12 years of investing
11 in an amount before it doubles.
12     Q.   A 10 percent interest rate will double
13 in 7.2 years, right?
14     A.   Yes.
15     Q.   And on and on and on we could go.
16          You have not taught economics outside of
17 trying to teach lawyers economics?
18     A.   Outside -- I won't say just lawyers but
19 economists also.  Not outside of the seminars and
20 presentations, no formal teaching.
21     Q.   You have never been employed by a
22 university, for example?
23     A.   That's right.
24     Q.   Or even for that matter, and I'm not
25 trying to belittle you, a high school or any

Page 38

1 teaching of economics?
2    A.   That's true.
3    Q.   Did you discuss this life care plan with
4 Dr. Yarkony?
5    A.   No.
6    Q.   And life care planning is not your area
7 of expertise?
8    A.   That's correct.
9    Q.   And if we take a look at your report and
10 combine it with our discussion today, do we have
11 all of your opinions in this matter?
12    A.   I believe so.
13    Q.   You can't think of any that you did not
14 include in your report or that you did not ferret
15 out based on our detailed grilling this morning?
16    A.   That's correct.
17    Q.   Then I'm going to turn you over to
18 Mr. Leib here, who probably has several hours of
19 questions for you.
20    MR. LEIB:  Unfortunately, I have no questions.
21    MR. BLECHA:  I have several hours of
22 questions.  No, we are done.
23    THE REPORTER:  Signature?
24    THE WITNESS:  Does Wisconsin have where I need
25 to waive or reserve?

Page 39

1    MR. WEIR:  He can take care of that.  I think
2 you either need to read it or you need to say that
3 you are waiving it and relying on this lady to get
4 it right, which she probably will, but that is your
5 choice.
6    THE WITNESS:  I will waive.
7             FURTHER DEPONENT SAITH NOT.

Page 40

1 STATE OF ILLINOIS )
2           ) SS:
3 COUNTY OF C O O K )
4        I, KRISTIN C. BRAJKOVICH, a Certified
5 Shorthand Reporter of said state, do hereby
6 certify:
7        That previous to the commencement of the
8 examination of the witness, the witness was duly
9 sworn to testify the whole truth concerning the
10 matters herein;
11        That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16        That the said deposition was taken
17 before me at the time and place specified;
18        That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23        IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,
25 Illinois, this 20th day of March 2020.

Page 41

6 C.S.R. Certificate No. 84-3810.