





Transcript of the Deposition of
# Mary Kay Kolar, R.N.
**Case:** Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
**Taken On:** June 24, 2020

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CORTNEY KAISER, individually, and   )
as mother and next friend of         )
C.B., a minor,                       )
                                     )
          Plaintiff,                 )
                                     )
          -vs-                       )   No. 3:19-cv-00315
                                     )
THE MONROE CLINIC, INC.,             )
JAMES J. EHLE, M.D., and             )
WISCONSIN INJURED PATIENTS AND       )
FAMILIES COMPENSATION FUND,          )
                                     )
          Defendants.                )


          The videotaped deposition of

MARY KAY KOLAR, R.N., called for examination via

videoconference, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Court

pertaining to the taking of depositions, taken before

Mary T. Murphy McGuirk, a Certified Shorthand Reporter

and Notary Public within and for the County of Cook,

State of Illinois, and a Certified Shorthand Reporter of

said state, on June 24, 2020, at 10:00 a.m. CST.

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 2

 1   APPEARANCES (via videoconference):

 2        COPLAN & CRANE, LTD.
          MR. BENJAMIN A. CRANE
 3        1111 Westgate Street
          Suite 101
 4        Oak Park, Illinois 60301
          Phone: 708-358-8080
 5        E-mail:  bcrane@coplancrane.com

 6             Appeared on behalf of the Plaintiff;

 7        LEIB KNOTT GAYNOR
          MR. SAMUEL LEIB
 8        219 North Milwaukee Street
          Suite 710
 9        Milwaukee, Wisconsin 53202
          Phone: 414-276-2102
10        E-mail: sleib@lkglaw.net

11             Appeared on behalf of the Defendants
               The Monroe Clinic, Inc., and Dr. Ehle;
12
          OTJEN LAW FIRM, S.C.
13        MR. TODD WEIR
          20935 Swenson Drive
14        Suite 310
          Waukesha, Wisconsin 53186
15        Phone: 262-777-2200
          E-mail: tweir@otjen.com
16
               Appeared on behalf of the Defendant
17             Wisconsin Injured Patients and Families
               Compensation Fund.
18

19
     ALSO PRESENT (via teleconference):
20        Ms. Marion Buckley
          Mr. Anthony Scardapane, Videographer
21

22

23

24

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 3

```
 1                        INDEX

 2                                          PAGE
    MARY KAY KOLAR, R.N.
 3     EXAMINATION BY MR. CRANE.............    5
       EXAMINATION BY MR. LEIB.............. 133
 4     FURTHER EXAMINATION BY MR. CRANE..... 137

 5
                         EXHIBITS
 6

 7     No. 1082 referenced ................  28
       No. 1079 referenced ................  34
 8     No. 1078 referenced ................  97
       No. 1080 referenced ................ 116
 9

10          (Exhibits 1078 to 1084 attached.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 4

1    THE REPORTER:  Before we proceed, I will ask
2  counsel to agree on the record that under the
3  current national emergency pursuant to Section 319
4  of the Public Health Service Act, there is no
5  objection to this deposition officer administering
6  a binding oath to the witness remotely.
7    Please state your agreement on the record.
8    MR. CRANE:  Agreed.
9    MR. LEIB:  Agreed.
10    MR. WEIR:  Todd Weir, yes.
11    THE VIDEOGRAPHER:  I have a time of 10:15,
12  which is early, according to my -- is everyone
13  here?  I guess we got them.  Okay.
14    One moment.
15    We are now on the record.  This begins
16  Videotape No. 1 of the deposition of Ms. Mary Kay
17  Kolar in the matter of Cortney Kaiser versus Monroe
18  Clinic and Wisconsin Injured Patients and Families,
19  in the U.S. District Court, Western District of
20  Wisconsin, Docket No. 3:19-cv-00315.
21    Today is Wednesday, June 24th, 2020, and
22  the time is 10:16 a.m. Central time.  This
23  deposition is being taken via remote virtual
24  deposition at the request of the law firm of

Page 5

1  Coplan & Crane.  The videographer for today is
2  Anthony Scardapane of Magna Legal Services, and our
3  court reporter is Mary McGuirk, also of Magna Legal
4  Services.
5    Will counsel and all parties present
6  please state your appearance and who you represent?
7    MR. CRANE:  Ben Crane for the plaintiff.
8    MR. LEIB:  Samuel Leib of Leib Knott Gaynor,
9  LLC, appearing for The Monroe Clinic and Dr. Joseph
10  Ehle.
11    MR. WEIR:  Injured Patients and Families
12  Compensation Fund appears by Todd Weir.
13    MR. CRANE:  All right.  Let's go.
14    THE VIDEOGRAPHER:  Okay.  Will the court
15  reporter now please swear in the witness?
16    (The witness was duly sworn.)
17    THE VIDEOGRAPHER:  Thank you.  Please proceed.
18    MARY KAY KOLAR, R.N.,
19  called as a witness herein, having been first duly
20  sworn, was examined and testified as follows:
21    EXAMINATION
22  BY MR. CRANE:
23    Q.  Good morning, Ms. Kolar.  My name is
24  Ben Crane.  I'm going to ask you some questions about

Page 6

1  the life care plan that you prepared.  Is that okay?
2    A.  That's fine.
3    Q.  Are you hearing me okay?
4    A.  I can hear you fine.
5    Q.  Okay.  If any --
6    A.  Go ahead.
7    Q.  If at any point in time you don't understand
8  me, please -- please stop me and let me start again.
9  The other thing, having done a lot of these lately, it's
10  just -- it's even more important to wait until the
11  question is done before you start answering.  Okay?
12    A.  Okay.
13    Q.  Great.  How many depositions have you given as
14  a nurse life care planner?
15    A.  Two.
16    Q.  Okay.  Do you remember the names of those
17  depositions or the parties involved?
18    A.  One was Muman Abdulkaffi, A-b-d-u-l-k-a-f-f-i,
19  and I cannot remember the other one.  It was a motor
20  vehicle accident in Eau Claire.  I can't remember the
21  name of that one.
22    Q.  But it was a motor vehicle in Eau Claire,
23  Wisconsin?
24    A.  Correct.

Page 7

1    Q.  And who retained you in that case?
2    A.  Beverly Wickstrom.
3    Q.  And who is Beverly Wickstrom?  What firm is
4  she with, and does she typically represent the plaintiff
5  or the defendant?
6    A.  She is with the Wachs law firm.
7    THE REPORTER:  I'm sorry, Ms. Kolar?  Could
8  you please repeat?
9  BY THE WITNESS:
10    A.  Yes.  It's -- she's with Dana Wachs' firm, and
11  she represents only plaintiffs.
12  BY MR. CRANE:
13    Q.  Okay.  And that was a motor vehicle crash.
14  What type of injuries were involved?
15    A.  The woman was complaining, headaches, neck
16  pain, general body injuries.  Soft tissue, primarily.
17    Q.  And you prepared a life care plan?
18    A.  I did.
19    Q.  Okay.  And the life care plan, was it -- is
20  that something you still have access to?
21    A.  No.
22    Q.  When was that case?
23    A.  Three years ago.
24    Q.  You gave a deposition?

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 8

1    A.  Correct.
2    Q.  Okay.  The life care plan that you -- you
3  generated --
4         (Audio distortion.)
5         THE REPORTER:  Sorry, Mr. Crane.  We can't --
6  Mr. Crane, there was interference.  We can't hear
7  you.  Mr. Crane, we can't hear you.
8         MR. LEIB:  No.  No.  No.  I can -- I can see
9  you talking, but we can't hear you, Ben.
10        No.  Silence.
11        THE REPORTER:  Do you want to go off the
12  record?
13        THE VIDEOGRAPHER:  Yeah, I'm going -- I'm
14  going to go for here.  The time now --
15        MR. LEIB:  Now -- now we can hear some.
16        MR. CRANE:  Can you hear me now?
17        UNIDENTIFIED SPEAKER:  Thank you for calling
18  Magna Legal Services conference --
19        MR. LEIB:  Your lips were moving.  Nothing was
20  coming through.  It was garbled.  Now -- now it's
21  not that bad.
22        MR. CRANE:  All right --
23        MR. LEIB:  Now you're just breaking up there.
24        THE REPORTER:  Mr. Leib, I can't hear you.

Page 9

1         MR. LEIB:  Oh, really?  Okay.  I don't
2  know.  I'm on -- I'm on my cell phone.  You know,
3  there's something -- it must be something with
4  the --
5         THE REPORTER:  You just need to get closer to
6  it.
7         MR. LEIB:  To my cell phone?
8         THE REPORTER:  Yes.
9         MR. LEIB:  Okay.  Can you hear me now?
10        MR. CRANE:  Mary, can you hear me okay?
11        THE REPORTER:  Mr. Crane, I can hear you.
12        MR. CRANE:  Ms. Kolar, how about you?  Can you
13  hear me okay?
14        THE WITNESS:  Yes, I can.
15        MR. CRANE:  All right.  Very good.  Let's go
16  back on the record.
17        THE VIDEOGRAPHER:  We're still on, sir.
18        MR. CRANE:  Great.
19  BY MR. CRANE:
20    Q.  All right.  I'm looking at your report, and
21  it's got tables in it to show the different costs and
22  the different items that you're addressing.  Just as a
23  general proposition, how do you create that table?  Do
24  you use a --

Page 10

1    A.  Well, that's --
2    Q.  -- computer program --
3    A.  Go ahead.
4    Q.  -- Word document.  What is it?
5    A.  No.  It's a Word document.  And it has --
6  there's an option that says "Insert."  You can insert a
7  table.  So I insert a blank table, and then I complete
8  it.
9    Q.  Okay.  When you say you insert --
10   A.  I just -- go ahead.
11   Q.  I'm sorry.  When you say you insert --
12   A.  That's okay.
13   Q.  -- a life table and then you complete it,
14  where do you get the life table from which you then
15  insert it into the Word document?
16   A.  I didn't make that clear.  It's a blank table
17  that's a Word option.  And then I -- I fill in all the
18  words.
19   Q.  Okay.
20   A.  I don't -- kind of program.
21        THE REPORTER:  I'm sorry, Ms. Kolar.  That cut
22  out.  I don't something a program.
23  BY THE WITNESS:
24   A.  I don't use any kind of a program.

Page 11

1  BY MR. CRANE:
2    Q.  Okay.  You're acquainted with the fact that
3  those kinds of programs do exist.  You just don't use
4  them?
5    A.  Correct.
6    Q.  Very good.  All right.  The other case that
7  you gave a deposition in on --
8         (Audio distortion.)
9         THE REPORTER:  Mr. Crane, it's gone again.
10        MR. CRANE:  I'm going to -- I'm going to try
11  and call in.  I don't know why this is happening.
12  (Indiscernible.)
13        THE REPORTER:  Can we go off, please?
14        THE VIDEOGRAPHER:  Yeah, yeah.  The time
15  now -- I'm sorry.  The time now is 10:24 a.m.  We
16  are off the video record.
17        (Discussion off the record.)
18        THE VIDEOGRAPHER:  The time is 10:26 a.m.
19  We're back on the video.
20        MR. LEIB:  Mary, do you need a break already?
21        MR. CRANE:  I do.
22        MR. LEIB:  You're waving your hands.  It looks
23  like you've already gone through a four-hour
24  deposition.

5 (Pages 8 to 11)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 12

1  MR. WEIR:  She's just staying limber.
2  MR. CRANE:  Okay.  Ready?
3  THE VIDEOGRAPHER:  We're back on the record,
4  sir.
5  BY MR. CRANE:
6  Q.  Okay.  You mentioned, I think, the Abdulkaffi
7  case?
8  A.  Correct.
9  Q.  Is that the other case you gave a deposition
10 in?
11 A.  Yes.
12 Q.  Okay.  And what did that case concern?
13 A.  That was a brain damaged -- or the claim of a
14 brain damaged baby at birth.
15 Q.  And what side retained you in that case?
16 A.  The defense.
17 Q.  And who was the attorney that retained you?
18 A.  Mark Solheim, S-o-l-h-e-i-m.  He's with the
19 Larson firm in Minneapolis.
20 Q.  Did you testify at trial in either one of
21 those cases?
22 A.  I'm sorry.  What did you say?
23 Q.  Sure.  Did you testify at trial in either one
24 of the cases that we talked about?

Page 13

1  A.  No.  They both settled.
2  Q.  All right.  What is your profession?
3  A.  I am a certified life care planner as well as
4  a registered nurse and an attorney.
5  Q.  Do you still actively practice law?
6  A.  I only do arbitrations through the American
7  Arbitration Association as an arbitrator in no-fault
8  cases.
9  Q.  So auto cases?
10 A.  Yes.
11 Q.  And then do you still practice nursing?
12 A.  No.
13 Q.  How long has that been true?
14 A.  1986.
15 Q.  In terms of your professional time, can you
16 give me a sense of how much time you spend as a lawyer
17 and how much time as a certified life care planner?  And
18 to the extent that there's any overlap, please describe
19 that.
20 A.  There is no overlap.  I would say of the time
21 I work, which is part-time, 95 percent is life care
22 planning and 5 percent is the arbitrate.
23 Q.  So give me a sense.  Since -- you know, since
24 the pandemic hit, have you done any arbitration work?

Page 14

1  A.  No.
2  Q.  So can we take -- can we go back, say, from
3  March 1st of 2020 to March 1st of 2019 -- can you give
4  me a sense of how many arbitrations you participated in?
5  A.  Five.
6  Q.  And in those -- you know, in those
7  arbitrations, if they're anything like the ones that
8  I've sat through, you know, it's typically something
9  where you can get it done in -- in maybe a half a day or
10 maybe -- or be done by early afternoon kind of
11 situation?
12 A.  More like an hour in Minneapolis.
13 Q.  Okay.  Well, we call it the Windy City for a
14 reason.
15 All right.  And then in terms of your time
16 as a life care planner, you mentioned that, you know,
17 you're working part-time.  But how much -- how much
18 time -- and let's use that same time frame, in the year
19 of -- from -- from March 1st of 2019 through March 1st
20 of 2020.  Can you give me an idea, you know, how much
21 you were working as a -- as a life care planner?
22 A.  It varies, but I would say on an average,
23 probably ten hours a week.
24 Q.  And when did you start -- let me back up.  In

Page 15

1  your -- in your work as a life care planner, was there
2  work that you performed that is not involving litigated
3  matters?
4  A.  No.
5  Q.  A hundred percent of your work is litigation?
6  A.  Correct.
7  Q.  All right.  And how long has that been true
8  from now and go back into the past?  Has that always
9  been true, or is there a point in time where that wasn't
10 true?
11 A.  No.  That's always been true.
12 Q.  From your résumé -- or from your CV, it
13 appears to me that you began doing life care planning
14 work in 2013; is that about right?
15 A.  Correct.
16 Q.  And since 2013, can you give me a -- strike
17 that.
18 In every case that you get involved in,
19 every litigated matter, do you prepare a life care plan
20 such as the one that you've submitted in this case?  And
21 I say that very broadly, in the sense that, you know,
22 you're putting pen to paper, creating tables, coming up
23 with the future cost of things or the future -- future
24 cost needs of things.

6  (Pages 12 to 15)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 16

1      A.  In most -- I would say 98 percent of the time,
2   I prepare a full official life care -- like I did in
3   this case.  I have been asked two or three times to
4   prepare more of a summary written report that an
5   attorney needed to help facilitate settlement.  And, in
6   fact, I just prepared one last week.  It was a
7   seven-page report.  But it's more in the terms of a
8   letter.
9      Q.  Got you.  All right.  So I want to talk about
10  the full official ones, the 98 percent.  Okay?
11     A.  Okay.
12     Q.  Can you give me a -- can you give me a sense
13  of how many of those life care plans you've prepared
14  since 2013 in litigated matters?
15     A.  Approximately 100.
16     Q.  That's more than ten a year; is that fair?
17     A.  Correct.
18     Q.  Can you give me a sense of, are there -- you
19  know, of late, let's say in the last three years, has
20  that held true that you're looking at somewhere around
21  10 a year?
22     A.  It's been more like 15.  The last couple of
23  years, I've been busier.
24     Q.  Has it been at least 15 a year for the last

Page 17

1   three years?
2      A.  I would say yes.
3      Q.  Have you gone over 20 in some of the last
4   three years?
5      A.  No.
6      Q.  In these approximately 15 a year for the last
7   three years, are there -- is there a breakdown that
8   you're able to offer between plaintiff and defense when
9   you prepare these?
10     A.  50/50.
11     Q.  When you -- let me just take care -- the
12  50 percent of the time where you're retained by the
13  defense, can you give me a sense of what types of cases
14  those involve?
15     A.  All -- well, obviously, they're all
16  personal injury cases.  I would say the majority
17  have been auto cases, auto accidents, but I have done
18  what I call baby cases, and I've done -- I did an
19  electrocution case, an assault case.  I just wrote a
20  care plan in the last six months for a fellow that was
21  shot in the back after a bar brawl.
22          So there are things other -- motor
23  vehicle, but I would say by far more of the -- than --
24          (Audio distortion.)

Page 18

1          (Off-the-record reporter clarification.)
2   BY THE WITNESS:
3      A.  I said there are -- okay.  There are the other
4   cases, the occasional other cases, but by far the
5   majority of my care plans have been for auto cases.
6   BY MR. CRANE:
7      Q.  All right.  A couple of things.  How many of
8   those -- that 50 percent of defense cases, you mentioned
9   baby cases.  How many baby cases have you worked on for
10  the defense where you generated a life care plan in a
11  litigated matter?
12     A.  Seven.
13     Q.  Are you sure about that?
14     A.  Pardon me?
15     Q.  Are you sure about that?
16     A.  I would say somewhere between seven and ten.
17  I know it has not been more than ten.
18     Q.  Okay.  In those seven to ten cases where you
19  have prepared life care plans in litigated matters in --
20  in baby cases, have you been retained by either of the
21  firms involved in this case, either Mr. Leib's firm or
22  Mr. Weir's firm?
23     A.  Yes.
24     Q.  On how many occasions of those seven to ten

Page 19

1   times?
2      A.  Well, I wasn't retained by Mr. Leib's firm,
3   but he was on the case, the Abdulkaffi case I told you
4   earlier.
5      Q.  Okay.
6      A.  But it was another attorney that retained me.
7      Q.  So you met Mr. Leib on this case, on this
8   other case?
9      A.  No.  I met his son Brenden.
10     Q.  Okay.  But you knew Mr. Leib was working on
11  the Abdulkaffi case?
12     A.  Yes.
13     Q.  Other than the Abdulkaffi case, have you
14  worked on any litigated matters with Mr. Leib's firm in
15  any way?
16     A.  No.
17     Q.  Okay.  Same questions for Mr. Weir's firm.
18     A.  No.
19     Q.  How about a case involving The Monroe Clinic?
20     A.  That was Mya Cook or Mya deCook.
21     Q.  Okay.  Is that through -- is that a
22  plaintiff's name?
23     A.  That was, yes, the child's name.
24     Q.  Mya DeCook?

7 (Pages 16 to 19)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 20

1    A.  Correct.
2    Q.  And who retained you in that case?
3    A.  I have to think a minute.
4        I think that was Mark Solheim as well.
5    MR. LEIB:  That -- that case has nothing to do
6    with The Monroe Clinic.  You're mistaken on that.
7    THE REPORTER:  I'm sorry, Mr. Leib --
8  BY THE WITNESS:
9    A.  Oh, that was the one -- I'm sorry.  Mr. Leib
10   said that was not The Monroe Clinic.  Monroe Clinic, I
11   think, was the Abdulkaffi case.  And Mya deCook was
12   against Olmsted County.
13   MR. LEIB:  No.  Do you want me to clarify?
14  BY MR. CRANE:
15   Q.  Another case other than this particular case
16   involving Monroe Clinic?
17   A.  Not that I can recall.
18   Q.  Okay.  In the Abdulkaffi case, did you rely
19   upon any other witnesses in that case's opinion, any
20   other professional retained witnesses?
21   A.  No.  I'm sorry.  I can't remember that.
22   That -- it was a while ago.  I'm assuming -- I shouldn't
23   assume.  But typically in cases, it's -- I ask that one
24   of the experts, whether it's plaintiff's or defense,

Page 21

1    review my plan to lay the medical foundation that's
2    necessary.  So I am thinking that happened in
3    Abdulkaffi, but I do not remember the name of the
4    physician.
5    Q.  Would you agree with me that that did not
6    happen in this case, that Dr. Simms did not review your
7    plan?
8    A.  I --
9    MR. LEIB:  Let me just -- lack of foundation.
10       You can go ahead.
11  BY THE WITNESS:
12   A.  I don't know if Dr. Simms has reviewed it.  I
13   have an understanding that any defense expert will be
14   reviewing my care plan to lay the foundation.
15  BY MR. CRANE:
16   Q.  And where do you gain that understanding
17   from?
18   A.  From my conversations with defense counsel.
19   Q.  Okay.  And did they tell you whether or not
20   Dr. Simms had reviewed your care plan?
21   A.  No, they did not.
22   Q.  Is it your understanding based on everything
23   that you know that Dr. Simms has yet to review your care
24   plan?

Page 22

1    A.  Yes.
2    Q.  Okay.  Do you believe, whether it's as a
3    nurse, as a certified life care planner, or as an
4    attorney for several years in trials, that without
5    Dr. Simms giving blessing to your care plan, it lacks a
6    proper foundation to be entered into court?
7    MR. LEIB:  Object to form and foundation.
8    THE REPORTER:  Sorry.  Was that Mr. Weir?
9    MR. WEIR:  Calls for -- excuse me.  It calls
10   for a legal foundation, and Simms is not the only
11   physician in this case.
12  BY MR. CRANE:
13   Q.  Go ahead.
14   A.  Okay.  I would agree that a physician needs to
15   lay the foundation for some of the opinions in my case,
16   in my care plan.  Not all.  And as counsel has said,
17   there are other physicians that can -- can certainly lay
18   the foundation for my plan that have been retained in
19   this case.  And I don't know at this point who that will
20   be.
21   MR. CRANE:  What -- what can you read back
22   my -- my question, please, Ms. Court Reporter,
23   Mary?
24       (The record was read as requested.)

Page 23

1  BY MR. CRANE:
2    Q.  Can you answer the question?
3    A.  My answer is --
4    MR. LEIB:  Same objection.
5    MR. WEIR:  Object.  Now it's repetitive.  She
6    did answer it.
7  BY THE WITNESS:
8    A.  And my repeat answer --
9  BY MR. CRANE:
10   Q.  Yeah.  Go ahead.  They're making objections.
11   You can go ahead and answer.
12   A.  Okay.  A physician needs to lay the foundation
13   for some of the opinions in my care plan.  Not all.  And
14   I don't know who that physician will be, but I've been
15   told there will be a physician laying foundation.  I
16   would agree that some of the opinions in my care plan do
17   require foundation.
18   Q.  Which ones?
19   A.  Primarily the ones --
20   MR. LEIB:  Object to form, overly broad.
21       You can go ahead.
22  BY THE WITNESS:
23   A.  Primarily the ones relating to the future
24   medical treatments after say the age of 13.

8  (Pages 20 to 23)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

| Page 24 | Page 26 |
|---|---|

**Page 24**

1  BY MR. CRANE:
2      Q.  And under your plan, 13 is when he -- under
3  one of your plans, 13 is when he would potentially go
4  into a nursing facility of some sort?
5      A.  Under option 3, yes.
6      Q.  Right.  And so you don't have the foundation
7  for that opinion without Dr. Simms providing the
8  foundation or some other physician providing the
9  foundation?
10      MR. LEIB:  Object to the form.
11      MR. WEIR:  Object, calls for a legal
12      conclusion.
13  BY THE WITNESS:
14      A.  Foundation, are you saying that -- do I
15  believe I need foundation about him going into a
16  facility?
17  BY MR. CRANE:
18      Q.  You're not qualified to render an opinion as
19  to when he is appropriate to go into a facility, fair?
20      A.  No.  That's not fair.
21      Q.  Okay.
22      A.  He would be --
23      Q.  Go ahead.  Why isn't it fair?
24      A.  Because he could go into the facility that I

**Page 25**

1  have laid in my plan now.  That's a parent's
2  decision.  That is a qualified facility more than
3  capable of providing any care that C.B. would
4  require if the parents decided tomorrow that they
5  wanted him to go live there.  That's not something a
6  physician has to order.
7      Q.  As a nurse, did you ever admit a patient into
8  a nursing home?
9      A.  No.
10      Q.  Why not?
11      A.  Well, because most patients when
12  they go into a nursing home go from a hospital,
13  and the physician will write an order, or the
14  facility themselves have physicians as the
15  Marklund facility.
16      Q.  Right.  You need a physician's order to put
17  somebody into a nursing home, don't you?
18      A.  No.
19      MR. LEIB:  Object to the form of the question.
20  It's -- first of all, there's a lack of foundation,
21  and it's calling for a legal opinion.
22      MR. CRANE:  That was -- that one is a nursing
23  opinion.
24      MR. LEIB:  Well, we can -- we can disagree

**Page 26**

1  with that.
2  BY THE WITNESS:
3      A.  You did not --
4      THE WITNESS:  Should I go?
5      MR. LEIB:  Yeah.
6  BY THE WITNESS:
7      A.  You do not need a physician's order to start
8  the process of a -- of a person going into a long-term
9  care facility.  If someone -- let me -- as I -- I'll
10  explain.  If a person has dementia and they start
11  getting confused -- care that a family member can't
12  provide, the family could contact the nursing home and
13  start the process of getting the patient.  And the
14  facility physician does the initial admitting exam and
15  writes the order.
16  BY MR. CRANE:
17      Q.  Did you contact the Marklund Wasmond Center as
18  part of your investigation?
19      A.  I did.
20      Q.  And who did you speak with there?
21      A.  I spoke with the (inaudible) administrator
22  and --
23      (Audio distortion.)
24      (Off-the-record reporter clarification.)

**Page 27**

1  BY THE WITNESS:
2      A.  I spoke with the center's administrator,
3  Michelle Orwig, O-r-w-i-g, and I spoke with the facility
4  social worker, Natalie Rubino, R-u-b-i-n-o.
5  BY MR. CRANE:
6      Q.  Did either one of them tell you they were
7  willing to accept a patient without a physician's order?
8      A.  We didn't discuss that.  I told them what
9  C.B. medical needs are, and they said that he would
10  be -- he qualified to be admitted to their facility
11  based on his tube feeding, which is --
12      (Audio distortion.)
13      (Off-the-record reporter clarification.)
14  BY THE WITNESS:
15      A.  He would be an appropriate candidate for their
16  facility based on his tube feeding and his seizures.
17  BY MR. CRANE:
18      Q.  So you mentioned that some but not all of your
19  opinions require a medical doctor's blessing for proper
20  foundation.  You mentioned the one that you had
21  difficulty or that you might have some problems after 13
22  was the medical care -- or was the future medical care
23  after 13 was the issue that you believed required M.D.
24  foundation, right?

9 (Pages 24 to 27)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 28

1      A.  Correct.
2      Q.  All right.  So what I'd like to do is tease
3  out -- I'm going to option 1, option 2, option 3.  It's
4  on page 24 and 25 of the report.  And I'm going to share
5  my screen.
6          MR. CRANE:  Oh, can I have -- Anthony, can you
7      allow me to share my screen?
8          THE VIDEOGRAPHER:  Sure.  Yes, sir.  Yes, sir.
9      Coming up.
10         MR. CRANE:  You can call me Ben.
11         THE VIDEOGRAPHER:  You should be able to do it
12     now, sir.
13         MR. CRANE:  All right.
14             Okay.  We are -- and I -- I sent this
15     around -- or Julia sent it around to the court
16     reporter, following the same format, along the left
17     here, Sam and Todd.  Start with Exhibit -- we have
18     1078 is her CV all the way through 1084, which is
19     correspondence.  So what I'd like to look at is
20     1082.  And I'm going to go to page 24.
21             (Exhibit No. 1082 referenced.)
22  BY MR. CRANE:
23     Q.  Okay.  All right.  So I'm looking at
24  Exhibit 1082, option 1.  Is this -- is this from page 24

Page 29

1  of your report, Ms. Kolar?
2      A.  Yes.
3      Q.  Okay.  And then I am looking at option 1.  I
4  am looking at -- there's a column -- or there's a
5  heading "Medical Care" and then there's one that says
6  "Age 4 through Age 13" and then "Age 13 through Age 33."
7  Do you see that right there?
8      A.  Correct.
9      Q.  Under option 1, age 13 through age 33 is
10  $131,160.  Do I have that right?
11     A.  Yes.
12     Q.  Okay.  And would you agree with me that you do
13  not, without the blessing of an M.D., have the
14  foundation to offer an opinion regarding medical care,
15  age 13 through age 33; is that correct?
16         MR. LEIB:  Object to form.
17  BY THE WITNESS:
18     A.  I would agree with that.
19  BY MR. CRANE:
20     Q.  Okay.  And if you go to option 2, same number,
21  same -- same issue.  Do you agree that you, without an
22  M.D. blessing, don't have the foundation for age 13
23  through age 33 of this $131,160 amount?
24     A.  Yes.

Page 30

1      Q.  And the same would hold true under option 3,
2  true?
3      A.  Correct.
4      Q.  Okay.  Why do you have the foundation then
5  without M.D. blessing -- strike that.
6             We can agree that as far as you know --
7  and certainly -- well, here.  I've never been told any
8  M.D. has blessed your life care plan.  Do you know
9  something different?
10     A.  Not at this point.
11         MR. LEIB:  Object to the form of the question.
12             You can go ahead.
13  BY THE WITNESS:
14     A.  Not at this point.
15  BY MR. CRANE:
16     Q.  Okay.  Do you know something I don't know?  Do
17  you except some doctor to give your report a blessing?
18  Have you been told that there's a doctor that has
19  blessed your report, if you know?
20         MR. LEIB:  Object to form again.
21         THE REPORTER:  I'm sorry.  Mr. Leib, object to
22     form?
23         MR. LEIB:  Yeah.
24         THE REPORTER:  And Ms. Kolar?

Page 31

1  BY THE WITNESS:
2      A.  I have been told that some of the defense
3  experts will be reviewing my report or are reviewing my
4  report.  I have not been told who or what the results
5  are.
6  BY MR. CRANE:
7      Q.  Okay.  Has Dr. Simms to your knowledge
8  reviewed your report?
9          MR. LEIB:  Objection.  It's been asked and
10     answered.
11  BY THE WITNESS:
12     A.  I don't know.
13  BY MR. CRANE:
14     Q.  Okay.  Have you spoken with Dr. Simms at all
15  about this case?
16     A.  Yes.
17     Q.  Okay.  How many times have you talked with
18  Dr. Simms about this case?
19     A.  Once.
20     Q.  When did you speak with Dr. Simms about this
21  case that one time?
22     A.  Two or three weeks ago.
23     Q.  Was it before or after he gave his deposition?
24     A.  I don't remember -- I don't -- I don't know

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 32

1   that.
2      Q.  Okay.  Do you have any information that will
3   tell us exactly when two or three weeks ago you spoke to
4   Dr. Simms that one time?
5      A.  Yes, but if I try to get at it, I might lose
6   you all.
7      Q.  I think -- here, if you -- if you minimize it,
8   minimize the Zoom screen, just using that little --
9   little dash at the top, you can get at anything on your
10  computer, and it won't share anything until you've given
11  permission to share your screen.  So whatever you're
12  looking at, we're not going to be able to see.  So if
13  you have something that can pinpoint when you talked to
14  Dr. -- Dr. Simms, that would be helpful.
15         (Short pause.)
16  BY THE WITNESS:
17     A.  I'm trying.
18  BY MR. CRANE:
19     Q.  No.  I get it.  Take your time.  I mean, we
20  live in a different world.  We -- we all -- everybody is
21  kinder and has more patience.  I used to be a lot worse.
22     A.  That's good.
23        MR. LEIB:  We're hoping you ramp that up, Ben.
24        MR. CRANE:  Oh, I'm -- I'm just getting

Page 33

1   started.  I started -- I just changed my diet, Sam.
2   Watch out.
3         MR. LEIB:  Okay.
4         THE VIDEOGRAPHER:  Mr. Crane, do you want me
5   to go off the video?
6         MR. CRANE:  Does it really matter?  I mean,
7   you can.
8         THE VIDEOGRAPHER:  No, not to us.  Just to
9   you.
10        MR. CRANE:  Do you charge me when the -- when
11  the digital thing is running more?
12        THE VIDEOGRAPHER:  There's no meter, no.
13        MR. CRANE:  Got you.  All right.
14        Sam, I'm not seeing any invoices or bills
15  as far as I can tell from what I'm looking at.  If
16  you guys -- and that may be where she can look to
17  find this answer.
18        MR. LEIB:  Mary Kay, did you send us any
19  invoices or bills?
20        THE WITNESS:  I did.
21  BY MR. CRANE:
22     Q.  I don't know -- I don't know.  Maybe those
23  would have some information about when you talked to
24  Dr. Simms on them?

Page 34

1      A.  No.  It -- I thought there was one, but the
2   invoices I looked at right now are separate invoices.
3   It doesn't break it out.  And I don't have any -- the
4   notes I took -- briefly notes on that meeting, doesn't
5   have a date on it.  And it was -- I know it was at least
6   two weeks ago.
7      Q.  All right.  Well, today --
8         MR. LEIB:  Check the rider then.  Check the
9   rider.
10        THE WITNESS:  Check what?
11        MR. LEIB:  No.  I'm talking to Ben.
12        Check the rider.  She sent it to -- sent
13  it to us.  It should be contained with the rider.
14        MR. CRANE:  I'm not seeing it.
15        Oh, I -- I lied.  Here we go.  I've got
16  them.
17        All right.  So it does not -- skipped
18  right over it.
19        (Exhibit No. 1079 referenced.)
20  BY MR. CRANE:
21     Q.  I see one invoice here.  We've marked it as
22  Exhibit 1079.  It's for 35 hours of work, $6,125.  But
23  there's no indication that Dr. Simms was contacted or
24  discussed, that you had any conversation with him.

Page 35

1   Is that -- so do you believe -- with all of that
2   background -- that's not really a question.
3         The conversation with Dr. Simms would have
4   happened at some point after May 6th; is that fair?
5      A.  Yes.
6      Q.  And given it's June 24th, do you believe that
7   you spoke with him somewhere in the -- somewhere around
8   June 10th or thereabouts?
9      A.  In the first or second week of June is when I
10  believe I talked to him.
11     Q.  Okay.  And when you talked to him, you had --
12  you had already seen his May 26 -- or excuse me,
13  May 22nd report?
14     A.  Is that his IME?
15     Q.  You can call it that.  I'm not going to.  But
16  the examination and then he gave a report on life
17  expectancy.
18     A.  Yes.
19     Q.  Okay.
20     A.  And it was --
21     Q.  Do you have that -- do you have that document?
22     A.  I have it in my --
23        (Audio distortion.)
24        (Off-the-record reporter clarification.)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

---

Page 36

1   BY THE WITNESS:
2       A.  I have it.  I don't have it in the documents I
3   have right now --
4   BY MR. CRANE:
5       Q.  Is all --
6       A.  -- for obvious reasons.
7       Q.  Is -- all I want to know is, is it dated
8   May 22nd?
9       A.  Yes.
10      Q.  And do you have any other reports from
11  Dr. Simms?
12      A.  No.
13      Q.  Okay.  And so when you spoke with Dr. Simms --
14          (Audio distortion.)
15          (Off-the-record reporter clarification.)
16  BY MR. CRANE:
17      Q.  Yeah.  I'm going to back up.  There's somebody
18  else kind of talking.
19          Can you hear me okay, Ms. Kolar?
20      A.  Yes.  Yes.
21      Q.  Okay.  So when you talked to Dr. Simms at some
22  point in the first two weeks of June, what was the
23  purpose of your conversation?
24      A.  We were talking about life expectancy.

---

Page 37

1       Q.  Okay.  And what did he tell you about life
2   expectancy?
3       A.  That we -- at that point, I believed
4   his life expectancy projection was perhaps to
5   age 24 or 26 because I know he had not -- if I'm
6   remembering, I don't believe he had evaluated or
7   seen C.B. personally, because after he saw him,
8   that's when his opinion, age 33 life expectancy, was
9   given to me.
10      Q.  So at some point in time prior to the age 33
11  life expectancy being given to you, you were of the
12  understanding that he had an opinion that his life
13  expectancy was less than that?
14      A.  Yes.
15      Q.  Okay.  And when you were given the age 33 life
16  expectancy, who gave that to you?
17      A.  That --
18          (Audio distortion.)
19  BY MR. CRANE:
20      Q.  I'm sorry.  I didn't hear your answer.
21      A.  The defense attorneys, Mr. Leib, Brenden.
22      Q.  Did Mr. Leib tell you to use one life
23  expectancy over another?
24      A.  He said that 30 -- the life expectancy to age

---

Page 38

1   33 would be what Dr. Simms would testify to, and that's
2   why what I decided -- or what I should use in my care
3   plan because that is something that needs medical
4   foundation.
5       Q.  Okay.  And was there any other information
6   that you were relying upon other than the direction by
7   Mr. Leib to -- to reach that 33-year life expectancy or
8   to use that 33-year --
9       A.  No.
10      Q.  -- life expectancy?
11      A.  No.
12      Q.  Dr. Simms didn't call you and say you should
13  use something different, right?
14      A.  No, he did not.
15      Q.  Dr. Simms didn't provide you with a revised or
16  amended report, did he?
17      A.  No, not that I -- no.  I have not --
18      Q.  You relied upon -- you relied upon what the
19  attorney told you in developing the life expectancy
20  framework for your life care plan?
21      A.  Yes.
22          MR. LEIB:  Object to the form of the question.
23      I think it's been asked and answered.
24          You can go ahead.

---

Page 39

1   BY THE WITNESS:
2       A.  Yes.
3   BY MR. CRANE:
4       Q.  Okay.  Other than -- I'm coming back to your
5   qualification to render opinions without some sort of
6   blessing from an M.D.  Other than future medical
7   treatment after 13 -- let me pull this on the screen --
8   up on the screen.  And we'll start with -- we'll go back
9   to that first one you ran, option 1.
10          Are there other items on option 1 that you
11  believe could or might require an M.D. blessing for
12  foundation?
13      A.  No.
14      Q.  That's the only one?
15      A.  Correct.
16      Q.  Okay.  Where do you derive the foundation for
17  what medications he needs?
18      A.  From what he's currently receiving and also
19  the ones on my care plan are exactly the same as what
20  Dr. Yarkony has in his care plan, which he's laying the
21  foundation for except for the ones for C.B.
22  allergies, which are not related to his cerebral palsy.
23      Q.  Okay.  You're relying upon Dr. Yarkony's
24  opinions for option 1, medications.  Do I have that

---

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

| Page 40 | Page 42 |
|---|---|
| 1　correct? | 1　　　MR. LEIB: Object just to the extent whatever |
| 2　　　MR. LEIB: Object to form, misstates the | 2　the report says is what the report says. It speaks |
| 3　testimony. | 3　for itself. |
| 4　　　Go ahead. | 4　　　You can go ahead. |
| 5　BY THE WITNESS: | 5　BY THE WITNESS: |
| 6　　A. Okay. Sorry. | 6　　A. I don't think his report addressed that |
| 7　　　I'm relying on not only what's in | 7　specifically. |
| 8　Yarkony's report, but also what -- what medications | 8　BY MR. CRANE: |
| 9　C.B. was taking, according to his medical records at | 9　　Q. And so the totality of the foundation that you |
| 10　the time I prepared my report and based on the records | 10　have for excluding allergy medication from the life care |
| 11　that I had at that time. He's taking different things | 11　plan is a conversation that you had with Dr. Simms at |
| 12　now, but I didn't have those updated records when I | 12　some point in the first two weeks of June? |
| 13　gave -- or when I sent my report. | 13　　　MR. LEIB: Objection. It's been asked and |
| 14　BY MR. CRANE: | 14　answered. |
| 15　　Q. Okay. Option 1, it doesn't relate to medical | 15　BY THE WITNESS: |
| 16　treatment in the past, does it, like it's not -- | 16　　A. That's correct, but it's also based on my |
| 17　　A. No. | 17　nursing experience, that being allergic to chickens or |
| 18　　Q. This isn't a -- this isn't a tally of what's | 18　eggs and dogs and cats is an inborn trait that has |
| 19　been charged. This is all for the future, right? | 19　nothing to do with cerebral palsy. |
| 20　　A. Correct. | 20　BY MR. CRANE: |
| 21　　Q. So you're utilizing -- did -- did you utilize | 21　　Q. You're not a geneticist, are you? |
| 22　Dr. Yarkony's numbers for medication in total? | 22　　A. No, I'm not. |
| 23　　　MR. LEIB: Object to the form. It's been | 23　　Q. You're not a neurologist? |
| 24　asked and answered. | 24　　A. No, I'm not. |

| Page 41 | Page 43 |
|---|---|
| 1　　　You can go ahead. | 1　　Q. You're not an allergist? |
| 2　BY THE WITNESS: | 2　　A. No, I'm not. I'm not a physician. But I |
| 3　　A. I used actually a correlated source, | 3　would think any physician you ask is if his allergies |
| 4　which was the new University of Wisconsin bills for what | 4　are related to his cerebral palsy, no one will say they |
| 5　the medications cost. So these are the ones -- | 5　are. |
| 6　　Q. Okay. | 6　　Q. I'm just talking about the foundation for your |
| 7　　A. -- allergies. | 7　life care plan. |
| 8　　　(Audio distortion.) | 8　　A. I understand, and I'm telling you that you |
| 9　　　(Off-the-record reporter clarification.) | 9　don't have to be a physician to know that allergy |
| 10　BY THE WITNESS: | 10　medications are not related to cerebral palsy. |
| 11　　A. But I deleted the medications relating to his | 11　　Q. Would you agree you have to have proper |
| 12　allergies. | 12　foundation to have a life care plan, and in certain |
| 13　BY MR. CRANE: | 13　instances, you need an M.D. to give that blessing, don't |
| 14　　Q. Why? | 14　you? |
| 15　　A. Because his allergies are not related to his | 15　　　MR. LEIB: Object to the form of the question. |
| 16　cerebral palsy. | 16　It's been asked and answered, and it's for the |
| 17　　Q. Whose opinion are you relying upon for that? | 17　Court to decide whether or not there's foundation. |
| 18　　A. That was something Dr. Simms and I discussed | 18　　　MR. WEIR: It's also vague. |
| 19　during our phone call. | 19　BY THE WITNESS: |
| 20　　Q. Which you don't know when it was? | 20　　A. Foundation is -- is required for certain |
| 21　　A. Right. | 21　aspects of a life care plan. |
| 22　　Q. You're not relying -- there's nothing in | 22　BY MR. CRANE: |
| 23　Dr. Simms's report that says that you shouldn't account | 23　　Q. Okay. Where did you get the information on |
| 24　for his allergies, is there? | 24　disposable medical goods under option 1? |

13  (Pages 40 to 43)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 44

1    A.   From Ms. -- from Ms. Kaiser's deposition --
2    Q.   Okay.
3    A.   -- from Dr. -- Dr. Yarkony's report, and from
4    my research of costs on the Internet.
5    Q.   Your -- your research of what?
6    A.   Costs.
7    Q.   Okay.
8    Q.   How much did it cost?
9    Q.   Have you taken notes or -- I mean, in any way
10   memorialized the research that you've done?
11   A.   No.  I research and type at the same time.
12   Q.   And -- and the typing is all in this document
13   that you've produced, the life care plan of C.B.
14   Babler, Exhibit 1082?
15   A.   Yes.  Yes.
16   Q.   So over time -- over time, this -- this was a
17   living, breathing document, and as you went through, if
18   you've had conversation and you've reviewed medical
19   records, would you type into this document?
20   A.   Yes.
21   Q.   In terms of reviewing medical records, do you
22   use any sort of software or anything along those lines
23   to organize your medical records?
24   A.   No.

Page 45

1    Q.   Do you have paper copies of the medical
2    records, or are they all on -- all on computer?
3    A.   They were provided online.
4    Q.   Okay.  And then did you print them out?  Do
5    you have paper copies now?
6    A.   No.
7    Q.   Okay.  All of your review occurred digitally
8    of this -- of this case?
9    A.   Correct.
10   Q.   Okay.  Would you have taken notes about your
11   conversation with Dr. Simms in this living, breathing
12   document that we were just talking about?
13   A.   I would have -- and let me see.  I'm not -- I
14   don't know if I did.  And if I did, they were just
15   shorthand.
16   Q.   And then you would have typed over those notes
17   in this living, breathing document?
18   A.   Yes.
19   Q.   Did you also -- I -- I see in your report you
20   have expense for a handicapped accessible van?
21   A.   Yes.
22   Q.   It's on page 22 of your report?
23   A.   Yes.
24   Q.   Did you ultimately include that in the costs

Page 46

1    of the life care plan?
2    A.   Yes.  Under "Miscellaneous Expenses."
3    Q.   All right.  Right above that, there's a
4    sentence.  It's -- the sentence begins, "The cost of the
5    vehicle is not included."
6    A.   Correct.
7    Q.   Can you explain that for me?
8    A.   The family needs a vehicle, and so that's an
9    expense they would incur regardless of whether C.B.
10   has cerebral palsy.  So in life care plans, the standard
11   is to include the costs of the modification of the
12   vehicle to make it handicap accessible, but not the
13   vehicle itself.
14   Q.   Does the standard of care for certified nurse
15   life care planners require that you exclude the costs of
16   the vehicle from miscellaneous expenses and only include
17   that for modifications?
18   A.   I would say yes -- it's not nurse -- there's a
19   difference between life care planners and nurse life
20   care planners.  That's a distinction.  I am a certified
21   life care planner even though I am a nurse.
22   Q.   Okay.  Let me -- let me ask it -- and thank
23   you for making that distinction.  I'm going to go ahead
24   and clean it up with that understanding.

Page 47

1    A.   Okay.
2    Q.   Does the standard of care require of certified
3    life care planners that they exclude the cost of the
4    entire vehicle and only include those things that would
5    be necessary to modify the vehicle to be handicap
6    accessible?
7    MR. LEIB:  Object to the form.  It's vague.
8    You can go ahead.
9    BY THE WITNESS:
10   A.   I don't know if I would say that the standard
11   of care requires that it be excluded.  It's more proper
12   to say standard of care is that only the cost of the
13   modification is included.
14   BY MR. CRANE:
15   Q.   Is that standard of care defined somewhere?
16   A.   No.
17   Q.   And where do you derive your opinion that the
18   standard of care is to not include that?
19   A.   From my training when I went through
20   the program to obtain my certification as well as my
21   review of probably at least 50 to a hundred other life
22   care plans prepared by other life care planners, none of
23   them include the cost of the vehicle other than
24   Dr. Yarkony.

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 48

1    Q.  All right.  So you -- you mentioned your
2   training?
3    A.  Correct.
4    Q.  What else helps you form your -- your
5   understanding of the standard of care?
6    A.  My seven years of experience as a life care
7   planner and my 30-some years' experience as a trial
8   attorney working with life care planners.
9    Q.  Do you believe without your 30 years of trial
10  experience you would still be qualified to render an
11  opinion on the standard of care of a certified life care
12  planner?
13       MR. LEIB:  Object to the form of the question.
14       It -- it's for the Court to decide.  It's a legal
15       conclusion.
16  BY THE WITNESS:
17       A.  You can -- yes, yes.  I would -- to be a
18  certified life care planner, you need to have an
19  underlying license in a medical type of a field, which
20  means physical therapy, occupational therapy, speech
21  therapy, social work, registered nurse.  You have to
22  have a license that's active before you can become a
23  life care planner.  But once you're a life care planner,
24  you do not have to have trial experience.

Page 49

1   BY MR. CRANE:
2    Q.  Okay.  So what allows you to become a life
3   care planner is your background as a -- as a nurse
4   rather than your background as a trial attorney?
5    A.  Yes.
6    Q.  All right.  And at the point that you became a
7   life care planner, it had been approximately 27 years
8   since you had last treated a patient?
9    A.  Yes.
10   Q.  So it's your training, your seven years of
11  experience, and your 30 years as a trial lawyer that
12  believes your -- that qualifies you to render this --
13  your opinion on what the standard of care is for a
14  certified life care planner.  Do I have that right?
15   A.  Yes.
16       MR. LEIB:  Objection.  Object to the form.
17       It's been asked and answered.
18  BY MR. CRANE:
19   Q.  What about -- what is it about your training?
20  What were you trained what the standard of care was and
21  who were you trained by?
22   A.  As a life care planner?
23   Q.  Yes.
24   A.  My program was a certification program that I

Page 50

1   attended at the University of Florida, which is an
2   accredited program in which you have to perpetuate from
3   in order to be able to take the exam that allows you to
4   become certified.
5    Q.  And are there any other programs in the
6   country other than the one at Florida?
7    A.  There are many.
8    Q.  Okay.  Why did you choose the one at Florida
9   over one of the many others?
10   A.  Because the one at the University of Florida
11  was the very first program.  It's where the whole
12  occupation of life care planners started.  It has an
13  excellent reputation, and I searched it plus a few other
14  programs and felt that the University of Florida had a
15  program that I wanted to pursue --
16       (Audio distortion.)
17       THE REPORTER:  Sorry.  That I wanted to what?
18  BY THE WITNESS:
19       A.  Pursue.
20  BY MR. CRANE:
21   Q.  Did you -- did you investigate any other
22  programs?
23   A.  Yes.  But I can't remember the names.
24   Q.  Okay.  Are there programs for certified life

Page 51

1   care planners anywhere in the Midwest?
2    A.  I don't think so.
3    Q.  Okay.  The -- the one at the University of
4   Florida, what -- what was the -- what commitment did you
5   have to make in order to receive that certification or
6   that training for the certification, to complete that
7   program, I guess?
8    A.  What do you mean "commitment"?
9    Q.  Yeah.  What's the time commitment?  What's
10  the -- you know, how many -- you know, is it a -- is it
11  a -- it's not a four-year program where you're going
12  20 hours a week to school.  It's not like law school.
13  Can you give me a sense of what you had to do?
14   A.  It's an online program primarily, and it's six
15  courses.  And you can work at them or at least at that
16  time you could, at your own pace, up to a maximum, I
17  believe you had to complete -- excuse me, each section
18  within three months from when you started that section.
19  But each section, one section dealt with birth injuries,
20  birth -- cerebral palsy, different types of --
21  developmental delays would be the best thing to say.
22       There was a section that dealt with spinal
23  cord injury and spinal cord trauma and spinal shock.  So
24  it had a lot of net involved with it.

15  (Pages 48 to 51)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 52

1    (Off-the-record reporter clarification.)
2    BY THE WITNESS:
3       A.   It involved a number -- a lot of the types --
4    the physiology of an injury, the medical care and
5    treatment that a person with that injury would need
6    immediately, as well as what long-term care that person
7    would more likely than not need.  So you could
8    understand what caused the injury, for example, on the
9    spinal cord, how does someone with a spinal cord injury
10   end up paralyzed, what happens physiologically, what do
11   you do in the initial period, and then what about for
12   the next however many years that person is going to
13   live.  And that -- I completed my program in six months.
14   BY MR. CRANE:
15      Q.   That was at the requirement to complete it in
16   six months?
17      A.   No.  It could be up to a year and a half, I
18   think it was.
19      Q.   Okay.  And then you had to -- you had to --
20   you had to complete this program in order to be
21   certified by the ICHCC.  Do I have that right?
22      A.   Yes.  First you completed the program.  Then
23   you had to prepare a life care plan that would be
24   reviewed by your -- by a mentor who is already a

Page 53

1    certified life care planner.  And you had to take a test
2    and pass with 80 percent to become certified.
3       Q.   All right.  Can I -- can I -- let me break
4    that down a little bit because I got a little confused
5    in the middle there.  So you do the -- the program at
6    the University of Florida, the six courses that you
7    completed within six months.  And once you do that, then
8    you're eligible to apply for the ICHCC?
9       A.   Completing the required -- okay.  The pre --
10   the requirements to get certified are completing an
11   accredited course, having a -- preparing a life care
12   plan, which is critiqued and given the stamp of approval
13   by a certified life care planner, and passing the
14   certification.  Then you are certified.
15      Q.   Okay.  Who -- who are you critiqued by on your
16   life care plan?
17      A.   A life care planner that I found through the
18   University of Florida program.  And don't ask me her
19   name.  I can't remember.
20      Q.   I did, but if you don't remember, that's fine.
21           All right.  When you -- do I have it right
22   that you were required to take 16 credit hours of life
23   care planning methodology in that Florida program?
24      A.   Yes.

Page 54

1       Q.   Okay.  And I take it you completed that?
2       A.   I did.
3       Q.   In order to complete that 16 credit hours on
4    life care planning methodology, what did you have to do?
5    How many classes was that?  What did that involve?
6       A.   Well, there was printed materials.  There were
7    online lectures that you had to attend and watch, and
8    then you had to take a test after each subsection within
9    each of the six chapters, if you will.
10      Q.   Okay.  Do you have those printed materials any
11   longer?
12      A.   No.
13      Q.   Do you have any videos or notes from online
14   lectures regarding life care planning methodology?
15      A.   No.
16      Q.   Okay.  Did you have to take a course in
17   catastrophic case management or one that's more specific
18   within that grouping?
19           MR. LEIB:  Excuse me.  Could I have that back?
20   BY MR. CRANE:
21      Q.   Sure.  There's -- did you have to take a
22   course in catastrophic case management or something
23   within that -- maybe spinal cord injury specific or
24   cerebral palsy specific?  Was there something like that?

Page 55

1           MR. LEIB:  Object to the form.  I think she
2    answered that a while back.
3           But you can go ahead.
4    BY THE WITNESS:
5       A.   Well, I remember that there was a section on
6    spinal cord injuries, and there were lectures from the
7    Craig Institute in Denver.  So, I mean, they were
8    nationally known lecturers.  And I remember that there
9    was a program for a section on cerebral palsy and the
10   issues that faced people with cerebral palsy and how to
11   plan for that.
12   BY MR. CRANE:
13      Q.   Was it the Craig Institute?  Is that what you
14   said?
15      A.   Yes.  C-r-a-i-g.
16      Q.   And do you consider the Craig Institute to be
17   leading authorities in the area of life care planning?
18      A.   No.  They're a leading authority on the issues
19   of spinal cord injuries.
20      Q.   And life can -- life care planning for spinal
21   cord injuries or just --
22      A.   The man-- the care and treatment of people
23   with spinal cord injury.  That's --
24      Q.   And what did --

16  (Pages 52 to 55)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 56

1      A.  Go ahead.  I'm sorry.
2      Q.  Yeah.  What is the Craig Institute?
3      A.  It's a medical facility that specializes in
4  the care and treatment of people with spinal cord
5  injuries.  And they're on the -- in Denver.
6      Q.  Okay.  Thank you.
7          The classes that you took at Florida, what
8  percentage of them were online?
9      A.  Almost all.  There was also a two-day
10  in-person component that was dealing with about how
11  to -- how to learn how to testify, but all of the
12  substantive issues, materials, information was all
13  online.
14      Q.  So in this course that you took for
15  life care planning, they -- they also taught you
16  how to testify?
17      A.  Yes.
18      Q.  Why would a nurse life care planner need to be
19  trained on how to testify?
20      MR. LEIB:  Object to the form -- object to the
21  form of the question.
22          You can go ahead.
23  BY THE WITNESS:
24      A.  Testifying is part of being a life care

Page 57

1  planner and just knowing how to conduct yourself and the
2  procedures and objections and all of the mechanics of
3  testifying.  If you've never done it before, you have to
4  know how.  So that's part of the training that is
5  included, at least with the pro-- the Florida program.
6  BY MR. CRANE:
7      Q.  I take it when you were a practicing lawyer,
8  you from time to time would retain expert witnesses?
9      A.  Yes.
10      Q.  Can you give me -- well, let me -- let me ask
11  it to you this way.
12          Have you -- have you put expert witnesses
13  on the stand at trial?
14      A.  Yes.
15      Q.  How many times?
16      A.  Well, I think I had over 40 jury trials, so at
17  least probably 40 -- or 12.  A number of those trials
18  were for medical malpractice.  So it might have been
19  100 and -- 150 as a ballpark.
20      Q.  In those approximately 150 times in which you
21  put an expert on the stand, can you give me an idea as
22  to how many times you learned that the expert had
23  received training on how to be an expert witness?
24      MR. LEIB:  Object to the form.

Page 58

1  BY THE WITNESS:
2      A.  I don't know that I ever asked an expert how
3  they learned that.
4  BY MR. CRANE:
5      Q.  Okay.  As you sit here today, can you identify
6  a single expert witness that you put on the stand that
7  you knew received formal training on how to be an expert
8  witness?
9      MR. LEIB:  Object to the form and foundation.
10  BY THE WITNESS:
11      A.  I know that I heard from friends of mine who
12  are defense attorneys that physicians who become experts
13  have attended seminars or, I think, classes, whatever
14  you want to call it, put on by defense attorneys on how
15  to be an effective expert witness.
16      Q.  Okay.  Tell me about that.  What -- I've not
17  heard that.  Tell me -- tell me who told you that and
18  where that came from.  Is there a specific company that
19  does it?  Are there firms that do it?  Are there
20  organizations that do it?
21      A.  Well, there was a defense attorney that I was
22  good friends with by the name of Barbara Zurek,
23  Z-u-r-e-k, who tragically died in her sleep about a year
24  ago at the --

Page 59

1      Q.  Sorry to hear.
2      A.  -- age of 60.  She was an excellent trial
3  attorney.  And she had told me that back in the day --
4  I'm not sure if Midwest Medical Insurance Company is
5  still in business.  That was the self-insured insurance
6  company that physicians started in Minnesota to handle
7  liability claims and insurance.  And MMIC would put on
8  seminars for their insured physicians on how to testify,
9  not only as an expert, but if they were ever sued.  So
10  that's one example.
11      Q.  Okay.  Do you have any other examples?
12      A.  Not that I can think of right now.
13      Q.  Okay.  So back to my original question here,
14  and I guess it's before you talked to Barbara Zurek
15  about this.  Had you personally ever put a witness on
16  the stand that you knew had formal training to testify
17  as an expert witness?
18      MR. LEIB:  Object to form and foundation, not
19  likely to lead to admissible or discoverable
20  information.
21          You can go ahead.
22  BY THE WITNESS:
23      A.  I never asked any of my experts if they had
24  formal training.

17  (Pages 56 to 59)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 60

1   BY MR. CRANE:
2      Q.  If you learned for the first time under
3   cross-examination that one of the experts that you put
4   on the stand had received formalized training as to how
5   to testify as an expert witness, how would that make you
6   feel?
7      MR. LEIB:  Object to the form, foundation, you
8   know, beyond the expert- -- beyond the scope of the
9   expertise of a life care planner.
10     MR. WEIR:  Yeah.  I object.  I don't know how
11  this leads to any relevant evidence, so just let me
12  have a continuing objection on this line of
13  questioning, please.
14     MR. CRANE:  That's fine.
15     MR. WEIR:  Thanks.
16  BY THE WITNESS:
17     A.  Frankly, I would be happy that -- that -- I
18  mean, I would inquire about what kind of training they
19  had.  And when I say that I had this two-day program
20  about how to testify, it wasn't about what to say.  It
21  was about waiting until the other attorney stops
22  talking, how I'd respond if there's an objection.  That
23  was the mechanics of testifying.  It had nothing to do
24  with what you say or how you lay foundation or any

Page 61

1   substantive training.
2   BY MR. CRANE:
3      Q.  Have you ever marketed your services in any
4   way as a life care planner, certified life care planner?
5      A.  Yes.
6      Q.  How so?
7      A.  Yes.  When I first started my practice,
8   letters to a number of attorneys in Minnesota that I had
9   worked with, letting them know that I was now working as
10  a life care planner, and that was the extent of it.
11     Q.  Nothing else?
12     A.  Nothing else.
13     Q.  How many letters did you send out?
14     A.  Twenty.
15     Q.  Okay.  Did anybody respond and hire you?
16     A.  I've been hired through word of mouth.  I
17  don't know if any of those letters actually generated --
18  my plan worked, but my practice started, and it's been
19  growing ever since.
20     Q.  And, in fact, over the last three years,
21  you've seen at least 15 new cases each year?
22     A.  Yes.
23     MR. LEIB:  That's been asked and answered.
24     MR. CRANE:  And that's entire -- I'm just

Page 62

1   reframing where we are.
2      MR. LEIB:  She said 10 to 15, and now you're
3   saying at least 15, Ben.  You're -- you're not
4   stating her testimony properly, but we don't need
5   to argue about it.  The record -- the -- the
6   transcript states accurately what she said.
7      MR. CRANE:  My notes say and my memory say
8   differently.  I think it was -- it was before -- it
9   was about 10 a year over the course of her career,
10  and then over the last three years, she's seen an
11  uptick of at least 15 a year, but not as high as
12  20.
13  BY MR. CRANE:
14     Q.  Do I have that right, Ms. Kolar?
15     A.  Some -- yes.  It's between 10 -- 10 to 15,
16  maybe a little more one year, a little less one year.  I
17  don't keep track.
18     Q.  You're -- you're changing a little bit what I
19  thought we had agreed on before, so let's -- let me make
20  sure that I have this right.  My notes and my memory
21  tell me that at some point in time, you acknowledged
22  that there was an uptick in work that you were receiving
23  the last few years, and I thought we established that in
24  the last three years, you've written at least 15 life

Page 63

1   care plans each year, but not as high as 20.  Am I wrong
2   about that now?
3      MR. LEIB:  Let me just --
4   BY THE WITNESS:
5      A.  You --
6      MR. LEIB:  -- object.
7         Excuse me.  The record says whatever the
8   record says.  This is the problem when  questions
9   get repeated.  You -- you wanted to frame it
10  differently, and now we're in a discussion about
11  what she said before.  Whatever the record said,
12  the record said.
13     MR. CRANE:  I agree with that, but she
14  changed -- she seems to be trying to change what
15  she said previously.
16  BY MR. CRANE:
17     Q.  So go ahead.  Do you want to change what you
18  said previously?
19     A.  I'm not trying to --
20     MR. WEIR:  Excuse me.  I object to the form.
21  It's argumentative.
22  BY THE WITNESS:
23     A.  I'm not trying to change my testimony.  I'm
24  trying to clarify that you were -- I -- I don't know

18  (Pages 60 to 63)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 64

1  that every single year in the last three years I've had
2  15 cases.  I said that was an average the last three
3  years.  I might have had 18 in one year and 12 in the
4  next.  That's all I'm saying.
5  BY MR. CRANE:
6     Q.  Over the last three years, have you requested
7  of anybody that you're working with on litigated matters
8  send you these matters electronically as opposed to
9  paper form?
10    A.  No.  It's up to each individual attorney how
11 they send them.
12    Q.  Okay.  And can you give me a sense over the
13 last three years, a percentage, paper versus digital,
14 what -- what it's been like for you?
15    A.  I would say it's about 70 percent digital and
16 30 percent paper.
17    Q.  And when the 70 percent digital comes when you
18 receive it, whether it be by e-mail or Dropbox or some
19 other form or a thumb drive or a disc coming in the
20 mail, do you then download that information to your
21 computer?
22    A.  Yes.
23    Q.  Every one of those 70 percent of the time in
24 the last three, approximately, years?

Page 65

1     A.  I won't say every one, but the majority of
2  time, I do download them, and then when the case is
3  finished, I delete them.
4     Q.  Okay.  And so the Abdulkaffi case that you
5  worked on previously that you told us about, have you
6  deleted that file from your hard drive?
7     A.  I believe that case came to me via paper.  And
8  I've deleted -- I have destroyed those records.
9     Q.  Can you -- do you know whether the Abdulkaffi
10 case -- whether you have digital information on your
11 computer from that case?
12    A.  I have deleted it.
13    Q.  When?
14    A.  Within a month of being told the case has
15 settled.
16    Q.  When was that?
17    A.  I believe that was last year.
18    Q.  Was it before or after you were contacted
19 regarding this case?
20    A.  Before.
21    Q.  How many open files do you have currently?
22    A.  Twelve.
23    Q.  How many of them are plaintiff?  How many are
24 defense?

Page 66

1     A.  Without counting, I would still say it's
2  50/50.
3     Q.  Can you count them, please?
4        (Short pause.)
5     MR. WEIR:  Why don't we take a short break
6  while she's counting so I can use the facilities?
7  I'll be back in about two minutes.
8        MR. CRANE:  Can we -- Todd, can you wait just
9  45 seconds until we get resolution on this issue?
10 I -- I don't -- I really don't want to stop.  We'll
11 stop after I --
12       MR. WEIR:  No, that's fine.  If she's counting
13 and gives an answer, then maybe we don't need a
14 break.  I'll be back.
15 BY THE WITNESS:
16    A.  I have eight plaintiff cases right now and
17 four defense.
18 BY MR. CRANE:
19    Q.  And what did you look at to reach that
20 determination?
21    A.  I just wrote down based on my recall of the
22 cases that I -- I've -- I've opened right now and the
23 ones that I have sitting waiting for me to start working
24 on.

Page 67

1     Q.  So that 12, are those the open ones, and then
2  there's others that you're sitting waiting for them,
3  waiting to work on them?
4     A.  No.  The 12 includes those that are -- that I
5  have been contacted by and I have direct -- I'm waiting
6  for the records or I am -- I have the records and I just
7  haven't reviewed anything yet.
8     Q.  Do you have your invoice handy?
9     A.  From this case?
10    Q.  Yeah.  There's only -- I have one.  We marked
11 it as 1079.  Actually, I can pull it up on the screen.
12    A.  No.  I have it.
13    Q.  Okay.  I'm looking at it right now.  And in
14 the right-hand corner, top right-hand corner, it
15 indicates invoice number 10 -- 235.  Do you see that
16 there?
17    A.  Right.
18    Q.  Okay.  How is that number generated?
19    A.  I started at 150 when I started my practice,
20 and as I do cases, I -- or no.  Let's see.  I started at
21 125.  And as I do cases, I just add a number.  So this
22 would be the 110th case -- or the 110th invoice, I
23 should say.
24    Q.  Right.  And you told us you've done over a

Royal Reporting Services, Inc.
312.361.8851

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 68

1    hundred. So that would indicate to me that you would on
2    some cases send more than one invoice. Do I have that
3    right?
4         A.  Yes.
5         Q.  And you started at 125?
6         A.  Yes.
7         Q.  Why did you start at 125?
8         A.  Because I didn't want to start at 1 because
9    that would seem like I was brand-new, and I just chose
10   125.
11        Q.  You thought the number of the invoice would
12   somehow affect your credibility?
13        A.  Yes.
14        Q.  And so you -- you chose to lie about what
15   number it was?
16        A.  It wasn't --
17        MR. LEIB:  Come on, Ben.  Come on.
18            (Off-the-record reporter clarification.)
19        MR. LEIB:  Ask a fair question.  Calling her a
20   liar is -- is not appropriate.
21        MR. CRANE:  That's what it was.  That's --
22        MR. LEIB:  No, it's not.
23        MR. CRANE:  I'm sorry.  I'm sorry.  From the
24   mouth of babies, Sam.  I -- I just was being honest

Page 69

1    with what I --
2        MR. WEIR:  It's argumentative.  It just as
3    easily could have been a reasonable marking tool.
4    Knock it off.
5    BY THE WITNESS:
6        A.  To me, it's no different than when you open a
7    checking account and start your check numbers at 1000.
8    That doesn't mean you already signed 999 checks.
9        MR. CRANE:  Why don't we -- why don't we take
10   a break, and maybe a ten-minute break.  Okay?
11       MR. LEIB:  Okay.
12       THE VIDEOGRAPHER:  The time -- the time now is
13   11:48 a.m.  We are off the video record.
14            (Recess.)
15       THE VIDEOGRAPHER:  The time now is 12:04 p.m.
16   We are back on the video record.
17   BY MR. CRANE:
18       Q.  All right.  Ms. Kolar, I want -- I wanted to
19   go through your report a little bit more here, and I'm
20   interested in kind of focusing in on option 2 -- no,
21   option 3.  And in particular -- and that's on page 26 of
22   your report.
23           I'm looking at --
24       MR. LEIB:  Ben, I'm sorry.  Give me one

Page 70

1    second.
2            Ben, just hold on one second.  I'm just
3    trying to find the report.
4        MR. CRANE:  Yeah.  Yeah.  Let's -- let's just
5    take a soft off the record.  I just made that up.
6    That's the court reporter take -- take a break and
7    the videographer stay on.
8        MR. LEIB:  Okay.  I've got it.  Thanks.
9        MR. CRANE:  All right.  Good.  Good.
10   BY MR. CRANE:
11       Q.  All right.  So are you following me,
12   Ms. Kolar, option 3?  I'm looking at durable -- or I'm
13   sorry, at "In Home Care"?
14       A.  Yes.
15       Q.  Okay.  And then the more detailed part of
16   option 3 begins on page 18 and then it goes to 19.  And
17   then I guess it -- and correct me if I'm wrong, but it
18   ends up at the top third of the page at 21.
19       A.  I'm pulling that up.
20            18 and 19 and 20 is all option 3, and 21.
21       Q.  But basically the top -- the top half of 21?
22       A.  Yes.
23       Q.  You identified this Marklund Wasmond Center as
24   one that would be appropriate for ▮C.B.▮  Do I have

Page 71

1    that right?
2        A.  Yes.
3        Q.  How far is that facility from Orangeville,
4    Illinois?
5        A.  Ninety miles.
6        Q.  And so that would be 90 miles each way?
7        A.  Correct.
8        Q.  And -- and that 90-mile figure, did you
9    actually go and look that up?
10       A.  I did.
11       Q.  Did you account anywhere in your plan for --
12   for the parents coming to visit ▮C.B.▮ while he's in a
13   nursing facility?
14       A.  You mean in terms of a mileage reimbursement?
15       Q.  Yes.
16       A.  No, I did not.
17       Q.  How about in terms of any -- strike that.
18            If -- do you know what ▮C.B.▮ options
19   are for utilizing a bus to go to -- to go to school, to
20   attend the therapies -- the kids at school?
21       A.  Now or at Marklund?
22       Q.  No.  Currently.
23       A.  Currently, mom takes him is my understanding.
24       Q.  Is that because that there's not a bus

20  (Pages 68 to 71)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 72

1  available to take him?
2      A.  I don't know.  That question was not asked in
3  her deposition.
4      Q.  And you didn't interview her, did you?
5      A.  You wouldn't let me.
6      Q.  Is that what you were told?
7      A.  Yes, I was.
8      Q.  Okay.
9      A.  Yes.
10     Q.  Is that what you were told?
11     A.  I was told that you wanted a list of the
12 questions that I wanted to discuss, and I provided those
13 to counsel.  And then I was told that you refused to let
14 me talk with Mrs. -- Ms. Kaiser.
15     Q.  Did -- was there any indication that I refused
16 to answer any questions that you wanted answered?
17     A.  I wanted to talk with her.  I didn't want to
18 have you answer the questions.  Part of a life care
19 plan -- part of a life care plan -- and this is in the
20 standard of care -- is to first preferably personally
21 meet with the person you're evaluating, see where they
22 live, look at their equipment, and just get to know the
23 person, as well as in a case involving a child, talk to
24 the parents, see how clean the house is, just get a

Page 73

1  sense of if they're an involved, good caregiver, and ask
2  a lot of detailed questions that are typically not asked
3  in deposition.  And that's what I wanted to do.  Now,
4  with the pandemic, I didn't ask to do an in-person
5  visit.  But I did want to actually talk with mom on the
6  phone.
7          MR. LEIB:  And just for the record, Ben, this
8      is why we had an agreement with Kevin to have it
9      recorded, so that Mary Kay Kolar and others, both
10     on our side and your side, would have had the
11     benefit of the discussions that took place at the
12     time of the IME.  So that's the record.
13 BY MR. CRANE:
14     Q.  Ms. Kolar, was this an unusual circumstance
15 for you when you were retained in this case?  Were you
16 under a rush to -- to complete your work on it?
17         MR. LEIB:  Object to the form of the question.
18 BY THE WITNESS:
19     A.  It was a little shorter of a turnaround time
20 than I usually have, but I wouldn't call it a rush.
21 BY MR. CRANE:
22     Q.  Okay.  Were you asked to prepare your report
23 within a week of having first been contacted?
24     A.  No.

Page 74

1      Q.  Were you asked to complete some form of work
2  within the first week after you were contacted?
3      A.  No.
4      Q.  Were you asked to complete a review of the
5  materials you were provided within the first week after
6  you were contacted?
7      A.  No.
8      Q.  All right.  Were you told that if you were
9  going to accept this assignment, there was a need for a
10 week's turnaround time?
11     A.  No.
12     Q.  Under the best of circumstances, no pandemic,
13 no rush, no whatever, how much time in advance of
14 finalizing your report for filing would you prefer to
15 have interviewed somebody like Ms. Kaiser when you're
16 developing a life care plan?
17     A.  It's in --
18         MR. WEIR:  Object --
19         MR. LEIB:  Object to the form --
20         (Simultaneous crosstalk.)
21         MR. LEIB:  -- and it's an improper
22     hypothetical.
23 BY THE WITNESS:
24     A.  My typical process is I get the records.  I

Page 75

1  review the records so that I'm familiar with what the
2  issues are, and then I either meet with or speak with
3  the person or family.  And so it would have been
4  probably within a month of getting the records.
5  BY MR. CRANE:
6      Q.  Okay.  And was that time condensed here?
7      A.  No.
8      Q.  Okay.  What prevented you -- I mean -- strike
9  that.
10         You're not able to diagnose cerebral
11 palsy?
12     A.  Correct.
13     Q.  You're not able to treat cerebral palsy?
14     A.  Well, as you say, I'm not able to order
15 treatment or give it.  I mean, I could certainly do
16 range of motion exercises.  I can get the child up.  I
17 mean, so what's your definition of "treat"?
18     Q.  Do you currently have permission to practice
19 nursing at any facility?
20     A.  I have -- no, I'm not employed at a facility.
21     Q.  Right.  So you're -- without being able to
22 work at a facility of some sort, you cannot practice
23 nursing, can you?
24     A.  That's not true.  As long as you're licensed

21  (Pages 72 to 75)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 76

1    in the state of Minnesota, I could go and provide
2    nursing care tomorrow.
3       Q.   Under -- under who?
4       A.   Under my board of nursing license.
5       Q.   How would -- where would the patient come
6    from?
7            MR. LEIB:  Object to the form of the question,
8       and I don't think this is likely to lead to
9       admissible or discoverable information.
10           Go ahead.
11   BY THE WITNESS:
12      A.   If, for example, a knee broke, they had to
13   have surgery and they needed someone to come and provide
14   nursing care, my license would allow me to do that.  It
15   does not need a physician order.
16   BY MR. CRANE:
17      Q.   And you haven't done that in the last
18   26 years, true?
19      A.   True.
20           MR. LEIB:  Objection.  It's been answered.
21   BY MR. CRANE:
22      Q.   But you still believe that you're incapable of
23   treating cerebral palsy.  Do I have that right?
24           MR. LEIB:  Objection, asked and answered.

Page 77

1    Mis- -- misstates her testimony.  Not likely to
2    lead to admissible or discoverable information.
3    BY THE WITNESS:
4       A.   I asked you to define what you mean by
5    "treat."
6    BY MR. CRANE:
7       Q.   What would it be -- what are you limited in by
8    terms of the treatment you're licensed?  What is the top
9    of your license, do you believe, in terms of treatment?
10      A.   There are both independent nursing functions
11   as well as medically directed nursing functions.  RNs,
12   as professional nurses, can provide a great deal of
13   care, which would include things like bathing, personal
14   care, giving exercises, assessing skin integrity,
15   deciding or listening if you hear congestion or rales in
16   someone's lungs that it would indicate pneumonia,
17   looking at their fingers to see if they're -- they're
18   blue, see if they have a low oxygen, taking their vital
19   signs, doing an overall assessment.  Are they in a coma?
20   I mean, I could go on and on and on.  That's all part of
21   RN function.
22      Q.   Sure.  But you would depend -- you would be
23   dependent upon a doctor to tell you what the
24   significance of vital signs or lab results or physical

Page 78

1    exam findings were, fair?
2       A.   No.
3            MR. LEIB:  Object to the form of the question.
4       It's multiple and overly broad.
5            You can go ahead.
6    BY THE WITNESS:
7       A.   I do not need a physician to tell me that a
8    blood pressure of 60/40 means the person is in shock.
9    So, no, I do not need a physician to tell me -- for me
10   to -- for my findings.
11   BY MR. CRANE:
12      Q.   Would your license allow you to treat a person
13   for shock?
14      A.   No.  Only certain things, like having
15   them lay down, put their feet above their head,
16   basic first aid types of things.  But in terms of
17   treating the cause of the shock, whether that would be
18   blood loss or heart failure, a physician would need to
19   treat that.
20      Q.   Right.  Did you consult with any treating
21   physicians in this case?
22      A.   No, I did not.
23           MR. LEIB:  Object to the form and foundation.
24           Go ahead.

Page 79

1    BY THE WITNESS:
2       A.   I did review Dr. Ward's deposition.
3            THE REPORTER:  I'm sorry.  I did review what?
4            BY THE WITNESS:  Dr. Ward, W-a-r-d,
5       apostrophe, S, deposition.
6    BY MR. CRANE:
7       Q.   And did Dr. Ward provide any opinion or offer
8    any suggestion as to what the appropriate in-home care
9    would be for ████ C.B. █?
10      A.   No.
11           MR. LEIB:  Object to the form.  It's overly
12      broad, and his deposition speaks for itself.
13           You can go ahead.
14   BY MR. CRANE:
15      Q.   Did -- did Dr. Simms?
16      A.   No.
17      Q.   Did Dr. Yarkony?
18      A.   Yes.
19      Q.   Did anyone else, to your knowledge?
20      A.   Not -- not that I know of.
21      Q.   Okay.  So the only information that you have
22   is Dr. Yarkony's medical opinions as to what the
23   appropriate in-home medical care would be for ██ C.B. █.
24   Do I have that correct?

22  (Pages 76 to 79)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 80

1    A.  No.
2         MR. LEIB:  Yeah.  This has already been --
3    this has already been asked and answered.  We
4    advised her that there'd be a physician.  You have
5    Dr. Msall's report.  This has already been gone
6    over multiple times now at this point, Ben.
7         MR. CRANE:  Yeah, I just don't -- Sam, I mean,
8    let's not -- there's no disclosed opinion, and
9    you're telling me there might be a disclosed
10   opinion at some point in time.
11        MR. LEIB:  No.  There is a disclosed opinion.
12   There is a disclosed opinion.
13        MR. CRANE:  From Msall?
14        MR. LEIB:  Dr. Msall's supplemental report was
15   sent to you over the weekend.  You have it.
16        MR. CRANE:  I have --
17        MR. LEIB:  You've reviewed it.
18        MR. CRANE:  She has?
19   BY MR. CRANE:
20    Q.  Have you seen --
21        MR. LEIB:  I'm sorry.
22   BY MR. CRANE:
23    Q.  Nurse Kolar, have you seen Dr. -- Nurse Kolar,
24   have you seen Dr. Msall's report?

Page 81

1    A.  No, I --
2         THE REPORTER:  Dr. whose report?
3    BY MR. CRANE:
4    Q.  Dr. Msall, M-s-a-l-l?
5    A.  M-a-s-a-l-l [sic].
6         I have not seen it.  I have been told that
7    it's coming.
8    Q.  You have not reviewed it?
9    A.  No.
10    Q.  It forms none of the foundation for your
11   opinions?
12        MR. LEIB:  That's -- object to the form of
13   the -- object to the form of the question and --
14   and foundation.  It doesn't matter if she's seen it
15   or not.
16        MR. CRANE:  It absolutely does.
17        MR. LEIB:  You already asked the question,
18   Ben.  You know that she hasn't reviewed it, so...
19        MR. CRANE:  You're just -- you're just
20   coaching now.
21        MR. LEIB:  No, I'm not.  You're asking
22   the same questions over.  You have Msall's
23   report.  You know what he says in it, and it
24   doesn't --

Page 82

1         MR. CRANE:  No, I don't, because I -- I had no
2    idea you were going to supplement Msall who you
3    disclosed like two months ago having no opinions
4    whatsoever about future care in terms of the
5    appropriateness of the life care plan.
6         Honest to God, the first time -- you know,
7    Kevin was going to do Msall, so I didn't even look
8    at it.  And so the first time hearing -- let me
9    finish, Sam.  The first I'm hearing about Dr. Msall
10   having any opinions regarding this life care plan
11   is what you told me, Sam, about a minute and a half
12   ago.  And when this was brought up at the beginning
13   of the deposition, nobody said anything about
14   Dr. Msall having these opinions.
15        MR. LEIB:  Well, it doesn't matter if she's
16   seen Dr. Msall's report or not.  You know she
17   talked to us on the phone.  We told her there's a
18   defense position that's reviewed it.  It really
19   doesn't matter.  We sent the report, too, and
20   I'm -- you know, I understand there's so many
21   volume on this stuff.  You didn't see it, and --
22   and Kevin is going to do it, and that's fine.
23        But you know we just got the UW records
24   last week.  These other things that he's reviewed,

Page 83

1    it's all itemized in what we sent through, you
2    know, so -- but -- but regardless of all of that,
3    you've asked her about it.  She -- she has reviewed
4    whatever she's reviewed, and that's it.  You don't
5    have to keep asking her about it.
6    BY MR. CRANE:
7    Q.  Does Dr. Msall's supplemental amendment that
8    you haven't seen yet form any foundation whatsoever for
9    your opinions?
10        MR. LEIB:  How would she know that?  She
11   hasn't reviewed it.  Objection.
12        MR. CRANE:  You're interrupting to coach, Sam.
13   That's totally improper.
14        MR. LEIB:  No.  This is argumentative.  How
15   can you ask her a question about something she
16   hasn't reviewed?  She -- she didn't review it, so
17   now you're asking her to give an opinion whether
18   something she hasn't reviewed laid the foundation
19   for her opinions.  And, first of all, the
20   foundation is not for the witness to decide.  But,
21   secondly, she hasn't reviewed it, so --
22        MR. CRANE:  All right.  Let me -- let me ask
23   it again, and she can answer it over your
24   objection.

23  (Pages 80 to 83)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

|  | Page 84 |
|---|---|

1    BY MR. CRANE:
2        Q.  You're not relying upon Dr. Msall's
3    supplemental report for your opinions in this case, are
4    you?
5        A.  Let me give you -- let me explain something,
6    Mr. Crane.
7        Q.  I don't want an explanation.  I want an answer
8    to the question I asked.
9        A.  At this point -- at this point, I do not know
10   which defense expert will lay foundation on or for some
11   of the parts of my care plan.
12       Q.  Okay.  You are not relying upon Dr. Msall's
13   supplemental report for the foundation for your
14   opinions, true?
15       A.  I can't answer that question because I want to
16   explain how it works with my care plan.
17           MR. LEIB:  Go ahead.
18   BY THE WITNESS:
19       A.  Okay.  I write a care plan based on my review
20   of all the records, what's going on with the person up
21   until the point of my care plan, and then I send it to
22   whoever retained me.  They then send my care plan to an
23   expert for review, to say, is this appropriate?  Do you
24   agree with this?  So I don't ask a doctor in advance,

|  | Page 85 |
|---|---|

1    what do you think I should put in my care plan?  That's
2    for me to decide based on my education and experience.
3           So within my care plan is my opinions.
4    Whether they have been adopted or approved, I don't
5    know.  I assume they will be, or if someone says, I
6    don't agree with this; you need to do -- he needs this,
7    this, and this, then I would change my care plan to
8    follow the physician's recommendations.
9    BY MR. CRANE:
10       Q.  So are you relying upon Dr. Msall's
11   supplemental report for any of your opinions in this
12   case?
13           MR. LEIB:  Object to the form of the question.
14   It's been asked and answered.
15   BY THE WITNESS:
16       A.  I don't know.
17           (Off-the-record reporter clarification.)
18   BY THE WITNESS:
19       A.  No, I don't k-n-o-w.
20   BY MR. CRANE:
21       Q.  All right.  When you wrote your report and
22   signed it, the one that was filed with the federal
23   court, it -- it wasn't your intent at that point in time
24   on -- that you finalized your report on June 15, 2020,

|  | Page 86 |
|---|---|

1    to rely upon Dr. Msall for your opinions in this case;
2    is that true?
3        A.  I don't know which physician I'm relying on.
4    I recognize that there needs to be medical foundation
5    for some of the opinions in my report.  Who that person
6    will be, it could be Dr. Gilles; it could be Dr. Msall;
7    it could be someone else.  I don't know that yet because
8    I have not been told who has approved or agreed to my
9    care plan.
10       Q.  My question really is different.  There's --
11   there's two parts to this.  There's a before and an
12   after.  Okay?  There's the after, which is after you
13   created the life care plan, getting a blessing from an
14   M.D. saying it's appropriate.  There's a before where
15   you don't have the foundation to say how long this child
16   is going to live and some of the other things.  So on
17   one end, you're relying upon their opinions.  On the
18   other end, they're relying upon your opinions and
19   blessing them and saying this is an appropriate care
20   plan.  So let me start over.
21           MR. LEIB:  Well, let me just object -- let me
22   just object to the speech, Ben.  Go ahead and ask a
23   question.
24           MR. CRANE:  I'm trying to.  There -- there

|  | Page 87 |
|---|---|

1    seems to be confusion about her role here, and I'm
2    trying to -- maybe I'm wrong.
3    BY MR. CRANE:
4        Q.  But do you -- and I'm starting over here.
5           In drafting your opinions and drafting the
6    life care plan of [C.B.] which you filed in
7    federal court, which was filed in federal court and you
8    signed, you do not in any way, shape, or form rely upon
9    the supplemental report of Dr. Msall or anything
10   regarding Dr. Msall, true?
11           MR. LEIB:  That's been asked and answered.
12           You can go ahead.
13   BY THE WITNESS:
14       A.  Not -- at the time I signed my report, I was
15   not relying on the foundation of any physician.
16   BY MR. CRANE:
17       Q.  At all?
18       A.  Other than his current records and what he
19   has -- what's been -- what's gone on with -- board or
20   his medication, his medical treatment.  So, yes, I
21   relied on the physician -- his treating physicians.  But
22   in terms of his in-home care or his care needs, based on
23   my experience, education, and training, and what he is
24   getting right now in terms of in-home care and has been

24  (Pages 84 to 87)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 88

1   since birth, what's in the care plan is what I think is
2   appropriate.
3        Q.   Was it your decision and your decision alone
4   to make the determination that at age 13, it would be
5   appropriate for ██ C.F. to go into a nursing facility?
6        A.   I didn't --
7        MR. LEIB:  Foundation.  Hearsay.
8            You can go ahead.  Just pause just a
9   second so we can get objections in.
10           That's been asked and answered.
11           You can go ahead.
12   BY THE WITNESS:
13       A.   I am not making a decision because there's
14   three options in my care plan.  I'm giving the pricing
15   for different types of care.  He could go at -- into
16   Marklund next week.  But a lot of times, in my
17   experience with dealing with families with brain-injured
18   babies -- and I handled a number of these cases as an
19   attorney, as a plaintiff's attorney -- is when the child
20   reaches 12 or 13, that they've gotten so big that it's
21   hard physically to continue to care for them.  So I just
22   chose that as a number of a reasonable time when ██ C.B.
23   might and his family might want him to move into a
24   facility.  I didn't --

Page 89

1   BY MR. CRANE:
2        Q.   Is 13 -- is 13 or 14 a less reasonable time
3   for him to move into a facility?
4        A.   Is it what?
5        Q.   I'm sorry.  Here, let me ask it again.
6            What -- what makes 13 reasonable and not
7   12 or not 14?
8        A.   It's just an arbitrary number.  That's when he
9   becomes a teenager.  He could go when he's 10.  He could
10   go when he's 15.  I just had to pick a number, and so I
11   chose 13.
12       Q.   And that's not based on an M.D. opinion, true?
13       A.   True.
14       MR. LEIB:  That's been asked and answered.
15   BY MR. CRANE:
16       Q.   Your life care plan stopped at age 33?
17       A.   Yes.
18       Q.   What's the likelihood -- well, let me ask this
19   first.  Of the three plans, is there one that's more
20   likely than other to -- than the others to occur?
21       A.   I don't know.
22       Q.   And you're not able to offer an opinion as to
23   more probably true than not true, number one would
24   occur?

Page 90

1        A.   I don't know.  That's up to the family.
2        Q.   Okay.  And the same would be true for option 2
3   and option 3?  You're not able to offer an opinion more
4   likely than not as to what is to occur?
5        A.   Correct.
6        Q.   Okay.  And is there a likelihood that ██ C.B.
7   lives beyond 33 years?
8        A.   That's --
9        MR. LEIB:  Object to the form, beyond the
10   expertise of the witness.
11           You can go ahead.
12   BY THE WITNESS:
13       A.   I am not qualified to give an opinion on life
14   expectancy, so I defer to answer that.
15   BY MR. CRANE:
16       Q.   Sure.  But is the -- did you ask anybody?
17       A.   Dr. Simms.
18       Q.   Yeah.  What did he tell you?  What's the
19   likelihood that the child is going to live past 33?
20       A.   We didn't discuss that.  He said in his
21   opinion, ██ C.B. has a life expectancy of 33.  I didn't
22   get into details of the likelihood he'll live to 34.
23       Q.   Do you have a definition of life expectancy
24   that you understand to be reasonably accepted by life

Page 91

1   care planners?
2        A.   It's the age at which the person is likely to
3   live to.
4        Q.   Okay.  And 50 percent of those people live
5   longer; 50 percent of those people live less?
6        A.   True.
7        Q.   Okay.  You didn't consider, did you, the
8   50 percent possibility that ██ C.B. would outlive
9   33 years, did you?
10       MR. LEIB:  Object to the form of the question.
11   It's argumentative.
12           You can go ahead.
13   BY THE WITNESS:
14       A.   In formulating a life care plan, you have to
15   use an end point.  And the end point that I used is up
16   to the jury to decide the likelihood that he'll live
17   less or more than to age 33.
18   BY MR. CRANE:
19       Q.   Right.  But if they make -- if they reach the
20   conclusion that, hey, that he's going to live to 50,
21   your life care plan would provide them no direction
22   whatsoever as to what moneys would be necessary from age
23   33 to 50?  Do I have that correct?
24       MR. LEIB:  Yeah, no, you don't.  The economist

25  (Pages 88 to 91)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 92

1    has issued a report.  You have that report.  And
2    the -- you know the life care plan provides the
3    life care, the three options, and then the
4    economist turns it into the -- into the present
5    value aspect.  This is not within the gamut of the
6    life care planner.  Life expectancy is not within
7    the gamut of the life care planner.
8           Ben, I'm objecting to this whole line of
9    questioning because this is not appropriate for
10   either this witness and it's -- it's abusive to her
11   because you're asking her questions that are
12   blatantly not within the appropriate questions of a
13   life care planner.  So, you know, I'm not telling
14   her not to answer the question, but at some point,
15   we -- we'd have to call Judge Magistrate Crocker
16   and talk about this because this is endless.
17   BY MR. CRANE:
18       Q.  Did Dr. Simms let you know that he believed
19   that there was still a possibility that the child would
20   live past 33?
21       A.  We didn't discuss that.
22       Q.  If he held that opinion, is that something
23   that you would like to know?
24       A.  If he said it's more likely than not that

Page 93

1    he'll live beyond age 33, yes.  And if I can go back one
2    question, when you said my life care plan doesn't
3    provide any guidance if he lives beyond age 33, in the
4    total -- the -- the three graphs or the three totals at
5    the end, that assumes age 33.
6           But within the body of my care plan, I
7    have annual costs for every piece of thing -- everything
8    that's in this care plan.  So if the jury is given those
9    annual costs, they could easily calculate what another
10   17 years would -- would result in terms of a dollar
11   figure.
12       Q.  And so at trial, are you going to explain to
13   them that -- strike that.
14           Let's bounce over to your CV.
15           Oh, I know what I wanted to ask.  You
16   mentioned that you -- as a plaintiff's attorney, you
17   handled labor and delivery brain-damaged baby cases?
18       A.  I did.
19       Q.  How many?
20       A.  Ten.
21       Q.  And were they all of the hypoxic ischemic
22   encephalopathy variety?
23       A.  Yes.
24       Q.  And of those ten, were you able to

Page 94

1    successfully resolve any of them for the -- the injured
2    party?
3        A.  Yes.
4        Q.  How many of those ten?
5        A.  Three went to trial with a plaintiff's
6    verdict, and the other seven settled.
7        Q.  So three plaintiff's verdicts and seven
8    settlements?
9        A.  Correct.
10       Q.  Ten for ten.
11       A.  Right.
12       Q.  Okay.  What were the verdicts?
13       A.  One --
14          MR. LEIB:  This is -- wait a minute.  This is
15   not likely to lead to admissible and discoverable
16   information.  It's irrelevant.  Can -- can you
17   provide the relevance of this, Ben, for that -- why
18   it's discoverable, what her results were as an
19   attorney in these brain damage baby cases?
20          MR. CRANE:  You can make your objection.  I'm
21   asking the questions.
22          MR. LEIB:  Well, I know, but at some point
23   we've got to get the magistrate on the phone to get
24   an input.  These are so improper that I don't

Page 95

1    understand --
2          MR. CRANE:  Why?
3          MR. LEIB:  -- why you're --
4          MR. CRANE:  Sam, you hired a plaintiff's
5    attorney for your life care planner.  You didn't
6    expect me to ask these questions?
7          MR. LEIB:  You've asked --
8          MR. CRANE:  Every -- every time.  I can't
9    imagine it's not every single time.
10         MR. LEIB:  You're asking her what the results
11   were in cases she litigated when she practiced as
12   an attorney.
13         MR. CRANE:  Yeah.  And I'm going to go look up
14   those cases and see the life care plans and see how
15   they got such big verdicts and see where her life
16   care plans are different, so that's what I'm
17   searching for.  And that is --
18         MR. WEIR:  And that will be relevant at some
19   point in time?
20         MR. CRANE:  Yes.
21         MR. WEIR:  Seriously.
22             And some of these settlements might be
23   confidential in terms of the amount.
24         MR. CRANE:  I'm sure she'll let us know.

26  (Pages 92 to 95)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 96

1    She's a licensed attorney.  She knows when she can
2    open her mouth and not.
3         MR. WEIR:  Well, she shouldn't have to open
4    her mouth on these irrelevant issues, but go ahead.
5    Waste our time.
6    BY MR. CRANE:
7         Q.  What are the three verdicts?
8         A.  The largest was 2.5 million.
9         Q.  Okay.
10        A.  And that was in -- I'm trying to remember the
11   county.  I think it was Brainerd.  And at the time, that
12   was the largest plaintiff's malpractice verdict in that
13   county.  The other one were 1.1 million.  That was,
14   like, 28 years ago.  That was in Olmsted County.  And
15   the final one was, like, 1.4 million.  But they weren't,
16   like, huge verdicts, like --
17        Q.  Okay.
18             (Off-the-record reporter clarification.)
19   BY THE WITNESS:
20        A.  I said they weren't huge verdicts.
21   BY MR. CRANE:
22        Q.  Did each one of those cases have a life care
23   plan?
24        A.  Yes.

Page 97

1         Q.  And who did you use as a life care planner?
2         A.  Linda Graham, G-r-a-h-a-m.
3         Q.  Okay.  And then in the seven settlements, did
4    you use Ms. Graham for those as well?
5         A.  For some of them.
6         Q.  Who else did you use besides Ms. Graham in
7    those seven settlements?
8         A.  I didn't use care -- or have care plans on all
9    of them because some of them, the liability wasn't
10   strong, and we knew the case -- that the child had a
11   very short life expectancy.
12        Q.  And in settling those cases, life expectancy
13   was something that you considered?
14        A.  Of course.
15        Q.  Of those settlements, what was the largest?
16        A.  Those are all confidential, and I can't
17   disclose that.
18        Q.  Each one of them is confidential?
19        A.  Yes.
20             (Exhibit No. 1078 referenced.)
21   BY MR. CRANE:
22        Q.  Okay.  Looking -- I've got -- I'm not sure.
23   Looking at your CV, 1078, under the section about
24   qualified neutral, KolarLaw, LLC, qualified neutral

Page 98

1    under practice includes arbitration of no-fault disputed
2    claims.  We talked about that before, right?
3         A.  Right.
4         Q.  And then it says, "consultation with elder law
5    attorneys to assist individuals with life care planning
6    needs."  Are you still doing that?
7         A.  No.
8         Q.  Okay.
9             MR. LEIB:  I -- excuse me, Ben.  I don't have
10   anything on my screen.
11            MR. CRANE:  Oh, you don't?
12            MR. LEIB:  No.
13            MR. CRANE:  I mean --
14            MR. LEIB:  It says, "Ben Crane has started
15   screen sharing," but there's nothing there.  Do I
16   have to work on anything or --
17            MR. CRANE:  Here, let me stop and I'll
18   re-share.
19   BY MR. CRANE:
20        Q.  Ms. Kolar, did you -- were you seeing that?
21        A.  Yes.
22        Q.  It seemed like you were.  Okay.
23            MR. LEIB:  Yeah, I see everybody.  I just
24   don't see the document you're referring.

Page 99

1             MR. CRANE:  How about now?
2             MR. LEIB:  No.  I have writing that says, "Ben
3    Crane has started screen share."  That's -- does
4    anybody else see it on their screen?
5             THE WITNESS:  I see it.
6             MR. LEIB:  Okay.  Well, here.
7             MR. CRANE:  I'm -- I'm just reading from her
8    CV, Exhibit 1078 that we sent around.
9             MR. LEIB:  Yeah.  As long as -- as long as --
10   as long as she can see it, just go ahead.
11            THE VIDEOGRAPHER:  I'll tell you it's also on
12   the screen, and it will be in the recording.
13            MR. CRANE:  Great.
14   BY MR. CRANE:
15        Q.  So the portion of your CV under your law
16   practice, we should take out, "consultation with elder
17   law attorneys to assist individuals with life care
18   planning needs"?
19        A.  To make it accurate, yes.
20        Q.  Okay.
21        A.  I haven't done that in -- I'm just no longer
22   doing that.
23        Q.  When did you stop doing it?
24        A.  About two years ago.

Royal Reporting Services, Inc.
312.361.8851

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

---

Page 100

1    Q.  Did you ever deliver any babies?
2    A.  I -- no.
3    Q.  All right.  Looking at page 4 of your CV under
4  "Seminars Attended," it looks like both of these
5  seminars were put on by the International Symposium of
6  Life Care Planners.  Do you see that there?
7    A.  Yes.
8    Q.  You went to a seminar in 2013 in Atlanta and
9  one in Scottsdale, Arizona, in 2015?
10    A.  Correct.
11    Q.  Do you consider the International Symposium of
12  Life Care Planners to be an authority in the area of
13  life care planning?
14    A.  Yes.
15       MR. LEIB:  Object to the form.  It's overly
16  broad.
17       You can go ahead.
18  BY MR. CRANE:
19    Q.  Okay.  And when you went to -- strike that.
20       These two seminars, they form at least
21  some basis for your professional experience and then the
22  opinions you're rendering here?
23    A.  Yes.
24    Q.  I guess that same would be true for

---

Page 101

1  the -- that symposium that you attended in June
2  of 2017?
3    A.  Yes, although the seminar -- or the symposium
4  in June of 2017 was more geared towards --
5       (Audio distortion.)
6       (Off-the-record reporter clarification.)
7  BY THE WITNESS:
8    A.  Okay.  The symposium was more geared to an
9  internal type --
10       (Audio distortion.)
11       (Off-the-record reporter clarification.)
12  BY THE WITNESS:
13    A.  That was geared more towards discussing the
14  policy that the International Symposium of Life Care
15  Planners would develop on certain things and also
16  dealing with cost issues, ethics of life care planning.
17  That wasn't substantive in terms of medical experts like
18  the other one.
19       (Off-the-record reporter clarification.)
20       (The record was read as requested.)
21  BY THE WITNESS:
22    A.  In terms of experts giving lectures as the
23  2013 and 2015 involved.
24       (Short pause.)

---

Page 102

1  BY MR. CRANE:
2    Q.  Other than the -- a personal interview with
3  Cortney Kaiser, is there any other work that you still
4  would like to do on this case or would have liked to do
5  on this case?
6    A.  No.
7    Q.  Did you rely upon Dr. Gilles's opinions in any
8  way for your opinions on this case?
9    A.  No.
10    Q.  Have you been involved as -- I know we talked
11  about as a life care planner, but as either a lawyer or
12  as a nurse in a litigated matter involving either
13  Mr. Weir or Mr. Leib's firm?
14    A.  No.
15    Q.  Have you given any presentations to groups of
16  lawyers?
17    A.  Yes.
18    Q.  As a life care planner?
19    A.  Yes.
20    Q.  What presentations have you given to groups of
21  lawyers as a life care planner?
22    A.  It's on my CV.  Let's see.  Four.
23    Q.  I'm sorry.  You broke up there.
24    A.  It's on my CV on page 4.

---

Page 103

1    Q.  Okay.
2    A.  I spoke at a joint seminar sponsored jointly
3  by the Minnesota Association for Justice and Minnesota
4  Defense Lawyers in April of 2010 -- oh, as a life care
5  planner, it was in April of 2013.  I have spoke to the
6  same type -- same seminar, a joint seminar sponsored by
7  what was MTLA at the time and then --
8       (Audio distortion.)
9       (Off-the-record reporter clarification.)
10  BY THE WITNESS:
11    A.  -- MT, as in Tom, LA and Minnesota Defense
12  Lawyers in April of 2013 about when to retain and how to
13  maximize opinions of life care planners.
14       MR. LEIB:  You're -- this is Sam Leib.  You're
15  kind of cutting in and out, but what -- what you
16  just mentioned, is that all on your CV?  Can I just
17  read it on your CV?
18       THE WITNESS:  Yes.  It's on page 4.
19       MR. LEIB:  Okay.  That's fine.
20       MR. CRANE:  It's on the screen right now.
21       (Off-the-record reporter clarification.)
22       MR. CRANE:  Yeah, it's on the screen right
23  now, isn't it?
24       MR. LEIB:  I have nothing on my screen.  I --

---

Royal Reporting Services, Inc.
312.361.8851

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 104

1    I haven't -- apparently, you've got the CV, but
2    that's fine.  I just -- as long as I know it's on
3    the CV and I can read it later, I'll just do that.
4    BY MR. CRANE:
5         Q.   All right.  The first item, it says invited
6    lecturer at numerous hospitals to present seminars to
7    registered nurses on how to avoid being sued for
8    professional negligence, 1995 through 2005.  I take it
9    that was one -- more than one presentation?
10        A.   Yes.
11        Q.   How many -- how many hospitals, how many
12   seminars did you present to registered nurses in that
13   ten-year period?
14        A.   Probably 10 to 15.
15        Q.   Was it through some organization?
16        A.   No.  It was -- people would just hear about me
17   and I would get a call from a hospital, usually their
18   risk management people, and they would ask me to come
19   and give a lecture, and I would do that.  It took about
20   two hours maximum.
21        Q.   Okay.  And would this two-hour lecture --
22   would you give a similar form of the same lecture
23   multiple times?
24        A.   Yes.

Page 105

1         Q.   Can you give me a sense of what the topics
2    discussed in this -- these lectures was?
3         A.   It was sort of a primer on when people -- when
4    health-care providers get sued, what are the theories,
5    and we would talk about what negligence was, what the
6    definition of negligence was, and how that would get
7    proven or try to be proven in a trial.  We talked about
8    whether they should have their own malpractice insurance
9    versus relying on the insurance provided by the
10   employer.
11            We talked about how frequently nurses get
12   individually named versus the hospital being named,
13   things like that.
14        Q.   And would you say that you gave that lecture
15   or something along those lines more than 15 times?
16        A.   No.
17        Q.   Somewhere between 10 and 15?
18        A.   Right.
19        Q.   Was -- was it a once a year thing?
20        A.   There might be two in one year and none in the
21   next.  It just depended on when I would get asked.
22        Q.   Were there other presenters at these seminars?
23        A.   No.
24        Q.   And were all the hospitals in the Twin Cities

Page 106

1    area or in Minnesota?
2         A.   They were all in Minnesota, but all -- not
3    all in the Twin Cities.
4         Q.   It looks like you were involved in writing a
5    chapter on -- in Minnesota practice on medical
6    malpractice?
7         A.   Yes.
8         Q.   Do you have a copy of that book?
9         A.   I think I do.  It's packed away somewhere.
10        Q.   Since -- now I've got on the screen
11   Exhibit 1079, your -- the invoice that we've been
12   provided.  Can you give me an estimate from -- from
13   May 6th until the current as to how many hours you
14   expect to bill for your time up until now?
15        A.   I've spent another two hours yesterday
16   reviewing things and then the testimony today.
17        Q.   Is that all the time that you're going to -- I
18   mean, here, I want to be fair to you because there's
19   another month in between and you had a conversation with
20   Dr. Simms at some point in the first two weeks.  You
21   finalized your report.  Are you --
22            MR. LEIB:  Well --
23            MR. CRANE:  I'm going to try to be fair to
24   her.  I mean, she -- she said she was going to have

Page 107

1    two more hours, and I just don't think that
2    that's -- I don't think she thought that answer
3    through because --
4    BY THE WITNESS:
5         A.   I --
6    BY MR. CRANE:
7         Q.   Go ahead.
8         A.   I'm sorry.  Some of the dates on that invoice
9    are wrong.  The drafting of the care plan, that was
10   actually finalized the first week of June.  For some of
11   those dates from April should actually be more in May
12   and June.  And the deposition prep, that should have
13   been yesterday.  I'm not sure how those dates got
14   screwed up, but they're -- the dates are wrong.  What's
15   on here is correct as of -- or through yesterday.  Just
16   the dates are wrong.
17        Q.   So the initial dates, I mean, is it that --
18   here, let's take "Draft care plan," for instance.  Is it
19   that you started drafting the care plan April 25th and
20   you completed it at some point in the first couple weeks
21   of June?
22        A.   Yes.
23        Q.   Okay.
24        A.   And the thing with the record review, I didn't

29 (Pages 104 to 107)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 108

1  do 16 hours of reviewing records on one day in April.
2  That was in through April and into May. And then I
3  reviewed additional this week that just came in that
4  were updated.
5       Q.  Those new records that came in, did they in
6  any way change your opinions?
7       A.  Well, there was one thing that looks like for
8  his tube feedings, they're using -- they're being
9  done -- the way it reads on the note, it says he's
10  drinking his bottles of Pediasure. And I don't know if
11  that means he's drinking it with, like, a nipple because
12  it specifically says he's drinking his bottles, which
13  would mean he doesn't need the tube or the feeding pump.
14  And then what he doesn't drink, it says is given by
15  gravity, which means you just hang the bag and you count
16  the drips so it doesn't run in too fast. But, again,
17  it's not on a pump. So if he's not using a pump, then
18  he doesn't need a pump in his durable goods.
19       Q.  So are you taking out the pump on the durable
20  goods based on the new records that you saw?
21       A.  If my assessment is correct, that they're not
22  using the pump anymore, then it should be deleted from
23  my care plan, yes.
24       Q.  But you don't know whether that assessment is

Page 109

1  correct based on the information you have at this point.
2  You'd just be speculating?
3       A.  Right. Right. It's -- yeah. It's unclear
4  from the records if what I'm thinking is accurate.
5            (Audio distortion.)
6            (Off-the-record reporter clarification.)
7  BY THE WITNESS:
8       A.  I said it's unclear from the records if what
9  I'm thinking is accurate. And the other change would be
10  is some of his medications are different than what's in
11  the care plan.
12  BY MR. CRANE:
13       Q.  Did you -- in terms of the in-home care, did
14  you make a decision as to what would be appropriate
15  between an RPN and an LPN and other care providers?
16       A.  Yes, I did.
17       Q.  Can you explain for me your -- your thought
18  process there?
19       A.  Well, the thought process is that from birth
20  until now, ▓C.B.▓ has not received any in-home care.
21  Based on the information that's available to me, mom has
22  been doing all of his care and doing a really good job
23  at it. However, as he gets older, she is not going to
24  be able to do all of these cares by herself because

Page 110

1  he'll get bigger. She won't be able to lift him as
2  easily, et cetera. And it's also a vigorous strain and
3  burden on her to be the only person giving ▓C.B.▓ care.
4  So I've allowed --
5            (Audio distortion.)
6  BY THE WITNESS:
7       A.  -- a home health aide ten --
8  BY MR. CRANE:
9       Q.  You're breaking up a lot.
10       A.  I'm sorry. I'm trying to find my page.
11       Q.  That's -- that's fine. And when you get
12  there, can you get let us know where you are?
13       A.  Sure.
14       Q.  16, 17 maybe.
15       A.  Right. That's on -- okay. So option 1 would
16  be care provided by a nursing agency. And I have
17  allowed ten hours a day of home health care -- or home
18  health aide, which would help with ▓C.B.▓ cares,
19  diaper changes, bathing, transferring him in and out of
20  his chair, everything but his tube feedings.
21            An RN can be provided, and I called and
22  spoke with Peak Health Care. And they said they do
23  allow one-hour blocks for people that need medications
24  or tube feedings, so that they could come twice a day

Page 111

1  for one-hour blocks to run the tube feeding, which would
2  then free up mom to not have to be there for the tube
3  feedings.
4            And then I also allowed two to four weeks
5  depending on parent's discretion of 24-hour care by an
6  RN that would allow parents to have no responsibilities
7  for ▓C.B.▓ for those two to four weeks per year.
8       Q.  Okay. So just looking at option 1 real
9  closely here. So you've got -- for RN is you provide
10  two one-hour blocks a day per -- of care per day. Do I
11  have that right?
12       A.  Yes.
13       Q.  Are you relying upon an M.D. in any way to --
14  for the appropriateness of two one-hour blocks of RN
15  care a day?
16       A.  No.
17       Q.  Same with home health aide. Are you
18  providing -- or are you relying in any way upon an M.D.
19  to make that conclusion, that that would be appropriate
20  care?
21       A.  No.
22       Q.  Same with the last item, the RN for respite
23  care for two to four weeks?
24       A.  No.

Royal Reporting Services, Inc.
312.361.8851

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 112

1    Q.   Just looking at the RN that you have for
2  respite care and then scooting over to the right to
3  daily costs, $1,488?
4    A.   Yes.
5    Q.   If you go up to the top for the RN and instead
6  of providing two one-hour blocks, it was 24 hours, you'd
7  be looking -- it would be that 1488 number per day?
8    A.   I don't know what your question is.  If it's
9  24 hours, it's -- it'd be 24 times 62, and that gives
10  you the 1488.
11    Q.   Right.  And so the 1488 is through Peak Health
12  Care, 24 hours of RN care, fair?
13      MR. LEIB:  I'm sorry.  Could you -- could you
14  just give me the page again on this thing?  I don't
15  know --
16      MR. CRANE:  Page 16 -- page 16, option 1.
17  Yeah, I don't think this is -- I'm just trying to
18  make sure I'm comparing apples to apples.
19      MR. LEIB:  Where --
20      MR. CRANE:  That 1488 --
21      Sure.  Page 16, option 1, there's an RN,
22  two-hour blocks all the time.
23      MR. LEIB:  Okay.  I see there.  You requested
24  a second RN.

Page 113

1      MR. CRANE:  Yeah.  Where it says daily cost,
2  1488, 1,488.
3      MR. LEIB:  Yeah.  I got it now.  Sorry about
4  that.
5  BY MR. CRANE:
6    Q.   So the daily rate for 24-hour RN care through
7  Peak Health Care would be $1,488?
8    A.   Yes.
9    Q.   And if -- rather than for the -- for that
10  first RN entry, where you have two one-hour blocks per
11  day, if that was instead 24 hours, it would be that 1488
12  times --
13    A.   Yeah.
14    Q.   -- you know, 365 days.
15      That would be the daily rate every day?
16    A.   Yes.
17    Q.   All right.
18      MR. LEIB:  It just came on the screen for some
19  reason.
20      Now it's gone.
21  BY MR. CRANE:
22    Q.   You note in your -- your plan, dental
23  extractions might be necessary depending on how C.B.
24  permanent teeth develop?

Page 114

1    A.   Correct.
2    Q.   Has anybody -- have you done any assessment as
3  to -- well, strike that.
4      Is he at risk for developing dental
5  problems just because of the fact that he has cerebral
6  palsy and is unable to at this point brush his teeth?
7    A.   He may be at a little increased risk of
8  cavities.  Higher --
9      (Audio distortion.)
10      THE REPORTER:  Sorry.
11  BY THE WITNESS:
12    A.   -- risk of cavities.
13      THE REPORTER:  There's interference.
14      Anyone else hearing that?
15      THE WITNESS:  Yeah.
16      MR. LEIB:  Yes.
17      MR. CRANE:  We can probably -- somebody
18  that's -- well, that's interesting.  Somebody needs
19  to mute.
20      All right.  Let me -- I'm getting a lot of
21  feedback.  Is anybody else getting a lot of
22  feedback?
23      MR. LEIB:  Yes.  This is Sam Leib.  I'm
24  getting a ton of feedback.

Page 115

1      THE REPORTER:  Can we go off the record?
2      MR. CRANE:  Yes.
3      THE VIDEOGRAPHER:  The time is 1:07 p.m.
4  We're off the record.
5      (Discussion off the record.)
6      (Recess.)
7      THE VIDEOGRAPHER:  The time now is 1:13 p.m.
8  We are back on the video record.
9  BY MR. CRANE:
10    Q.   Ms. Kolar, are you a member of the
11  International Association of Rehabilitation
12  Professionals?
13    A.   Yes.
14    Q.   And also the American Association of Nurse
15  Life Care Planners?
16      I'm sorry.  Did you hear me?
17    A.   Oh, I'm sorry.  I answered yes, I'm a member
18  of both of those organizations.
19    Q.   Okay.  All right.  Thank you.  And I -- you
20  know, I don't think I did -- you mentioned the two
21  depositions you've given.  Have you testified at trial
22  before?
23    A.   Yes.  That I did -- I thought I viewed
24  those -- I've testified three times.

31  (Pages 112 to 115)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 116

1    Q.  Two times in depositions, once at trial?
2    A.  No.  I mean, I've testified three times at
3  trial.
4          (Exhibit No. 1080 referenced.)
5  BY MR. CRANE:
6    Q.  Got you.  All right.  I want to take a look
7  at -- all right.  Exhibit 1080, is that up on your
8  screen?
9    A.  No.
10         MR. LEIB:  This is Sam.  It's not on my
11  screen.
12         MR. CRANE:  Because I didn't do what I needed
13  to do.  I screwed it up.  It's up on my screen.
14         MR. LEIB:  What -- maybe -- maybe you can
15  identify it then so I can --
16         MR. CRANE:  Yeah.  Now, I think -- so it's
17  Exhibit 1080, "Materials Sent to Mary Kay Kolar."
18         Does anybody see that now?
19         THE WITNESS:  I see it.
20         MR. CRANE:  Okay.
21         MR. LEIB:  Now I've got it.  I've got it.
22  BY MR. CRANE:
23    Q.  Okay.  All right.  What I'd -- what I'd like
24  to find out -- and this doesn't have to be -- I just

Page 117

1  want to make sure that I have -- I know everything that
2  you've -- that encompasses your file.  Okay?
3          So in this materials -- this list of
4  materials, it starts off with depositions that you have
5  reviewed.  I just want to confirm that you've reviewed
6  all of this stuff, okay, and then I want to confirm that
7  there's nothing more.  If there is something more, I'd
8  like to figure out what that is.
9          So this document that we're looking at
10  here, 1080, have you seen this before?
11    A.  I have not seen this, and it says materials
12  sent to me.  That does not mean that I reviewed all of
13  these documents.
14    Q.  Okay.  Is there a better source to determine
15  everything that you've reviewed in this case?
16    A.  I don't think that I would prepare what I
17  reviewed, but what I was sent.  So we can just go
18  through this list, and I'll tell you what I reviewed.
19    Q.  All right.  So were you provided with
20  Dr. Yarkony's deposition and Exhibits 1 through 6?
21    A.  Yes.
22    Q.  Were you provided with Dr. Mulkey's
23  deposition?
24    A.  Dr. --

Page 118

1    Q.  Sarah Mulkey?
2    A.  Yes.
3    Q.  How about David Gibson?  Were you provided
4  with his deposition?
5    A.  Yes.  I was -- all of what's on this document,
6  I was provided.
7    Q.  Okay.  So I'm going to keep going.  So you
8  were also provided Dr. Rotenberg, Dr. Schuman, and
9  Dr. Ward, right?
10    A.  Correct.  Yes.
11    Q.  So you were provided six -- well, you also
12  were provided Cortney Kaiser's deposition transcript?
13    A.  Yes.
14    Q.  So that's seven depositions?
15    A.  Yes.
16    Q.  Okay.  Other than those seven depositions,
17  were you provided any other deposition transcripts?
18    A.  I don't think so, no.
19    Q.  Okay.  All right.  And so of those seven
20  depositions, did you -- well, strike that.
21          When counsel provided them to you, did you
22  expect that they -- they thought you would take a look
23  at them?
24    A.  No.

Page 119

1          MR. LEIB:  Object to the form.  Excuse me.
2  Object to the form.  Not likely to lead to
3  admissible or discoverable information, what
4  counsel was referring to but...
5          (Audio distortion.)
6          (Off-the-record reporter clarification.)
7          MR. LEIB:  It's irrelevant what the thought in
8  counsel's mind was as to what counsel's
9  expectations were.
10  BY MR. CRANE:
11    Q.  Go ahead.  You can answer.
12    A.  I don't know what counsel's expectations were.
13  I told counsel that I don't read any information related
14  to the liability issues because that's not germane to
15  what I've been retained for.  So I did not review any
16  depositions relating to the labor and delivery, either
17  the care itself.  I did not review the records for the
18  labor and delivery.  I did not review any expert
19  disclosures for that or their depositions.
20    Q.  Did you read Dr. Yarkony's deposition?
21    A.  I did.
22    Q.  Did you bill for your time in reading it?
23    A.  Yes.
24    Q.  Did you read Dr. Sarah Mulkey's deposition?

32  (Pages 116 to 119)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 120

1    A.  No.
2    Q.  Did you read Dr. David Gibson -- or excuse me,
3  David Gibson's deposition?
4    A.  No.
5    Q.  Did you read Dr. Rotenberg's deposition?
6    A.  No.
7    Q.  Did you read Dr. Schuman's deposition?
8    A.  No.
9    Q.  Did you read Dr. Ward's deposition?
10    A.  Yes.
11    Q.  Do you know what kind of doctor Dr. Schuman
12  is?
13    A.  She's an osteopath -- osteopath.  I don't know
14  her specialty.
15    Q.  Okay.  In any event, you were provided her
16  deposition, Dr. Rotenberg's deposition, David Gibson's
17  deposition, Sarah Mulkey's deposition, and you didn't
18  read any of them, true?
19    MR. LEIB:  Objection.  This has already been
20  asked and answered.  We know that, Ben.  Please.
21    You can go ahead and answer again.
22  BY MR. CRANE:
23    Q.  Is that true?
24    A.  True.

Page 121

1    Q.  Okay.  Did you read Cortney Kaiser's
2  deposition?
3    A.  Yes.
4    Q.  And you billed for your time in reviewing it,
5  I take it?
6    A.  Yes.
7    Q.  Next, you read Dr. Yarkony's deposition?
8    A.  Yes.
9    Q.  In part, you relied upon Dr. Yarkony's life
10  care plan to reach your conclusions, did you not?
11    MR. LEIB:  Objection.  It's already been asked
12  and answered.
13    MR. WEIR:  It's been asked and answered, and
14  now it's vague and overbroad.
15  BY MR. CRANE:
16    Q.  You can answer it.
17    A.  I would -- I would not say that I relied on
18  his opinions or his report.  I would say that I agreed
19  with portions of his report, and I put that same
20  information in my report.
21    Q.  If I would have contacted you -- if I would
22  have contacted you first and I would have provided you
23  with Dr. Yarkony's life care plan, you could have
24  done -- you could have done your work in his numbers,

Page 122

1  could you have not?
2    MR. LEIB:  Object to the form and foundation
3    and improper hypothetical and it's argumentative.
4    You can go ahead.
5  BY THE WITNESS:
6    A.  Why would I do that?  I'm asking.  If you
7  wanted me to -- if you wanted me to act as a copy
8  machine, I could have copied it, but I wouldn't do that.
9  I wouldn't just blank or flatly adopt his care plan.
10  BY MR. CRANE:
11    Q.  Well, he provided opinions as to life
12  expectancy, true?
13    A.  True.
14    Q.  He provides opinions as to what level of care
15  is appropriate for the child, true?
16    A.  True.
17    Q.  Did you do anything to try and incorporate the
18  opinions of Dr. Yarkony in terms of life expectancy or
19  the proper level of in-home care in -- in putting
20  together your life care plan, or did you simply rely
21  upon -- or did you discard his information or his -- his
22  opinions?
23    MR. LEIB:  Objection.  This has been asked and
24    answered.  It's argumentative.  And it misstates

Page 123

1  earlier testimony.
2    MR. WEIR:  Calls for multiple.
3    (Off-the-record reporter clarification.)
4  BY MR. CRANE:
5    Q.  Here, I'll ask it again.  In terms of
6  Dr. Yarkony's life expectancy opinions and his opinions
7  related to the appropriate level of care he thinks that
8  C.B. needs, did you incorporate those opinions in any
9  way into your life care plan?
10    MR. LEIB:  Object to the form of the question.
11    It's already been asked and answered.  And it's
12    multiple.
13    MR. WEIR:  It's also vague.
14  BY THE WITNESS:
15    A.  No.
16  BY MR. CRANE:
17    Q.  Okay.  Why not?  Why not?
18    A.  Did you ask -- oh, why not?  Because I don't
19  agree with them.
20    Q.  Thank you.
21    All right.  Do you agree with -- what do
22  you agree with regarding Dr. Simms's life expectancy
23  opinions?
24    A.  I --

33  (Pages 120 to 123)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 124

1    MR. LEIB: Object to the form of the question.
2  It's beyond the scope of the expertise of the
3  witness. This has been gone over in great detail
4  earlier in the deposition. It's argumentative.
5    You can go ahead.
6  BY THE WITNESS:
7    A. I agree with Dr. Simms' opinion because, to
8  me, it makes more sense. I am not qualified to give
9  opinions on life expectancy, but my experience with
10 children with CP and the issues that C.B. has is that
11 I have never seen one live beyond the age of 30.
12 BY MR. CRANE:
13   Q. How many children are in this group of
14 children you're referring to?
15   A. Twenty-five.
16   Q. Okay. And of those 25 children, how many are
17 children that you represented versus ones that you
18 prepared life care plans for?
19   A. Ten that I --
20     (Audio distortion.)
21   THE REPORTER: Sorry, sorry, sorry.
22   (Off-the-record reporter clarification.)
23 BY THE WITNESS:
24   A. Ten that I represented. And I think it was

Page 125

1  seven care plans. I can't -- now I'm getting confused.
2  But I also -- through -- through reading, I read a lot
3  of literature on cerebral palsy and studies regarding
4  life expectancy. And so through that reading, that's
5  been my experience.
6  BY MR. CRANE:
7    Q. Do you know what level of -- well, strike
8  that.
9      In addition to Cortney, the -- the
10 transcripts that we've talked about, you've looked at
11 the damage expert's Rule 26(a)(2) disclosures, I take
12 it?
13   A. Yes.
14   Q. Along with the Exhibits A through G?
15   A. Yes.
16   Q. You reviewed an excerpt to the plaintiff's
17 26(a)(2) disclosures?
18   A. Yes.
19   Q. Exhibits?
20     What -- what does that excerpt consist of?
21   A. Dr. Yarkony.
22   Q. Anything else?
23   A. And Doctor -- I don't remember if your
24 disclosures included Dr. Ward, but I did read his

Page 126

1  deposition.
2    Q. Okay. Then -- and -- and in terms of those
3  disclosures that we just went through, you -- you
4  reviewed those disclosures and you billed for your time
5  in reviewing them?
6    A. Yes.
7    Q. Okay. And then the medical chronology, that
8  was provided to you by counsel?
9    A. Correct.
10   Q. Was that the one that has -- it's -- it's
11 got -- in red at the top, it mentions that it's
12 attorney-client work product or attorney work product,
13 something like that? I've seen it before. I'm just
14 trying to --
15   A. At --
16   MR. LEIB: Yeah. It's the same one that was
17 given to you previously. We reserve our right to
18 object to it, our privilege to it, but we gave it
19 to you previously, and that's the same one.
20   MR. CRANE: Okay. That's -- I was just trying
21 to make sure it was the same one.
22 BY THE WITNESS:
23   A. But I -- I did not review the chronology. The
24 records, the -- what's in my life care plan is all

Page 127

1  generated by me, everything.
2  BY MR. CRANE:
3    Q. So you didn't -- you didn't look at the
4  medical chronology provided by counsel?
5    A. Correct.
6    Q. Okay. And then just moving forward with the
7  rest of this list as I scroll down, can you just tell me
8  what stuff you didn't look at?
9    A. What I did or did not?
10   Q. Did not. So beginning with the medical
11 chronology and just moving down so we can move a little
12 bit more quickly through this.
13     So you didn't look at the medical
14 chronology.
15     Plaintiff's (a)(2) disclosures from
16 12/16/19, did you look at those?
17   A. Yes.
18     (Off-the-record reporter clarification.)
19 BY MR. CRANE:
20   Q. All right. And then there's a series of
21 medical records, and I'm going to try and do this in one
22 bite. So from -- the first one I'm looking at is AA28
23 through 177 therapy notes, and then it goes all the way
24 down to N1-174 from Lurie's. Did you review, to the

Royal Reporting Services, Inc.
312.361.8851

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 128

1  extent you felt necessary, those records?
2      A. Yes.
3      Q. And did you bill for your time in that review?
4      A. Yes.
5      Q. Okay. Starting with the record "Babler,
6  C.B. J. Medical Recs Monroe Clinic, (certified, from
7  client)," right there, do you see that?
8      A. Yes.
9      Q. And then we're going to go all the way down
10 and take into account all the way down to "IME Report of
11 Mark Simms, MD." Do you see that there?
12     A. My screen cuts off with all -- my screen ends
13 with records from Monroe Clinic certified. I'm not --
14     Q. Okay. I'm trying to -- I'm on the next page.
15 Are you seeing me scroll at all now?
16     MR. CRANE: Anybody?
17     MR. LEIB: Yeah, I see you.
18     THE WITNESS: I --
19     MR. LEIB: I see that the final one on my
20  screen is IME report of Mark Simms.
21 BY MR. CRANE:
22     Q. Yeah. If you look at the very top --
23     A. Yes.
24     Q. Okay. At the very top is that last line, the

Page 129

1  Babler medical records certified, and then if you look,
2  there's a page break. There's, like, six other sets of
3  bills, and then there's the IME report of Mark Simms.
4  Do you see that there?
5      A. Yes.
6      Q. All right. So you -- have you reviewed those
7  records and bills and report to the extent you felt
8  necessary?
9      A. Yes.
10     Q. And you billed for your time in doing so?
11     A. Yes.
12     MR. LEIB: Ben, I know you've already asked --
13  excuse me. Just -- I know you've already asked her
14  about this. The 6- or 700 pages we got in from UW
15  last week or so, I don't know if that's on this
16  list.
17     MR. CRANE: It's not. It's not. I'm going to
18  ask her about it.
19     MR. LEIB: Okay. You'll just clarify that,
20  you know.
21 BY MR. CRANE:
22     Q. All right. So -- so we've gone through this
23 list of materials. In addition to this list of
24 materials, you've got about 600 pages of UW records in

Page 130

1  the last period of time. You've had a chance to review
2  those, I take it, to the extent you feel necessary?
3      A. Yes.
4      Q. And you either have or will bill for your time
5  in having done that review?
6      A. Yes.
7      Q. Aside from all the documents we've just talked
8  about, are there any other documents that you've
9  reviewed in coming to your conclusions in this case?
10     A. No.
11     Q. Okay. Are there any other documents that you
12 need to either complete your review or to make your
13 opinions more sound?
14     MR. LEIB: Object to the form of the question.
15         You can go ahead.
16 BY THE WITNESS:
17     A. Any report by a physician who comments on my
18 life care plan, either supportive or nonsupportive, I
19 would like to see that.
20 BY MR. CRANE:
21     Q. And thus far, you've seen nothing supportive
22 or not supportive regarding your life care plan from
23 some other physician or witness, true?
24     A. True.

Page 131

1      MR. LEIB: Object to the form of the question,
2  misstates the testimony. It's overbroad.
3  BY MR. CRANE:
4      Q. Did I hear you say "True"?
5      A. True.
6      MR. CRANE: Okay. Just give me one second.
7  I'm almost done.
8         All right. So -- all right. That's all I
9  have.
10     MR. LEIB: Okay. I just -- I've got about --
11        (Audio distortion.)
12        (Off-the-record reporter clarification.)
13     MR. LEIB: Can you hear me now?
14     MR. CRANE: Yes.
15     MR. LEIB: Okay. And it looks like the Zoom
16 thing went away, and now it's rebooting for -- for
17 reasons I'm not technically qualified to comment
18 on. But is everybody okay if -- if the court
19 reporter can hear me that we just -- let me just
20 ask my clarifications just hearing me?
21     MR. CRANE: Sure.
22     MR. WEIR: This is Weir. Yes.
23     MR. LEIB: Okay. I guess I'm back on. I -- I
24 see my own face.

35 (Pages 128 to 131)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 132

1      MR. CRANE: Hey, Todd -- can I interject one
2   second?  Todd, I promise you no one is ever going
3   to question who's talking when -- when you -- you
4   don't even have to announce your name.  You have --
5   you have the most distinctive voice I've ever
6   heard.  We know it's Weir.
7      MR. LEIB: Mary, can you see me now?
8      THE WITNESS: I cannot because that document
9   is still up on the screen.
10      MR. CRANE: Oh, I thought I --
11      THE REPORTER: I can -- I can see Mr. Leib
12   now.
13      MR. LEIB: Hey, Ben, it's the old document on
14   the screen trick, huh?
15      MR. CRANE: Yeah.  Sometimes better stuff ends
16   up there than others, you know.
17      MR. LEIB: Okay.  Are we okay now?
18      THE WITNESS: I still can't see you.  I can
19   see Todd and the court reporter.
20      MR. CRANE: I think we can -- go ahead.
21      MR. LEIB: I don't know -- I don't know if
22   it's necessary.  But if you look at "Speaker View,"
23   if you click "Speaker View," it'll -- it'll allow
24   you to see the speaker.  But is -- is it okay,

Page 133

1   Ms. Kolar, if we just go ahead, or do you want us
2   to --
3      THE WITNESS: Sure.  I can see you now.
4      MR. LEIB: Okay.  Good.
5           EXAMINATION
6   BY MR. LEIB:
7      Q.  So, Ms. Kolar, you were asked questions about
8   your life care plan.  First of all, do you have an
9   opinion to a reasonable life care planner certainty that
10   your life care plan was done with appropriate
11   methodology?
12        (Audio distortion.)
13      THE REPORTER: I'm sorry.  I didn't get an
14   answer.
15   BY THE WITNESS:
16      A.  I have an opinion.
17   BY MR. LEIB:
18      Q.  And what is that opinion?
19      A.  That it was.
20      Q.  Your life care plan, do you have an opinion to
21   a reasonable life care certainty that the information
22   contained in it is appropriate to the life care --
23   future life care of CB, which is the -- we're required
24   to use the initials of the child?

Page 134

1      MR. CRANE: Objection, foundation.
2      Go ahead.
3   BY THE WITNESS:
4      A.  Yes, I have an opinion.
5   BY MR. LEIB:
6      Q.  And what is that opinion?
7      A.  That it is.
8      Q.  The report of Dr. Simms that you reviewed is
9   dated May -- May 12th, 2020?
10      A.  Correct.
11      Q.  Yes.  Okay.  In that report, there
12   is reference to Dr. Simms' opinions that to a
13   reasonable degree of medical certainty, that
14   there is less than a 50 percent probability that
15   C.B. -- sorry, that CB will live to the age of
16   33 years by -- when you read that in the report and
17   based upon that opinion by Dr. Simms, did you
18   incorporate in your report the 33 years as -- as
19   being the point that he would probably not live
20   beyond based upon Dr. Simms' opinions?
21      A.  Yes.
22      Q.  You are not qualified, nor are you intending
23   to give opinions regarding life expectancy of the child;
24   is that fair?

Page 135

1      A.  That's fair.
2      Q.  Your background and experience you
3   were asked about by Mr. Crane tells you that
4   Dr. Yarkony's life expectancy -- normal life
5   expectancy, it transcends common sense in your
6   experience; is that fair?
7      MR. CRANE: Objection, foundation.
8   BY THE WITNESS:
9      A.  Yes.
10   BY MR. LEIB:
11      Q.  And have you told us on the record the basis
12   for your opinion in that regard?
13      A.  Yes.
14      Q.  Dr. Simms also notes in his report, "It is my
15   opinion that C.B. could be cared for appropriately in
16   a nursing home facility in the future."  Do you recall
17   reading that in his report?
18      A.  Yes.
19      Q.  And you made reference in this deposition to
20   the diligence that you utilized in determining that
21   Marklund Wadmon [sic] -- and that's M-a-r-k-l-u-n-d, new
22   word, Wadmon, W-a-d-m-o-n -- I think I spelled it
23   right -- is a -- an appropriate facility for CB to
24   reside at; is that correct?

36  (Pages 132 to 135)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 136

1    A.  Very appropriate, yes.
2    Q.  And that is a long care nursing home type
3  facility; is that correct?
4    A.  Yes.  It's a facility that is accredited for
5  caring for children and into their adulthood with
6  developmental disabilities.  So it's specifically geared
7  for taking care of kids like CB.
8    Q.  Okay.  Thank you.
9      And the -- the medical examination
10  assessment that was done by Dr. Simms, when you talked
11  to -- spoke with him on the phone, was there discussion
12  regarding his -- I think I may have muted -- yeah -- was
13  there discussion regarding the examination that he would
14  be doing?
15    A.  Yes.
16    Q.  And you tendered a listing of questions, and
17  it was disclosed in the rider then -- you tendered a
18  listing of questions that could be asked in lieu of your
19  going with some personal contact with mom during the
20  pandemic; is that correct?
21    A.  Yes.
22    Q.  And was it your understanding that this
23  examination by Dr. Simms was going to be videotaped
24  along with his discussion with mom?

Page 137

1    A.  Yes.
2    Q.  And you do not have the benefit of that
3  videotape or discussion with mom; is that correct?
4    A.  I do not.
5    Q.  All of that aside, do you feel that you have
6  had a fair and accurate opportunity -- even though you
7  didn't get the video recording of that examination and
8  discussion by Dr. Simms, do you feel that this life care
9  plan is appropriate and consistent with standard of care
10  methodology of life care planners as you've tendered it
11  in this case?
12    A.  Yes.
13      MR. LEIB:  That's all I have.  Thanks.
14      FURTHER EXAMINATION
15  BY MR. CRANE:
16    Q.  Can you let me know --
17      MR. CRANE:  I'm sorry.  Todd, do you want to
18  ask questions?
19      MR. WEIR:  No.
20  BY MR. CRANE:
21    Q.  Can you let me know -- the report of
22  Dr. Simms that you have, I've heard two different
23  dates and I want to make sure we're operating off
24  of the same one.  The report that you have, is it dated

Page 138

1  May 22nd?
2      MR. LEIB:  Let me just interrupt -- because
3  his report has May 22nd on the cover page, and then
4  at the -- at the header at the top of the page, it
5  says May 12th.  I just noticed that.  There's only
6  one report.  It's 13 of 13 pages, and I think we
7  could -- you know, we could probably determine
8  which is the accurate date.  But there is only one
9  report, to my knowledge.
10  BY THE WITNESS:
11    A.  And that's the report that I have seen.
12  BY MR. CRANE:
13    Q.  Okay.  And you've had -- again, you've had
14  this conversation with Dr. Simms about your work in this
15  case?
16    A.  Yes.
17    Q.  You have no notes from that conversation?
18      (Audio distortion.)
19      THE REPORTER:  I'm sorry.  I'm sorry.  I
20  didn't get an answer on that.
21  BY THE WITNESS:
22    A.  No.
23  BY MR. CRANE:
24    Q.  And just -- just for clarity, you have no

Page 139

1  notes from your conversation with Dr. Simms?
2    A.  No, I do not.
3      MR. WEIR:  Not unless you made them in the
4  last three hours.
5  BY MR. CRANE:
6    Q.  And what's your definition of qualified
7  experts, the -- the phrase that you use in your
8  report?
9    A.  Well, that would be someone with the requisite
10  education, training, and experience to express opinions
11  about which they have the requisite education, training,
12  and experience.
13    Q.  Okay.  So you've read Dr. Yarkony's
14  deposition.  Do you believe he's qualified to render the
15  opinions he's offered?
16      MR. LEIB:  Let me just object to the form of
17  the question and foundation.  It invades the
18  province of the jury.  They get to determine
19  whether or not he's credible.
20      MR. WEIR:  It's also overbroad.
21  BY THE WITNESS:
22    A.  My personal opinion of Dr. Yarkony is he's
23  qualified as a physician.  I don't know that he's
24  actually qualified as a life care planner.  He has not

37  (Pages 136 to 139)

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

| Page 140 |
|---|
| 1   taken any training as a life care planner, and his -- |

Page 140

1    taken any training as a life care planner, and his --
2    his report does not conform to the standards of a
3    certified life care planner.
4    BY MR. CRANE:
5      Q. If you're not -- if you don't have a
6    foundation without M.D. blessing to offer future medical
7    care beginning at -- at -- at 13, how is it that you're
8    able to offer the appropriate in-home care -- opinions
9    as to the appropriate in-home care for the entire
10    lifetime?
11      MR. LEIB: It's been asked and answered.
12    BY THE WITNESS:
13      A. Because medical care involves physicians, the
14    frequency that the -- or other providers, getting
15    medications, that type of thing, orders.
16      In-home care is more of an
17    assessment-based, what kind of care, what level of care
18    does this child need that would be safe and would follow
19    his needs if there should be any kind of foreseeable
20    medical emergency. That does --
21      (Audio distortion.)
22      (Off-the-record reporter clarification.)
23    BY THE WITNESS:
24      A. And I said a physician is not required to set

Page 141

1    the foundation for that -- for the level of care that
2    C.B. -- excuse me -- CB needs.
3    BY MR. CRANE:
4      Q. You believe that a medical opinion is
5    unnecessary to set what level of care CB needs, true?
6      MR. LEIB: Objection. It's --
7    BY THE WITNESS:
8      A. Correct.
9      MR. LEIB: -- argumentative. It's been asked
10    and answered.
11      Go ahead.
12      MR. WEIR: It's also overbroad.
13      MR. LEIB: Did you get the answer, Mary?
14    BY THE WITNESS:
15      A. I said -- I -- to answer his question, I don't
16    believe a physician has to have foundation for the level
17    of care in home that CB needs.
18      MR. CRANE: All right. That's all I have.
19      MR. LEIB: Okay.
20      MR. CRANE: I'm done.
21      MR. LEIB: Okay.
22      MR. WEIR: All right, everyone. Take care.
23      MR. LEIB: Let me just ask, what -- what are
24    we -- what are we going to do with the exhibits on

Page 142

1    this?
2      MR. CRANE: The court reporter has them all,
3    and I -- I'm asking her to attach them.
4      MR. LEIB: Okay. That's good.
5      THE VIDEOGRAPHER: The time now is 1:47 p.m.
6    We are off the video record. That's the end of the
7    deposition.
8      (The deposition concluded at 1:48 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Royal Reporting Services, Inc.
312.361.8851

Cortney Kaiser v. The Monroe Clinic, Inc.; et al.
Deposition of Mary Kay Kolar, R.N. - Taken 6/24/2020

Page 143

1                  REPORTER'S CERTIFICATE

2

3          I, Mary T. Murphy McGuirk, a Certified

4    Shorthand Reporter of the State of Illinois, do hereby

5    certify that the foregoing was reported by stenographic

6    and mechanical means, which matter was held on the date,

7    and at the time and place set out on the title page

8    hereof, and that the foregoing constitutes a true and

9    accurate transcript of same.

10             I further certify that I am not related to

11   any of the parties, nor am I an employee of or related

12   to any of the attorneys representing the parties, and I

13   have no financial interest in the outcome of this

14   matter.

15             IN WITNESS WHEREOF, I do hereunto set my hand

16   in Tinley Park, Illinois, this 26th day of June, 2020.

17

18

19        *Mary T. Murphy-McGuirk*

20

21             Mary T. Murphy McGuirk

22             Certified Shorthand Reporter

23             CSR Certificate No. 84-4160

24

Royal Reporting Services, Inc.
312.361.8851